## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————
KASHIF AFTAB,

                Plaintiff,

        v.

EMILIO T. GONZALEZ, Director,
U.S. Citizenship and Immigration Services, <u>et al.</u>

              Defendants.
—————————————————————

)
)
)
)
)
)
)
)
)
)
)
)

Case Number: 1:07-CV-2080-RWR

### MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER

Defendants Emilio T. Gonzalez, et al., through undersigned counsel, hereby move for dismissal of the complaint pursuant to Rule 12(b)(1) for lack of jurisdiction.  In the alternative, Defendants move that the case be transferred to the Northern District of Texas.  A proposed order and memorandum of points and authorities are attached hereto.

Dated: February 22, 2008

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_____
BRANDON L. LOWY
Special Assistant United States Attorney
555 Fourth St., N.W.
Washington, DC  20530
Phone: (202) 307-0364 Fax: (202) 514-8780
Brandon.Lowy@usdoj.gov

Attorneys for Defendants

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
KASHIF AFTAB,                             )
                                          )
              Plaintiff,                   )
                                          )
       v.                                 )
                                          )    Case Number: 1:07-CV-2080-RWR
EMILIO T. GONZALEZ, Director,             )
U.S. Citizenship and Immigration Services, <u>et al.</u>  )
                                          )
              Defendants.                  )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR IN THE
ALTERNATIVE TO TRANSFER**

<u>**INTRODUCTION AND SUMMARY**</u>

Plaintiff, Kashif Aftab asks this Court to order United States Citizenship and Immigration

Services ("USCIS") to complete its adjudication of his Form I-485 "adjustment of status"

application. Plaintiff also seeks lawful permanent resident status.  USCIS has not completed its

adjudication of Plaintiff's I-485 application because it requires further inquiry by USCIS in light of

the information obtained through the security check process.  Congress has expressly withdrawn

federal court jurisdiction over the discretionary judgments, actions, and decisions USCIS makes

when reviewing petitions for immigration benefits.  Hence, the Court lacks jurisdiction to

intervene in the adjudication process, and Plaintiff's complaint should be dismissed.

In the alternative, Defendants move to transfer this case to the United States District

Court for the Northern District of Texas.  Plaintiff resides in Texas, and the only nexus between

this District and the case is the fact that the agency heads named as defendants have offices in

D.C.  However, most of the events giving rise to this complaint — namely, the processing and

adjudication of Plaintiff's I-485 — involve adjudicative actions that have been and will be taken

by USCIS staff at the Texas Service Center.  Accordingly, the Northern District of Texas is a

more appropriate forum for this case than this Court, and the interests of justice support transfer.


## BACKGROUND

### A.    Statutory and Regulatory Background

#### 1.    Adjustments of Status and Background Investigations

The Immigration and Nationality Act permits the Attorney General "in his discretion and

under such regulations as he may prescribe," to adjust the status of an alien "to that of an alien

lawfully admitted for permanent residence."  8 U.S.C. § 1255(a).  Aliens that seek such

adjustments of status file applications referred to as an "I-485."  The procedures for admitted

aliens to apply for adjustment of status are set forth at 8 C.F.R. part 245.

USCIS processes adjustment applications in chronological order based on the date of

receipt.  Neither the statute nor the regulations establish a time frame in which adjudication must

occur.  The applicant must show that (s)he is not inadmissible to the United States under any

statutory ground of inadmissibility set forth at section 212(a) of the Immigration and Nationality

Act, 8 U.S.C. § 1182(a), including health-related, criminal, terrorist, and other grounds.  See 8

U.S.C. § 1255(a)(2).  An alien seeking adjustment of status bears at all times the burden of

persuading the Attorney General to exercise his discretion in the alien's favor.  See Randall v.

Meese, 854 F.2d 472, 474 (D.C. Cir. 1988); Jain v. Immigration and Naturalization Service, 612

F.2d 683, 687 (2d Cir. 1979); see generally Elkins v. Moreno, 435 U.S. 647, 667 (1978) ("...

adjustment of status is a matter of grace, not right ...").

3

Before a decision is rendered on an alien's I-485 application for adjustment of status, USCIS requests that the FBI conduct a national security screening. <u>See</u> Declaration of Genize Walker, ¶ 9 (Exh. 1) ("Walker Decl."). These checks currently include: (a) an FBI fingerprint check for relevant criminal history records on the applicant; (b) a check against the Interagency Border Inspection System (IBIS), which is managed by the Department of Homeland Security and contains records and "watch list" information from more than twenty law enforcement and intelligence agencies; and (c) an FBI name check. <u>See Id.</u> ¶ 9; <u>see also</u> 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison" with the Directors of the FBI and CIA to obtain and exchange information for use in enforcing the INA and in the interest of the internal and border security of the United States). When the FBI searches a person's name, the name is electronically checked against the FBI's Universal index. Declaration of Michael Cannon, ¶ 11 (Exh. 2) ("Cannon Decl."). The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, for both "main" (subject of an FBI investigation) files and "reference" (individual whose name appears as part of an FBI investigation, including associates, witnesses, and conspirators) files. <u>See Id.</u> There may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. <u>Id.</u> If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. <u>Id.</u> ¶ 12. These security checks sometimes raise issues impacting an applicant's eligibility for the benefit sought from USCIS. <u>See</u> Walker Decl. ¶ 9. The FBI forwards a summary of any derogatory information retrieved

during its name check to USCIS.  See Cannon Decl. ¶ 17.  In those cases, USCIS must conduct further inquiry to resolve any outstanding issues.  Walker Decl. ¶ 9.

In many cases, adverse information related to an applicant or beneficiary that is obtained through a security check requires further inquiry by USCIS, including outreach to the originating agency to determine whether the information is relevant to eligibility for the requested immigration benefit or may lead to other information bearing on eligibility. Id. ¶ 12.  USCIS frequently must take additional steps to fully assess an applicant's background, such as an interview, a written request for additional information, or a field investigation. See id.  The background checks are not considered complete until USCIS conducts a comprehensive review of any identified criminal or national security issues and any such issues are resolved.  Id. USCIS then completes the adjudication, issues its decision and takes any further action appropriate under the circumstances.  Id.

### 2.    Judicial Review of Immigration-Related Decisions

In 1996, Congress passed legislation to reduce, and in some cases eliminate, judicial review of certain immigration-related decisions made by the former Immigration and Naturalization Service ("INS").  See Sec. 306, Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009 (September 30, 1996).  In particular, 8 U.S.C. § 1252(a)(2)(B)(ii), divests courts of jurisdiction to review any "decision or action of the Attorney General the authority for which is specified … to be in the discretion of the Attorney General, other than the granting of [asylum]."

Because some courts, contrary to Congress' desires, found that this jurisdiction-stripping bar applied only to discretionary decisions made during removal (deportation) proceedings, on

May 11, 2005, Congress amended Section 1252(a)(2)(B)(ii) to clarify that its proscription against

judicial review applies regardless of whether the discretionary judgment, decision or action is

made in removal proceedings.  <u>See</u> Section 101(f), Real ID Act of 2005, Pub. L. 109-13, Div. B,

119 Stat. 231; <u>see also</u> House Conference Report 109-72 at 170 (May 3, 2005).  The REAL ID

Act also added references to the Secretary of Homeland Security consistent with the

reorganization of INS (under the Attorney General and U.S. Department of Justice) into USCIS

(under the Department of Homeland Security).  <u>Id.</u>  After passage of the Real ID Act, the statute

reads as follows:

> (B) Denials of discretionary relief
>
> Notwithstanding any other provision of law (statutory or nonstatutory) . . .
> and regardless of whether the judgment, decision, or action is made in removal
> proceedings, no court shall have jurisdiction to review-
> (i) any judgment regarding the granting of relief under section 1182(h),
> 1182(I), 1229b, 1229c, or 1255 of this title, or
> (ii) any other decision or action of the Attorney General or the Secretary of
> Homeland Security the authority for which is specified under this subchapter to be
> in the discretion of the Attorney General or the Secretary of Homeland Security,
> other than the granting of relief under section 1158(a) of this title.

8 U.S.C. 1252(a)(2)(B).

### B.    Plaintiff's Application

Plaintiff Kashif Aftab, a national of Pakistan, filed a Form I-485 application to register

permanent residence or adjust status on October 4, 2002.  <u>See</u> Compl. ¶ 2, 10; Walker Decl. ¶ 6.

That application was filed with USCIS's Vermont Service Center.  Compl. at ¶ 15.  Plaintiff

Aftab attended fingerprint appointments on December 3, 2002, and August 21, 2004.  Compl. at

¶ 15, 16.  Plaintiff responded to a USCIS Request for Evidence on November 23, 2004.  Compl.

at ¶ 16.  On August 8, 2005, and August 8, 2006, Plaintiff filed change of address forms with

USCIS, indicating that he had moved to a new address in Texas.  Compl. at ¶ 17.  On February 24, 2007, USCIS transferred Plaintiff's adjustment of status application to its Texas Service Center for further processing.  Compl. at ¶ 18.  Plaintiff responded to a second USCIS Request for Evidence on April 16, 2007.  Compl. at ¶ 20.  Plaintiff Aftab attended a third fingerprint appointment on May 11, 2007.  Id.  On October 12, 2007, Plaintiff wrote to the Texas Service Center to indicate his intention to file a Writ of Mandamus.  Compl. at ¶ 21.

USCIS submitted fingerprint checks of the applicant to the FBI on or around December 3, 2002, which were received by the FBI on December 29, 2002.  See Walker Decl. ¶ 14; Cannon Decl. ¶ 41.  USCIS received the results of that fingerprint check from the FBI on or around September 21, 2006.  See Walker Decl. ¶ 14.  The information received to date requires further inquiry and review.  Id.  USCIS is making every effort to promptly adjudicate Plaintiff's adjustment of status application.  Id.

Plaintiff initiated this action with a mandamus complaint filed on November 15, 2007. Plaintiff asks the Court to compel Defendants to perform their duty to adjudicate the Plaintiff's adjustment of status application without further delay.  Compl., Prayer ¶ a.

## STANDARD OF REVIEW

Defendants move for dismissal under Rule 12(b)(1) because the Court lacks subject matter jurisdiction to review Plaintiff's claim.  See Fed. R. Civ. P. 12(b)(1).  When reviewing a 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor."  Thompson v. Capitol Police Bd., 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); see also Vanover v. Hantman, 77

F. Supp.2d 91, 98 (D.D.C. 1999). "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." Rann v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C. Cir. 2003). In addition, plaintiffs bear the burden of persuasion, and must establish subject-matter jurisdiction "by a preponderance of the evidence." Thompson, 120 F. Supp.2d at 81; Vanover, 77 F. Supp.2d at 98. To determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. See Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992); Rann, 154 F. Supp. at 64.

## ARGUMENT

## I.    THE COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW PLAINTIFF'S CLAIM.

"Federal courts are courts of limited jurisdiction . . . [and] possess only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994); see also Shaffer v. Veneman, 325 F.3d 370, 372 (D.C. Cir. 2003) (noting that district courts "have only such jurisdiction as the Constitution and the Congress grant them"). The statutes cited in the complaint do not establish a statutory basis for the Court to exercise jurisdiction over this case. The Court lacks jurisdiction to review Plaintiff's challenge to USCIS's processing of his I-485 application because Section 1252 of the INA precludes judicial review of USCIS's "judgments" on applications for adjustment of status, and of numerous other discretionary decisions and actions involving immigration-related applications and proceedings.

8 U.S.C. § 1252(a)(2)(B).  That provision applies "notwithstanding any other provision of law," thereby trumping any alternative source of jurisdiction.  <u>Id.</u>  USCIS has broad discretion to determine the pace and manner of adjudicating adjustment of status applications.  Accordingly, there would be no Administrative Procedures Act ("APA") or mandamus jurisdiction over Plaintiff's challenge to that process even if the INA did not preempt other sources of jurisdiction.

**A.    8 U.S.C. § 1252(a)(2)(B) Divests This Court of Jurisdiction Over Plaintiff's Challenge to USCIS's Adjudication of His Application.**

Section 1252(a) of the INA expressly precludes judicial review of adjustment of status applications and other discretionary decisions.  As noted <u>supra</u>, Section 1252(a)(2)(B), provides that "no court shall have jurisdiction to review:"

> (i)    any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
> (ii)    any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this title to be <u>in the discretion of the Attorney General or the Secretary of Homeland Security,</u> . . . .

8 U.S.C. § 1252(a)(2)(B) (emphasis added).   In seeking to compel the adjudication of an adjustment of status application under 8 U.S.C. § 1255, Plaintiff's claims fall squarely within the plain meaning of each of these terms.

Section 1252(a)(2)(B)(ii) divests this Court of subject matter jurisdiction over Plaintiff's claim because the adjudication of an adjustment of status application is a discretionary action and decision.  "[T]his subchapter" refers to Subchapter II of Chapter 12 of Title 8 of the U.S. Code, which is composed of 8 U.S.C. §§ 1151 through 1378.  Section 1255(a), which grants the Attorney General discretionary authority to adjudicate adjustment of status applications, is thus part of Subchapter II.  The "authority" for adjudicating adjustment of status applications is

expressly "in the discretion of the Attorney General," pursuant to Section 1255(a).  See 8 U.S.C.

§ 1255(a) (providing that an alien's status "*may* be adjusted by the Attorney General, *in his*

*discretion* and under such regulations as he may prescribe."  Id. (emphasis added)).  The statute

provides no time frame for the adjudication of I-485 applications, and gives the Attorney General

complete discretion to prescribe any appropriate regulations.  See Id.  The Attorney General's

discretion over the process of adjudicating an I-485 necessarily extends to the assessment of

when, whether, and how to grant that application.

        Plaintiff Aftab is seeking judicial review of both an agency decision and agency action.

USCIS has, at this time, made a *decision* that it cannot immediately complete its adjudication of

Aftab's application because it requires further inquiry by USCIS in light of the information obtained

through the security check process.  This case also involves agency *action*.  The word "action" is

not limited to a single act, but also includes an ongoing process or a series of acts.  See Safadi,

466 F. Supp. 2d at 699 (citing Black's Law Dictionary 28 (6th ed. 1990) defining action as

"[c]onduct; behavior; something done; the condition of acting; an act or series of acts."); see also

Grinberg v. Swacina, 478 F. Supp. 2d 1350, 1352 (S.D. Fla. 2007) (finding initiation of

background checks was action); Zhang v. Chertoff, 491 F. Supp. 2d 590, 594 (W.D. Va. 2007)

("the preclusion of judicial review over a discretionary act of USCIS encompasses . . . the pace

of this process").  As explained in the Walker declaration, USCIS is engaged in the continuing

"action" of adjudicating Aftab's adjustment application by inquiring as to whether information

obtained by the FBI security check is relevant to his eligibility.  See Walker Decl. ¶ 12.  Thus

this is not a case in which an agency has refused to act.  Instead, the alleged delay is a direct

consequence of USCIS's conclusion that national security interests preclude it from completing

its adjudication of Aftab's application until its own inquiries following the FBI background investigations are complete.  See Sayyadinejad v. Chertoff, 2007 WL 4410356, at *5 (S.D. Cal. Dec. 14, 2007); see also Li v. Chertoff, 482 F. Sup. 2d 1172, 1177-78 (S.D. Cal. 2007).

At bottom, Aftab takes issue with the fact that USCIS is still engaging in investigative and evaluative activities to determine his eligibility.  He would have the Court order USCIS to "immediately" adjudicate his application, notwithstanding the need for these critical inquiries and notwithstanding that the decision whether to grant adjustment of status and when to do so is completely discretionary.  However, USCIS's *decision* to continue evaluating Plaintiff's application and the *action* it is taking in doing so lie within the discretion of the Attorney General under § 1255(a).  Thus Section 1252(a)(2)(B)(ii) precludes judicial intervention in USCIS's adjudicative process.  The withdrawal of subject matter jurisdiction in this regard is consistent with the well-established proposition that judicial review in immigration matters is narrowly circumscribed, see Reno v. Flores, 507 U.S. 292 (1993), and that control over immigration is largely entrusted to the political branches of the government, see United States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982); Mathews v. Diaz, 426 U.S. 67, 81 (1976).

That statutory language has led numerous courts to conclude that Section 1252(a)(2)(B)(ii) bars judicial review of claims challenging aspects of the I-485 adjudicative process.  See, e.g., Luo v. Keisler, 521 F. Supp. 2d 72 (D.D.C. 2007) (discussing Section 1252(a)(2)(B) and granting motion to dismiss action to compel adjudication of plaintiffs' I-485s); Orlov v. Howard, 523 F.Supp.2d 30, 36 (D.D.C. 2007) ("Therefore, because the adjustment process, including the pace of processing applications, falls within the discretion of USCIS, and because the pace of processing applications, including completing security checks, constitutes an

"action" under the plain meaning of the word, judicial review of plaintiff's claim is precluded by § 1252(a)(2)(B)(ii)."); Sun v. Gonzales, 1:07-cv-00504 (JDB), Order, December 10, 2007 (Pacer Dkt. 12) at 3 ("Because 8 U.S.C. § 1252(a)(2)(B)(ii) divests federal courts of jurisdiction to review a discretionary decision or action of USCIS, and an 'action' includes any discretionary act or series of acts within the adjustment of status process (including the pace of completing various security checks), this Court lacks jurisdiction over plaintiff's petition.") (Exh. 3); Grinberg v. Swacina, 2007 WL 840109 (S.D. Fla. March 20, 2007) (discussing Section 1252(a)(2)(B) and granting motion to dismiss); Safadi v. Howard, 466 F. Supp. 2d 696 (E.D. Va. 2006) (same); Sharkey v. Ganter, 2006 WL 177156 (S.D.N.Y.) (same); Dinsey v. Department of Homeland Security, No. 03-10081, 2004 WL 1698630, at * 4 (S.D.N.Y. 2004) (finding no jurisdiction over action to compel USCIS to adjudicate adjustment of status application because the INA "expressly places the adjustment of immigration status within the discretion of the Attorney General); see generally Zhu v. Gonzales, 411 F.3d 292, 294-96 (D.C. Cir. 2005) (concluding 1252(a) precludes judicial review of Attorney General's discretionary decision to  require party to obtain labor certification prior to obtaining a work visa); Mahaveer, Inc. v. Bushey, No. 04-1275, 2006 WL 1716723, at *3-*4 (D.D.C. June 19, 2006) (concluding 1252(a) bars review of discretionary denial of visa).

Defendants recognize that federal district courts are split on this issue, and that some judges have concluded that they have jurisdiction to review the reasonableness of any delays in completing adjudication of an I-485 petition.  Compare, e.g., Liu v. Novak, No. 07-263, 509 F. Supp. 2d 1 (D.D.C. 2007) (exercising jurisdiction over claim alleging unreasonable delay in resolving adjustment of status application); Alsharqawi v. Gonzales, No. 06-1165, 2007 WL

1346667 (N.D. Tex. Mar. 14, 2007) (same) with Luo, 521 F. Supp. 2d at 72 (dismissing claim

alleging unreasonable delay in resolving adjustment of status application for lack of jurisdiction);

Orlov, 523 F.Supp.2d at 36 ("judicial review of plaintiff's claim of delay in the adjustment

process is precluded by § 1252(a)(2)(B)(ii)"); Sun, 1:07-cv-00504 (JDB), Order, December 10,

2007 (Pacer Dkt. 12) at 3 ("this Court lacks jurisdiction to review the ongoing pace at which

plaintiff's application [Form I-485] is being adjudicated."); Elzer v. Mueller, No. 07-01666, 2007

WL 1221195 (E.D. Pa. Apr. 23, 2007) (dismissing challenge for lack or jurisdiction); Grinberg,

478 F. Supp. 2d at 1352 (same).  However, the D.C. Circuit has not yet addressed the issue, and

the other courts' rulings are not binding on this Court.  As the foregoing discussion makes clear,

the INA's jurisdiction-stripping provisions are best read as precluding judicial review of Plaintiff

Aftab's claims concerning the adjustment of status application. "[T]he determination that §

1252(a)(2)(B)(ii) precludes judicial review over plaintiff's claim is further supported by the

general rule that courts should refrain from interfering with matters of immigration and national

security."  Orlov, 523 F.Supp.2d at 36.

**B.    No Other Statute Gives the Court Jurisdiction to Review Plaintiff's**
**Challenge to the Pace of the Adjudication of His I-485 Application.**

Even if some other statute conferred jurisdiction to review Plaintiff's request for

immediate adjudication of his application, the INA would foreclose the exercise of that

jurisdiction because it applies "notwithstanding any other provision of law (statutory or

nonstatutory)." 8 U.S.C. § 1252(a)(2)(A); see Luo, 521 F. Supp. 2d at 74 n. 4 (citing INA and

noting that it specifically precludes judicial review "notwithstanding any other provision of

law"); Orlov, 523 F.Supp.2d at 34 ("under 8 U.S.C. § 1252(a)(2)(B)(ii) Congress clearly

intended to preclude judicial review in this situation [delays in the adjustment process]"); Sun,

1:07-cv-00504 (JDB) at 3 (citing INA and noting that it "divests federal courts of jurisdiction to

review a discretionary decision or action of USCIS"); Danilov v. Aguirre, 370 F. Supp. 2d 441,

445 (E.D. Va. 2005) (Ellis, J.) ("[I]t is well settled that general grants of jurisdiction may not be

relied upon to expand a very specific statute that either grants or limits jurisdiction.").  However

there is no alternative source of jurisdiction in this case.  The Mandamus Act does not apply

because the process of adjudicating Plaintiff's application involves discretionary acts and

decisions.  The Administrative Procedure Act is inapplicable for similar reasons.  The FBI has

plenary discretion over the terms on which its national security investigations are conducted.

Accordingly, neither the Mandamus Act nor the APA empowers this Court to compel the FBI to

complete its investigation of Plaintiff's background within 30 days or any specific period of

time.

      1.     The Mandamus Act Does Not Confer Jurisdiction Because the

               Adjudication of Plaintiff's Application Is A Discretionary Process.

The Mandamus Act would not confer subject matter jurisdiction even if the jurisdiction-

stripping provisions of INA § 242 did not apply.  That statute gives district courts "original

jurisdiction of any action in the nature of mandamus to compel an officer or employee of the

United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary

causes." Cheney v. United States District Court, 542 U.S. 367, 380 (2004) (internal quotations

and citation omitted); accord Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980).

District courts may issue a writ of mandamus only if three elements are met: "(1) the plaintiff has

14

a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff."  In re Medicare Reimbursement Litigation, 414 F.3d 7, 10 (D.C. Cir. 2005); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984) (noting that defendant must owe plaintiff "a clear nondiscretionary duty" and that all other remedies must be exhausted).  Even when those factors are present, "a court may grant relief only when it finds 'compelling equitable grounds.'"  In re Medicare Reimbursement Litigation, 414 F.3d at 10.

Here, Plaintiffs lack a clear right to immediate adjudication, and Defendants have no clear mandatory or ministerial obligation to adjudicate the applications or complete background checks within a particular time frame.  See Luo, 521 F. Supp. 2d at 74 n.4; Orlov, 2007 WL 4293490 at 37; Sun, 1:07-cv-00504 (JDB) at 4; Safadi v. Howard, 466 F.Supp.2d at 700; Grinberg, 478 F. Supp. 2d at 1354.  The decision whether to grant or deny Aftab's adjustment application is plainly discretionary by statute.  See 8 U.S.C. § 1255(a).  Surely, that discretion permits USCIS to enforce a background check requirement thereby ensuring that immigration benefits are not granted to an alien ineligible for the benefit due to fraud, criminal convictions, or national security matters.  There are no statutory provisions or regulations that mandate the adjudication of adjustment applications within a particular time frame.  Consequently, USCIS has no clear, mandatory duty to finish adjudicating Plaintiff's application prior to completion of background checks, or by a prescribed deadline.  Likewise, Plaintiff can point to no clear and indisputable right to have the background checks completed within a specific time frame.  See Shalabi v. Gonzales, No. 06-866, 2006 WL 3032413, at * 5 (E.D. Mo. Oct. 23, 2006) (denying plaintiff's request that the court compel that plaintiff's background check be expedited).  Those factors have led numerous district courts to find that mandamus relief is unavailable in cases

such as this.  See, e.g., Orlov, 523 F.Supp.2d at 37; Sun, 1:07-cv-00504 (JDB) at 4; Li, 482 F.

Supp. 2d at 1177; Grinberg, 478 F. Supp.2d at 1354; Safadi, 466 F. Supp.2d at 700; Saleh v.

Ridge, 367 F. Supp.2d 508, 511 (S.D.N.Y. 2005); Karan v. McElroy, No. 02 Civ. 6678 (JGK),

2003 WL 21209769, at *1 (S.D.N.Y. May 23, 2003); Zheng v. Reno, 166 F. Supp.2d 875, 880

81 (S.D.N.Y. 2001); Sadowski v. INS, 107 F.Supp.2d 451, 453 (S.D.N.Y. 2000).  This Court

should do the same.

> 2.    The Administrative Procedures Act Does Not Permit This Court to
>        Review Plaintiff Aftab's Challenge to USCIS's Processing of His
>        Application.

Plaintiff also has no right to judicial review under the APA.  Although the APA is not an

independent source of subject matter jurisdiction, it operates in tandem with federal question

jurisdiction under 28 U.S.C. § 1331 to permit courts to review challenges to certain agency

actions.  See Califano v. Sanders, 430 U.S. 99, 107 (1977); Grinberg, 478 F. Supp. 2d at 1355;

Galluci v. Chao, 374 F. Supp. 2d 121, 128 (D.D.C. 2005).  However, the APA expressly

precludes judicial review of agency actions in two circumstances: (1) if another statute

"preclude[s] judicial review;" and (2) when "agency action is committed to agency discretion by

law."  5 U.S.C. § 701(a)(2); Brock v. Pierce County, 476 U.S. 253, 260 n.7 (1986).  Both factors

prevent Plaintiff from using the APA as a means of challenging USCIS's processing of his

application and/or the FBI's processing of Aftab's background checks.

First, as discussed above, the INA bars judicial review of challenges to the adjustment of

status adjudication process.  Accordingly, Section 701(a) of the APA, which "withdraws [an

APA] cause of action" to the extent another statute "precludes judicial review," prevents Plaintiff

from raising an APA challenge concerning the adjudication of his adjustment of status application. Block v. Community Nutrition Inst., 467 U.S. 340, 345 (1984); see 5 U.S.C. § 701(a); Beyond Pesticides v. Whitman, 360 F. Supp. 2d 69, 71 (D.D.C. 2004); see generally Bruno v. Albright, 197 F.3d 1153, 1161-62 (D.C. Cir. 1999) (concluding that "the immigration laws preclude judicial review of consular visa decisions" and therefore bar APA challenges to a visa decision). Section 702 forecloses judicial review of Plaintiff's challenge to the adjudication of his application for the same reason, as it provides that "nothing herein affects other limitations on judicial review . . . or confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702.

Second, the APA bars judicial review of all of Plaintiff's claims because the USCIS actions Plaintiff has challenged are discretionary. The APA generally permits challenges to "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); see also 5 U.S.C. § 555(b) (indicating that agencies should conclude matters "within a reasonable time"). However, such claims are unreviewable by the courts if the relevant agency action is "committed to agency discretion by law." Id. § 701(a)(2); see also Orlov, 523 F.Supp.2d at 37 (quoting Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004) ("a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."). In Heckler v. Chaney, the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so that the court would have no meaningful standard against which to judge the agency's exercise of discretion." 470 U.S. 821, 830 (1985). As the Court explained, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate

agency action for 'abuse of discretion.'"  Id.; see also Steenholdt v. Federal Aviation Admin., 314 F.3d 633, (D.C. Cir. 2003) (articulating same standard).  "The principal purpose of the APA limitations . . . and of the traditional limitations upon mandamus from which they were derived-is to protect agencies from undue judicial interference with their lawful discretion . . . ."  Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004).

Plaintiff has no APA cause of action for "unreasonable agency delay" against USCIS because the timing of USCIS's adjudication of his application --- which includes its review of the information yielded through the security investigations --- is expressly committed to agency discretion, as are all other aspects of processing the applications.  Section 1255(a) permits the Attorney General to adjust an alien's status "*in his discretion* and under such regulations as he may prescribe."  8 U.S.C. § 1255(a) (emphasis added).  That is the type of "plenary" grant of discretion which renders agency actions unreviewable under the APA.  Secretary of Labor v. Twentymile Coal Co., 456 F.3d 151, 157 (D.C. Cir. 2006).  No statutory or regulatory provisions provide a "meaningful standard" against which to measure USCIS's process of adjudicating such an application.  Heckler, 470 U.S. at 830.  Rather, the agency maintains complete discretion to determine "how and when" to adjudicate the application.  See Id.  In contrast with certain other immigration provisions, e.g., 8 U.S.C. § 1447(b), the statute and regulations governing Plaintiff Aftab's adjustment of status application provide no time frame for when such an application must be adjudicated.  See Orlov, 523 F.Supp.2d at 37 ("[T]here are no statutory guidelines compelling USCIS to adjudicate adjustment of status applications within a certain period of time.");  Zheng, 166 F.Supp.2d at 879 ("[T]here is no requirement that the application be decided within a specific period of time[.]").  Consequently, there is no standard against which the Court

can measure whether USCIS has acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication, Id. § 706(1).  The fact that the adjudicatory process is committed to agency discretion by law renders claims relating to alleged delays in the adjudication of an adjustment of status application unreviewable under the APA.  See Luo, 521 F. Supp. 2d at 74 n.4; Orlov, 523 F.Supp.2d at 37; Sun, 1:07-cv-00504 (JDB) at 4; Safadi, 466 F.Supp.2d at 700; Zheng, 166 F.Supp.2d at 878 89; Karan, 2003 WL 21209769, at *1 ("[B]ecause decisions regarding the plaintiff's immigration status are committed to the discretion of the INS, this Court lacks the authority under . . . the APA to grant the relief the plaintiff seeks."); see also Rahman v. McElroy, 884 F. Supp. 782, 787-88 (S.D.N.Y. 1995).   In addition, at least two Supreme Court cases suggest that the presence of a specified time period triggers courts' ability to compel agency action that is "unreasonably delayed" under § 706(1).  See Norton, 542 U.S. at 65 ("Thus, when an agency is compelled by law to act within a certain time period . . . a court can compel the agency to act . . . ."); Brock, 476 U.S. at 260 n.7 (finding that because "the statutory command that the Secretary 'shall' act within 120 days does not commit such action to the Secretary's discretion, . . . [t]he court would have the authority to 'compel agency action unlawfully withheld or unreasonably delayed,' § 706(1)").

Without any mandatory time frame to adjudicate Plaintiff's claim that USCIS has "unreasonably delayed" adjudication of the applications and the processing of Aftab's background checks, this Court would have to create a temporal standard out of whole cloth.  This is a perilous task given the national security considerations that permeate USCIS's adjudicative process and the obvious national security interest in thorough and complete background checks. See Orlov 523 F.Supp.2d at 36 (declining "to impose an arbitrary deadline on USCIS for the

completion of such investigations" because "[i]nterference by this Court . . . could have national security implications"); see also Sayyadinejad v. Chertoff, 2007 WL 4410356, at *5 (S.D. Cal. Dec. 14, 2007) (recognizing that "any delay in adjudicating Plaintiff's adjustment of status application is not due to agency inaction, but rather to the time required to resolve all concerns of a … national security nature").  It is a well established proposition that judicial review of immigration matters is narrowly circumscribed, and that control over immigration is largely entrusted to the political branches of the government.  See Valenzuela Bernal, 458 U.S. at 864; Diaz, 426 U.S. at 81 ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.").  Moreover, as other courts have cautioned, in "'matters solely within the INS's discretion[,] . . . aside from our powerlessness to intervene, the judicial creation of such a duty would have the potential for mischievous interference with the functioning of already overburdened administrative agencies.'" Rahman, 884 F. Supp. at 787 (quoting Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1182 (2d Cir. 1978)); see also Heckler, 470 U.S. at 831 82 (noting that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities"); Luo, 521 F. Supp. 2d at 74 (concluding judicial intervention would be "inappropriate" given national security concerns).  Those principles counsel against the imposition of a judicially-created standard to gauge how long USCIS may wait for assurance that the background checks have identified no national security reasons that would merit denial of an applicant's adjustment application.

## II.     IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THE CASE TO THE NORTHERN DISTRICT OF TEXAS.

This case is governed by the general venue statute, 28 U.S.C. § 1391, which establishes default rules for venue that apply to federal lawsuits where the underlying statutes do not specify their own venue rules.  See 28 U.S.C. § 1391(a), (b), and (e) (each applying "except as otherwise provided by law.").  Section 1391 identifies three possible bases for venue for claims against federal government officials or agencies: (1) where a defendant "resides;" (2) the district where "a substantial part of the events or omissions giving rise to the claim occurred;" or (3) where "the plaintiff resides, if no real property is involved in the action."  28 U.S.C. § 1391(e).  Plaintiff appears to rely on the first two prongs of this test, and allege that venue is proper in this Court because the agency heads named as Defendants have offices in the District of Columbia and formulate the policy regarding background checks.  See Compl. ¶ 9 n. 2.

When a plaintiff bases its venue arguments solely on federal agency defendants' presence in Washington D.C., the venue challenge should be examined "very closely."[1]  Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993).  That close scrutiny has led courts in this District to invoke their transfer authority pursuant to 28 U.S.C. § 1404(a) and transfer cases to a district with a closer nexus to the parties' dispute.  See, e.g., Cameron, 983 F.2d at 256 (ruling Washington, D.C. was not the proper venue because the sole connection to Washington, D.C. was the inclusion of the Director of the Federal Bureau of Prisons and the Attorney General in their official capacities); Abusadeh v. Chertoff, 2007 WL 2111036, at *6-*9 (D.D.C. July 23,

---

[1] To the extent Plaintiff asserts that venue is proper in the District of Columbia because it is where "a substantial part of the events or omissions giving rise to the claim occurred," pursuant to 28 U.S.C. § 1391(e), the claim fails. Plaintiff summarily discounts the one year's time of processing that his application has undergone at the Texas Service Center, and has alleged no facts to support the claim that any events or omissions took place regarding Plaintiff's application in the District of Columbia.  See Compl.¶ 9 n. 2

2007) (transferring mandamus action seeking adjudication of naturalization application and petition to replace alien card to Southern District of Texas because that was where the application was being adjudicated); Fayyaz v. Dep't of Homeland Security, No. 06-2016, (D.D.C. Oct. 25, 2007) (unpublished Order) (transferring mandamus action concerning I-485 to the Southern District of Texas because that is where plaintiff resided and the district in which the USCIS office with jurisdiction over their applications was located) (attached as Exh. 3 hereto); Poliakova v. Gonzales, No. 07- 1210 (D.D.C. Dec. 17, 2007) (Order attached hereto as Exh. 4) (transferring mandamus action concerning I-485 to Southern District of Florida for the same reason) ; Rosales v. United States, 477 F. Supp.2d 213, 215-17 (D.D.C. 2007) (transferring case against federal agency to district in which the challenged events took place); Southern Utah Wilderness Alliance v. Norton, 315 F. Supp.2d 82, 886-89 (D.D.C. 2005) (concluding environmental case should be transferred to Utah where D.C. officials only set general policies and did not make specific decisions being appealed); Joyner v. District of Columbia, 267 F. Supp.2d 15, 20 21 (D.D.C. 2003) (holding that the case's only connection to Washington, D.C. was the situs of named federal government defendants and transferring to a district with which the case had several connections).  Otherwise, "[b]y naming high government officials as defendants, a plaintiff could bring suit here that properly should be pursued elsewhere." Cameron, 983 F.2d at 256.

The fact that some of the Defendants are high government officials who reside in the District of Columbia does not establish a sufficient connection to this District, and the Court should transfer this case to the Northern District of Texas.  Section 1404(a) permits the Court to transfer this case to "any other district or division where it might have been brought" for the

"convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). A threshold question is whether the case could have been brought in the district to which transfer is sought. See Stewart Organization v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citing Van Dusen v. Barrack, 376 U.S. 612, 613 (1964)). The Court then must engage in a case by case analysis and balance the private interests of the parties with public interests such as efficiency and fairness. Id. at 29; Abusadeh, 2007 WL 2111036, at *3. The moving party bears the burden to establish that it is proper to transfer the case. See Southern Utah, 315 F. Supp. 2d at 86. Trout Unlimited v. United States Dep't of Agriculture, 944 F. Supp. 13, 16 (D.D.C. 1996) (citing Air Line Pilots Ass'n v. Eastern Air Lines, 672 F. Supp. 525, 526 (D.D.C. 1987) (citations omitted). Plaintiff could have brought this case in the Northern District of Texas, and both the private and public interests favor transfer to that court.

The Northern District of Texas clearly is a district in which this case "might have been brought." Plaintiff resides within that state. USCIS's Texas Service Center is responsible for adjudicating Plaintiff's application; therefore any relief Plaintiff may obtain will involve that office, which is located in Dallas, Texas. See Walker Decl. ¶ 1. In sum, the adjudication at issue in this action is being conducted by USCIS staff located in the Northern District of Texas, making venue proper in that court under 28 U.S.C. § 1391. See Abusadeh, 2007 WL 2111036, at * 6 (concluding venue was proper in Southern District of Texas because I-485 was being adjudicated there).

The private interests favor transfer. The factors courts consider when assessing those interests include: Plaintiff's choice of forum, Defendants' choice of forum, whether the claim arose elsewhere, convenience of the parties, convenience of the witnesses, and ease of access to

sources of proof.  See Trout Unlimited, 944 F. Supp. at 16 (citation omitted).  Although courts

generally accord substantial deference to a plaintiff's choice of forum, that deference is lessened

when the forum chosen is not the plaintiff's home forum.  See Shawnee Tribe v. United States,

298 F.Supp.2d 21, 24 (D.D.C. 2002) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)).

Courts also apply less deference when the chosen forum has an inadequate nexus to the events in

the case.  See Southern Utah Wilderness Alliance, 315 F. Supp.2d at 86.

Plaintiff's choice of forum deserves little deference because he does not reside in this

District, and because this District lacks meaningful ties to the controversy.  Plaintiff resides in

Texas.  See Compl.¶ 11.  The Northern District of Texas is a more appropriate forum, because

that is where the decisions will be made.  As noted, the Texas Service Center is charged with

adjudicating Plaintiff's adjustment application.  See Walker Decl. ¶ 1, 2.  The named agency

defendants will have no direct involvement in the adjudication of that application.  Accordingly,

this case is similar to other cases in which courts have found that the private interests favor

transfer because the "primary issue in th[e] case" concerns a decision made by an agency field

office, and not headquarters.  Southern Utah Wilderness Alliance, 315 F. Supp.2d at 87; see, e.g.,

Rosales, 477 F. Supp. 2d at 216; Shawnee Tribe, 298 F. Supp.2d at 24; Sierra Club v. Flowers,

276 F. Supp. 62, 67 68 (D.D.C. 2003) (transferring case because federal officials in Florida made

the relevant decision and officials in Washington, D.C. were not involved in the decision making

process); see also Airport Working Group of Orange County, Inc. v. United States Dep't of

Defense, 226 F. Supp.2d 227, 230-31 (D.D.C. 2002) (transferring because connection to D.C.

was "attenuated" where D.C. officials were not actively involved in challenged decision).

24

Other private interest factors also support transfer. The Northern District of Texas is Defendants' choice of forum, and Defendants have legitimate reasons for the Court to transfer the case there. As noted, that district is the home jurisdiction of the Texas Service Center, which is charged with and is responsible for adjudicating Plaintiff's pending application. It is also in the state in which Plaintiff resides. Since this case involves activities taking place in the Northern District of Texas, there is local interest in resolving it there. See Schmidt v. American Institute of Physics, 322 F. Supp.2d 28, 36 (D.D.C. 2004) (holding that cases should be resolved in the locale in which they arise); Abusadeh, 2007 WL 2111036 at *8 (transferring case to jurisdiction where USCIS field office was located because of that district's interest in resolving the dispute). That also makes the Northern District of Texas a more convenient jurisdiction in which to litigate this case because the people directly involved in making the determination as to Plaintiff's application are located in Texas. See Walker Decl. ¶¶ 1, 2, 14.

The public interest also favors transfer. The relevant considerations include: the transferee's familiarity with governing laws, relative congestion of the calendars of the potential transferee and transferor courts, and local interests in deciding local controversies at home. See Trout Unlimited, 944 F. Supp. at 16 (citation omitted); Airport Working Group of Orange County, Inc., 226 F. Supp.2d at 229. Since this action concerns federal law, the Northern District of Texas is as familiar with the applicable law as the District of Columbia. In addition, there is no evidence that the Northern District of Texas's docket is significantly more congested than the District of Columbia's docket. See Trout Unlimited v. United States Dep't of Agriculture, 944 F.Supp. at 16; see also Exh. 5 (spreadsheet demonstrating caseload of both districts). In 2006 the districts had a similar number of pending cases (4,326 in the Northern

25

District and 4,114 in this Court), and civil cases in the Northern District were resolved more quickly than civil cases in this Court. See Id. Accordingly, both factors weigh in favor of the Court transferring this case to the Northern District of Texas.

The analysis in Abusadeh v. Chertoff is instructive here. There, as here, the Plaintiff filed a mandamus complaint seeking to compel USCIS to complete its adjudication of a pending immigration application. See 2007 WL 2111036 at *2. The Plaintiff's application was pending in a local USCIS field office in Virginia. See id. at *6. Plaintiff filed suit in this District, and named agency officials with offices in Washington, D.C. as defendants. See Id. Judge Kollar-Kottelly concluded that Abusadeh's choice of forum was entitled to little deference because there were no meaningful ties between this District and pending immigration applications being adjudicated by a USCIS field office outside Washington, D.C. See Id. at *6-*8. Further, the public interests favored transfer because both districts were equally familiar with the applicable law but the Southern District of Texas had a "superior interest in addressing the instant controversy because 'there is a local interest in having localized controversies decided at home.'" Id. at *8. The same is true with respect to the Northern District of Texas here.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court GRANT Defendants' motion to dismiss or, in the alternative, TRANSFER this case to the Northern District of Texas.


Dated: February 22, 2008                    Respectfully submitted,

                                            _____
                                            JEFFREY A. TAYLOR, D.C. BAR # 498610
                                            United States Attorney

26

_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


_____
BRANDON L. LOWY
Special Assistant United States Attorney
555 Fourth St., N.W.
Washington, DC  20530
Phone: (202) 307-0364 Fax: (202) 514-8780
Brandon.Lowy@usdoj.gov

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| KASHIF AFTAB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case Number: 1:07-CV-2080-RWR |
| EMILIO T. GONZALEZ, Director, | ) | |
| U.S. Citizenship and Immigration Services, <u>et al.</u> | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## ORDER

Upon consideration of Defendants' Motion to Dismiss or Transfer, it is this
_____ day of _____, 200_____,

_____ ORDERED that the Motion to Dismiss be and hereby is GRANTED, and that complaint be and hereby is DISMISSED;

_____ ORDERED that the Motion to Transfer be and hereby is GRANTED, and that the case be and hereby is TRANSFERRED to the United States District Court for the Northern District of Texas.

SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Kashif Aftab, A95854775        Plaintiff,

v.                                              Civ. Act. Number: **07-02080**

Department of Homeland Security, et. Al

Defendants.

## DECLARATION

I, Genize Walker, pursuant to 28 U.S.C. § 1746, hereby declare:

1.     I am currently employed as the Supervisory Center Adjudication at the Texas Service Center of U.S. Citizenship and Immigration Services (USCIS), an agency within the U.S. Department of Homeland Security (DHS).   The Texas Service Center is located in Dallas, Texas.

2.     My current duties include the supervision of the adjudication of applications and petitions for immigration benefits.  The subject matter of this declaration involves my official duties as an Assistant Center Director.

4.     In my capacity as Supervisory Center Adjudication Officer and based on my knowledge of the management of the Texas Service Center, information contained in the USCIS administrative file for and information supplied to me I have been delegated the authority to make declarations about the status of the Plaintiff's application and implement the procedures for processing background security investigations.

5.     There are five USCIS regional Service or Benefit Centers throughout the United States, each of which has jurisdiction over certain applications and petitions filed by persons or companies within its respective geographic jurisdiction, and/or exclusive nationwide jurisdiction over other types of applications. These Centers adjudicate cases on a mail-in basis only; they do not conduct in-person interviews. Employment-based adjustment of status cases like Plaintiff's are handled at the Nebraska and Texas Service Centers. TSC processes many type of applications/petitions that do not require personal

interviews and anticipates annual receipts of about 800,000 with about 700,000 anticipated completions. The TSC receives roughly 6,000 pieces of mail a day, sends out a corresponding amount, and has about 2,000,000 active files.

6.    The Plaintiff Kashif Aftab A95854775 filed an I-485 on October 4, 2002. The goal of the I-485 filing is to obtain lawful permanent resident ("green card") status for Plaintiff and any qualified dependent spouse or child through Plaintiff's employment. By statute, only about 140,000 aliens can get green cards through employment-based categories during each fiscal year, with percentage limits set per country and preference category. These visa numbers are tracked and issued by the Department of State. There is often a needed to further develop the information needed for an I-485 application before it is ready for consideration.

7.    It is the applicant's burden to show they are eligible for adjustment of status. In determining this, Center Adjudications Officers (CAO), under authority delegated by the Director, independently evaluate and weigh the sometimes voluminous and complex evidence and statements an applicant submits. CAO's may request additional evidence, make discretionary factual determinations and resolve any conflicts in the evidence. Additionally CAO's review Policy Statements, U.S CIS Procedural Manuals, the Foreign Affairs Manual of the Department of State, the Immigration and Nationality Act (INA) and other legal sources. CAO's then draft a proposed written decision for the Director of the TSC that is consistent with precedent, policy, factual determinations, and the exercise of the Directors discretion. The decision to approve an adjustment of status application involves national security, social, political and foreign policy considerations and determines when, how, and under what conditions foreign nationals are to be allowed to remain within the United States.   The proposed decisions of Center Adjudications officers are subject to internal review before the Director accepts it.  I-485's can be reconsidered upon motion or it can be renewed before an immigration judge during removal proceedings.

8.    General requirements for employment-based adjustment of status applications are that the alien is the beneficiary of an approved I-140 visa petition (or whose spouse is such a beneficiary), is in lawful immigration status on the date the Form I-485 is filed, has a visa number immediately available under the annual per-country and preference category quota, and is not inadmissible to the United States under listed statutory grounds that include health-related, criminal, and national security provisions.

9.    When an applicant applies for adjustment of status, USCIS conducts several forms of security checks to ensure that the alien is eligible for the immigration benefit and is not a risk to national security or public safety. In addition to records checks against DHS's own immigration systems, these security checks currently include:  (a) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal history records on the applicant (e.g., arrests and convictions); (b) a check against the DHS-managed Interagency Border Inspection System (IBIS), which contains records and "watch list" information from more than twenty federal agencies and which includes, but is not limited to, information related to persons who are wanted or under investigation for

serious crimes or suspected of terrorism-related activity; and (c) an FBI name check, which runs the alien's name against investigative and other databases of the FBI containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS. The three types of security checks described above sometimes raise issues impacting an applicant's eligibility for the benefit sought from USCIS. In those cases, USCIS must conduct further inquiry to resolve any outstanding issues.

10. Following the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough security checks on aliens who are seeking immigration status in the United States has required procedures that result in certain individuals not receiving their documents and benefits as quickly as in the past. If any of the various security checks reveals derogatory information on the applicant or beneficiary, those applicants typically experience a longer adjudication time.

11. USCIS receives an average of 6 million immigration applications and petitions per year. The requirement to conduct security checks in such a large number of cases, frequently on both applicants and beneficiaries, has severely tested the abilities of the law enforcement agencies to provide timely responses and of USCIS to issue decisions on applications promptly.

12. In many cases, adverse information related to an applicant or beneficiary that is obtained through a security check requires further inquiry by USCIS (sometimes referred to as "vetting"), including outreach to the originating agency to determine whether the information is relevant to eligibility for the requested immigration benefit or may lead to other information bearing on eligibility. The complete background check process includes the security checks but is not limited to those checks. USCIS frequently must take additional steps to fully assess an applicant's background, such as an interview or re-interview of an applicant and/or beneficiary or others, a written request for additional information, or a field investigation. The background checks are not considered complete until USCIS conducts a comprehensive review of any identified criminal or national security issues and any such issues are resolved. USCIS then completes the adjudication, issues its decision and takes any further action deemed appropriate under the circumstances.

13. Following the receipt of the security check responses, the subsequent need for USCIS to analyze the responses, make further inquiries if needed, and consider any relevant implications for the pending adjudications has also placed enormous pressures on the adjudicative capacities of USCIS. Although only a small percentage of the security checks results in adverse information of a national security or public safety nature, because of the large number of applications filed each year, a significant number result in national security or public safety hits requiring intensive review.

14. USCIS submitted the name check request to the FBI on or around December 3, 2002. USCIS received a response to the FBI fingerprint checks on or around September 21, 2006. The information received to date requires further inquiry and review. USCIS is making every effort to promptly adjudicate Plaintiff's adjustment of status application.

15.     This application is not impacted by the recent February 4, 2008 policy memo. That memo addresses circumstances where the FBI name check results remain pending. In this case, the FBI provided a response on September 21, 2006 which requires further investigation and evaluation.

I declare under penalty of perjury, that the foregoing is true and correct.

_____2/22/08_____
Date

Genize Walker
Supervisory Adjudication Officer
Texas Service Center

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| KASHIF AFTAB, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No: |
| | ) 1:07-cv-02080 |
| EMILIO T. GONZALEZ, et al., | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program

Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in

Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name

Check Units. The statements contained in this declaration are based upon my personal

knowledge, upon information provided to me in my official capacity, and upon conclusions and

determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures

followed by the FBI in responding to requests for information from its files pursuant to the policy

and the procedures of the United States Citizenship and Immigration Services ("USCIS").

Specifically, I am aware of the name check request for Kashif Aftab, the plaintiff in this civil

action.

## NATIONAL NAME CHECK PROGRAM

(4)     The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)     The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

2

compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)    Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)    The entries in the General Indices fall into two categories:

(a)    "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b)    "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)    In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system

3

consists of the following three automated applications that support case management functions

for all investigative and administrative cases:

(a)     Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b)     Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)     Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 100.4 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

4

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program

5

application searches names phonetically against the Universal Index records and retrieves similar

spelling variations (which is especially important considering that many names in our indices

have been transliterated from a language other than English).

(12)     If there is a match with a name in a FBI record, it is designated as a "Hit,"

meaning that the system has stopped on a possible match with the name being checked.  If a

search comes up with a match to a name and either a close date of birth or social security

number, it is designated an "Ident."

## RESOLUTION RATE

(13)     There are four stages involved in the completion of an individual name

check: batch processing, name searching, file review, and dissemination.  The first stage in the

process, batch processing, involves the transfer of the name check requests from USCIS to the

NNCPS on magnetic tapes.  Each tape can hold up to 10,000 names.  (Some requests are

transmitted via facsimile or verbally via telephone.)  The tapes are uploaded into an FBI system

and the names are electronically checked against the FBI's Universal Index (UNI).  Historically,

during the batch processing phase, approximately 68 percent of the name checks submitted by

USCIS are returned to USCIS as having "No Record" within 48-72 hours.  A "No Record"

indicates that the FBI's Universal Index database contains no identifiable information regarding a

particular individual.  Duplicate submissions (i.e., identically spelled names with identical dates

of birth and other identical information submitted while the original submission is still pending)

are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)     The second stage in the process is name searching.  For the name check

requests that are still pending after the initial electronic check, additional review is required.  An

6

FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)    The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16)    Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

(17)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

7

(18)   At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed.

(19)   The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which name checks are to be expedited based on criteria it determines. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(20)   Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (33) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)   Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

(22)   A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000)

8

of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45%

(~1,512,000) of the total incoming name checks were submitted by USCIS; and in fiscal year

2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23)     In November 2002, heightened national security concerns prompted a

review of the former Immigration and Naturalization Service's ("INS's") procedures for

investigating the backgrounds of individuals seeking immigration benefits. It was determined

that deeper, more detailed clearance procedures were required to protect the people and the

interests of the United States effectively. One of the procedures identified was the FBI's name

check clearance. Before November 2002, only those "main" files that could be positively

identified with an individual were considered responsive to the immigration authorities name

check requests. However, because that approach ran a risk of missing a match to a possible

derogatory record, the FBI altered its search criteria to include "reference" files as well. From a

processing standpoint, this meant the FBI was required to review many more files in response to

each individual background check request.

(24)     In December of 2002 and January of 2003, the former INS resubmitted 2.7

million name check requests to the FBI for background investigations of all individuals with

then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the

regular submissions by the former INS. Currently, the FBI has returned an initial response to all

2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to

those resubmitted requests indicated that the FBI had no information relating to the specific

9

individual who was the subject of the request, approximately 16 percent – or over 440,000 –
resubmitted requests indicated that the FBI may have information relating to the subject of the
inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than
6,300 of those resubmitted requests remain pending.

(25)    The FBI's processing of the more than 440,000 residuals has delayed the
processing of regular submissions from USCIS. A dedicated team within NNCPS has been
assigned to handle only these re-submitted name check requests. To the extent that the team
members are working on only these applications, they are unavailable to process the normal
submissions.

(26)    There are numerous factors that have contributed to delays in the
processing of name check requests. One is the volume of incoming name checks – the total
volume of incoming name check requests combined with pending name check requests has
historically outpaced the NNCPS's available resources to process this volume. As it concerns
submissions by USCIS, for Fiscal Year 2006, USCIS submitted approximately 1,633,000 name
check requests, of which approximately 718,000 represented naturalization-related name checks
and approximately 658,000 represented adjustment of status-related name checks. As of the end
of Fiscal Year 2006, the NNCPS had over 364,600 pending USCIS name check requests, of
which over 157,300 represented naturalization-related name checks and over 157,800
represented adjustment of status-related name checks.

(27)    The number of "hits" on a name when it is reviewed may further
contribute to a delay in processing a name check request. A "hit" is a possible match with a

10

name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

(28)    The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

(29)    The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

11

(30)    Another contributing factor which was briefly mentioned earlier in this
declaration is the expedited request.  Processing an expedited case means that an employee is not
available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31)    The FBI is seeking a number of improvements to its process.  Over the
short-term:

(32)    NNCPS is continuing to develop the Name Check Dissemination Database
("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate
preparation of reports to other Agencies, and provide avenues for future automation of the name
check process.

(33)    NNCPS is partnering with other Agencies to provide contractors and
personnel to process name checks.  For example, the FBI and USCIS have implemented a key
initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name
Check requests, that is, pending name check requests that have only one FBI file potentially
identified with it that needs to be reviewed in order to process the request.  By applying
contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the
pending USCIS name check workload.

(34)    The FBI is in the process of hiring additional employees to fill current
vacancies and has procured an employee development program to streamline the training of new
employees, thereby significantly decreasing the amount of time needed before a new employee

can begin to significantly impact the NNCPS workload. These efforts have led to the development of a name check employee training manual.

(35)    NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)    NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)    As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(38)    As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations around the United States and world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check

13

services. Once in place, the FBI will be able to scale resources proportionally with workload

demands – pending name checks will pay for themselves. At this time fees do not cover the

basic costs of providing the service. Therefore, the FBI cannot adequately apply resources to

processing name checks without pulling critically needed personnel and funding from other

programs. The FBI procured services to conduct a study to determine an appropriate fee

structure. The independent contractor hired to conduct the study has completed its work and the

proposed fee structure is undergoing the Federal rulemaking process.

(39)     For the reasons stated earlier, the FBI cannot provide a specific or general

time frame for completing any particular name check submitted by USCIS. The processing of

name checks, including those which are expedited at the request of USCIS, depends upon a

number of factors, including where in the processing queue the name check lies; the workload of

the analyst processing the name check; the volume of expedited name checks the analyst must

process for, among others, military deployment, "age-outs," sunset provisions such as Diversity

Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or

other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed

and resolved; the number of records from various Field Offices that must be retrieved, reviewed

and resolved; and, more generally, the staff and resources available to conduct the checks.

Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report

where in the processing queue a particular name check request may lie vis-à-vis other name

checks. Additionally, until review of each case is undertaken no estimate for the time required to

complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will

be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to

14

complete the review once it has begun. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(40)     It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

### PLAINTIFF'S NAME CHECK REQUEST

(41)     The name check request for plaintiff Kashif Aftab was received by the FBI from USCIS on or about December 29, 2002 and was completed on September 21, 2006. The FBI performed its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check were forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _14th_ day of February 2008.

_Michael A. Cannon_

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

15

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MOHAMMAD FAYYAZ and
GIZELA FAYYAZ,

               Plaintiffs,

        v.                                  **Civil Action 06-02016 (HHK)**

DEPARTMENT OF HOMELAND
SECURITY, et al.,

               Defendants.

## ORDER OF TRANSFER

Before the court is the motion of defendants to transfer or, in the alternative, to dismiss [#5].  Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion to transfer this action to the Southern District of Texas should be granted. The Southern District of Texas is the more appropriate venue for this action because plaintiffs reside in Houston, Texas, the United States Citizenship and Immigration Services Office with jurisdiction over plaintiffs' adjustment application is there, and plaintiffs' alleged harm occurred there.

Accordingly, it is this 25th day of October, 2007, hereby

**ORDERED** that the Clerk of the Court shall effect the transfer of  this action to the Southern District of Texas.

Henry H. Kennedy, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATALIA V. POLIAKOVA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 07-1210 (RCL) |
| | § | |
| EMILIO T. GONZALEZ, DIRECTOR | § | |
| UNITED STATES CITIZENSHIP AND | § | |
| IMMIGRATION SERVICES (USCIS), | § | |
| MICHAEL CHERTOFF, SECRETARY, | § | |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, | § | |
| ROBERT S. MUELLER, DIRECTOR, | § | |
| FEDERAL BUREAU OF INVESTIGATION, | § | |
| LINDA SWACINA, DIRECTOR, MIAMI | § | |
| DISTRICT OFFICE, USCIS | § | |
| | § | |
| *Defendants.* | § | |

## ORDER

Upon consideration of Defendants' Motion [11] to Transfer Venue and for Enlargement of

Time to File Answer, it is this 17th day of December, 2007,

ORDERED that Defendants' Motion be, and hereby is, granted, for the reasons stated well in

Defendants' response to Plaintiff's sur-reply; it is further hereby

ORDERED that this case be, and hereby is, TRANSFERRED to the Southern District of Florida;

it is further hereby

ORDERED that Defendants' Answer or other response to the complaint shall be due no sooner

than 15 days after the Southern District of Florida dockets the case in that district.

SO ORDERED.


Signed by United States District Judge Royce C. Lamberth on December 17, 2007.

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| DISTRICT OF COLUMBIA | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | | |
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 2,947 | 3,383 | 3,121 | 3,461 | 3,382 | 3,377 | U.S. | Circuit |
| | Terminations | | 3,458 | 3,305 | 3,365 | 3,101 | 3,159 | 3,291 | | |
| | Pending | | 4,114 | 4,634 | 4,422 | 4,656 | 4,338 | 4,151 | | |
| | % Change in Total Filings | Over Last Year | | -12.9 | | | | | 84 | - |
| | | Over Earlier Years | | | -5.6 | -14.9 | -12.9 | -12.7 | 69 | - |
| | Number of Judgeships | | 15 | 15 | 15 | 15 | 15 | 15 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .0 | 3.1 | 17.1 | 27.4 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 197 | 226 | 208 | 231 | 225 | 225 | 91 | - |
| | | Civil | 159 | 180 | 163 | 184 | 179 | 197 | 86 | - |
| | | Criminal Felony | 25 | 30 | 32 | 35 | 34 | 28 | 92 | - |
| | | Supervised Release Hearings** | 13 | 16 | 13 | 12 | 12 | - | 73 | - |
| | Pending Cases | | 274 | 309 | 295 | 310 | 289 | 277 | 80 | - |
| | Weighted Filings** | | 239 | 272 | 261 | 280 | 271 | 284 | 88 | - |
| | Terminations | | 231 | 220 | 224 | 207 | 211 | 219 | 88 | - |
| | Trials Completed | | 7 | 10 | 15 | 15 | 12 | 12 | 93 | - |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 14.4 | 12.9 | 12.8 | 10.2 | 9.6 | 7.7 | 90 | - |
| | | Civil** | 10.2 | 10.8 | 10.3 | 10.3 | 10.5 | 9.8 | 56 | - |
| | From Filing to Trial** (Civil Only) | | 37.0 | 35.0 | 27.4 | 25.0 | 29.0 | 24.0 | 74 | - |
| OTHER | Civil Cases Over 3 Years Old** | Number | 433 | 468 | 408 | 445 | 359 | 282 | | |
| | | Percentage | 15.1 | 14.1 | 12.8 | 12.7 | 11.1 | 8.6 | 83 | - |
| | Average Number of Felony Defendants Filed Per Case | | 1.4 | 1.5 | 1.5 | 1.3 | 1.4 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 70.60 | 86.63 | 75.49 | 85.69 | 93.32 | 69.99 | | |
| | | Percent Not Selected or Challenged | 47.2 | 53.6 | 50.4 | 56.6 | 55.7 | 51.9 | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2382 | 22 | 35 | 491 | 28 | 21 | 135 | 228 | 209 | 42 | 514 | 61 | 596 |
| Criminal* | 367 | 1 | 106 | 12 | 63 | 78 | 20 | 10 | 2 | 13 | 5 | 26 | 31 |

* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
** See "Explanation of Selected Terms."

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| **TEXAS NORTHERN** | | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | | |
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 5,646 | 5,895 | 6,560 | 6,985 | 6,591 | 5,991 | U.S. | Circuit |
| | Terminations | | 5,745 | 6,179 | 7,191 | 6,111 | 6,413 | 6,406 | | |
| | Pending | | 4,326 | 4,390 | 4,686 | 5,455 | 4,496 | 4,342 | | |
| | % Change in Total Filings | Over Last Year | | -4.2 | | | | | 46 | 5 |
| | | Over Earlier Years | | | -13.9 | -19.2 | -14.3 | -5.8 | 61 | 8 |
| | Number of Judgeships | | 12 | 12 | 12 | 12 | 12 | 12 | | |
| | Vacant Judgeship Months** | | .0 | .0 | 8.5 | 2.4 | 18.4 | 12.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 470 | 491 | 547 | 582 | 549 | 499 | 31 | 5 |
| | | Civil | 376 | 399 | 452 | 479 | 462 | 431 | 25 | 3 |
| | | Criminal Felony | 64 | 61 | 66 | 78 | 64 | 68 | 54 | 6 |
| | | Supervised Release Hearings** | 30 | 31 | 29 | 25 | 23 | - | 26 | 3 |
| | Pending Cases | | 361 | 366 | 391 | 455 | 375 | 362 | 54 | 8 |
| | Weighted Filings** | | 493 | 495 | 548 | 581 | 520 | 517 | 32 | 6 |
| | Terminations | | 479 | 515 | 599 | 509 | 534 | 534 | 34 | 5 |
| | Trials Completed | | 24 | 29 | 28 | 27 | 24 | 28 | 24 | 3 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 7.2 | 7.1 | 6.7 | 5.9 | 6.3 | 5.9 | 26 | 3 |
| | | Civil** | 7.4 | 8.6 | 7.4 | 7.2 | 6.6 | 7.1 | 11 | 3 |
| | From Filing to Trial** (Civil Only) | | 20.0 | 20.7 | 21.7 | 18.6 | 18.7 | 23.3 | 21 | 4 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 146 | 49 | 29 | 126 | 69 | 86 | | |
| | | Percentage | 4.3 | 1.4 | .8 | 2.8 | 1.8 | 2.3 | 28 | 4 |
| | Average Number of Felony Defendants Filed Per Case | | 1.5 | 1.6 | 1.5 | 1.5 | 1.7 | 1.7 | | |
| | Jurors | Avg. Present for Jury Selection | 39.54 | 40.42 | 51.06 | 50.46 | 56.30 | 47.80 | | |
| | | Percent Not Selected or Challenged | 36.2 | 34.8 | 43.9 | 54.9 | 54.1 | 52.7 | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 4516 | 187 | 150 | 1759 | 71 | 46 | 189 | 561 | 233 | 312 | 534 | 4 | 470 |
| Criminal* | 767 | 10 | 139 | 154 | 160 | 95 | 48 | 24 | 46 | 35 | 14 | 11 | 31 |

\*  Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."