**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

KASHIF AFTAB                                    )
                                                )
         Plaintiff,                             )
v.                                              )
                                                )        Civ. No.: 07-2080(RWR)
                                                )
EMILIO T. GONZALEZ, Director                    )
U.S. Citizenship and Immigration Services,      )
Et al.                                          )
                                                )
         Defendants.                            )
_____)


**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR IN THE**
**ALTERNATIVE TO TRANSFER**

        The Plaintiff, Kashif AFTAB, by counsel, respectfully opposes the Defendants' untimely

Motion to Dismiss or In the Alternative to Transfer, for the reasons set forth below.

**I.      INTRODUCTION**

        This Court should deny the Defendants' untimely Motion to Dismiss and their untimely

Motion to Transfer.[1]  Plaintiff's action for mandamus brought pursuant to 28 U.S.C. §1361 and

28 U.S.C. §1331 on November 15, 2007, over which this Court has proper subject-matter

jurisdiction, should proceed before this Court.

        The Plaintiff has a right to the adjudication of his adjustment of status application which

has been pending before Defendant Department of Homeland Security's (DHS) U.S. Citizenship

and Immigration Services (USCIS) for over five years.  8 U.S.C. §1255.   He is not asking for

---

[1] Defendant's motion was filed past the filing deadline, which had already been extended 30
days.  The Plaintiff did not oppose the Defendants' first extension request, but did in fact oppose
Defendants' second extension request that was filed after hours on the due date of their answer.
The Defendants' lack of transparency and non-responsiveness, as evidenced by these delays, is
central to the Plaintiff's mandamus action.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

1

this Court to approve or grant any status or impose on any discretionary decision of the agency. *See* Plaintiff's Verified Complaint for Mandamus and Declaratory Judgment ("Complaint"). Rather, he simply is requesting that the government be required to act in compliance with the Administrative Procedure Act, the Immigration and Nationality Act, and the United States Constitution by adjudicating his application in a timely manner.

A significant majority of federal district courts have ruled that adjudication of a properly filed adjustment of status application, including completion of all necessary background checks, is a purely ministerial, non-discretionary act which the Government is under an obligation to perform in a timely manner. [2] *See Aslam v. Mukasey,* --- F.Supp.2d ----, 2008 WL 220708 at *3

---

[2] *see, e.g.*, *Shirmohamadali v. Heinauer*, 2008 WL 508057, *2 (E.D.Cal. Feb 22, 2008); *Huang v. Mukasey*, 2008 WL 418048 (W.D.Wash. Feb. 12, 2008); *Mocanu v. Mueller*, 2008 WL 372459, *3 (E.D.Pa. Feb 08, 2008); *Mohammed v. Frazier*, 2008 WL 360778 (D.Minn. Feb. 8, 2008); *Ren v. Mueller*, 2008 WL 191919 (M.D. Fla. Jan. 22, 2008); *Xia v. Gonzales*, 2008 WL 168672 (W.D.Wash., Jan. 15, 2008); *Saleem v. Keisler*, 2007 WL 3132233 at *7 (W.D.Wis. Oct. 26, 2007); *Liu v. Novak*, 509 F.Supp.2d 1, 4 (D.D.C. Aug. 30, 2007) ("[T]here is … significant district court authority holding that §1252(a)(2)(B)(ii) does *not* bar judicial review of the pace of application processing or the failure to take an action"); *Han Cao v. Upchurch*, 496 F.Supp.2d 569 (E.D.Pa. 2007); *Duan v. Zamberry*, 2007 WL 626116, at *3(W.D.Pa. Feb. 23, 2007) (CIS has "a non-discretionary duty to process or adjudicate an adjustment application" and "that duty supports a mandamus action"); *see also Chen v. Chertoff*, 2007 U.S. Dist. LEXIS 68536, at *12 (N.D. Cal. Sept. 6, 2007) ("And while the discretion allotted by statute includes whether or not to grant an adjustment of status, it does not extend to processing the applications at any indefinite length of time or withholding action upon an application altogether"); *Liu v. Chertoff*, Slip Copy, 2007 WL 2435157 (D. Or. Aug. 29, 2007); *Tang v. Chertoff*, Slip Copy, 2007 U.S. Dist. LEXIS 64022 (E.D. Ky. Aug. 29, 2007); *Xu v. Chertoff*, Slip Copy, 2007 WL 2033834, (D. N.J. Jul. 11, 2007); *Toor v. Still*, 2007 WL 2028407 (N.D. Cal. Jul. 10, 2007); *Jones v. Gonzales*, 2007 U.S. Dist. LEXIS 45012 (S.D. Fla. June 21, 2007); *Quan v. Chertoff*, Slip Copy, 2007 WL 1655601, N.D. Cal., June 7, 2007); *Ma &Liu v. Gonzales*, Slip Copy, 2007 WL 1655188 (W.D. Wash. June 5, 2007); *Pool v. Gonzales*, Slip Copy, 2007 WL 1613272 (D.N.J. June 1, 2007); *Ibrahim v. Chertoff*, Slip Copy, 2007 WL 1558521 (S.D. Cal. May 25, 2007); *Chen v. Heinauer*, Slip Copy, 2007 WL 1468789 (W.D. Wash. May 18, 2007); *Koren v. Chertoff*, Slip Copy, 2007 WL 1431948 (D. Conn. May 14, 2007); *Dmitriev v. Chertoff*, Slip Copy, 2007 WL 1319533 (N.D. Cal. May 4, 2007); *Huang v. Gonzales*, Slip Copy, 2007 WL 1302555 (W.D. Wash. May 2, 2007); *Wu v. Chertoff*, Slip Copy, 2007 WL 1223858 (N.D. Cal. Apr. 25, 2007); *Song v. Klapakas*, Slip Opinion, 2007 WL 1101283 (E.D. Pa. Apr. 12, 2007); *Mahd v. Chertoff*, Slip

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

2

n. 3 (E.D.Va. Jan. 25, 2008) ("A significant minority of district courts has accepted the government's view that federal courts lack subject matter jurisdiction over claims that the CIS has unreasonably delayed its adjudication of an adjustment of status application.").

Defendants' eleventh-hour motion to dismiss is unjustified and appears to be solely for the purpose of further unwarranted delay. The Plaintiff has been waiting more than five years for a decision on his adjustment of status application, and this mandamus lawsuit was brought only after countless entreaties to the agency were met with stubborn inaction. *See* Complaint. The Defendants' latest dilatory tactic, in a case centered on well-documented allegations of unreasonable agency delay, is clearly not "in the interest of justice" and should not be countenanced by this Court. 28 U.S.C. §1404(a). Likewise, Defendants' Motion to Transfer Venue is another pure dilatory tactic and the facts and law support venue in this Court. *See* Defendants' Motion and Memorandum of Law In Support of Motion to Dismiss or In the Alternative to Transfer ("Defendants' Motion"). Consequently, this Court should deny the Defendants' untimely motion filed on February 22, 2008.

## II.     RELEVANT BACKGROUND

The Plaintiff filed a Petition for Writ of Mandamus before this Court on November 15, 2007. The underlying facts are set forth fully therein and will not be repeated here. *See* Complaint. The Plaintiff and his counsel elected to file suit in the District of Columbia pursuant to 28 U.S.C. §1391(e), as this is an action against officers and agencies of the United States in their official capacities, brought in a district where a substantial part of the events or omissions

---

Copy, 2007 WL 891867 (D. Colo. Mar. 22, 2007); *Singh v. Still*, 470 F. Supp. 2d 1064 (N.D. Cal. 2006); *Aboushaban v. Mueller*, Slip Copy, 2006 WL 3041086 (N.D. Cal. Oct. 24, 2006); *Zahani v. Neufeld*, Slip Copy, 2006 WL 2246211 (M.D. Fla. June 26, 2006); *Elkhatib v. Butler*, Slip Copy, 2005 WL 5226742 (S.D. Fla. June 7, 2005).

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

3

giving rise to the Plaintiff's claim occurred and continue to occur.    *See* Complaint ¶9.    In addition, national policy concerning adjudication of applications for immigration benefits – including the background check procedure for applicants for adjustment of status – is formulated by the DHS and implemented by USCIS headquarters offices in Washington, D.C. and the FBI, all of which are federal agencies resident in this District.    *Id.*    Three of the four named Defendants are residents in this District.    If only the action of the USCIS Texas Service Center were required, as Defendants' allege, the evidence suggests that Plaintiff's application would have long ago been adjudicated.    USCIS's published guidelines indicate that the Texas Service Center is currently reviewing employment-based adjustment of status applications filed on or before August 25, 2006, therefore the adjudication of Plaintiff's adjustment application clearly extends far beyond the Texas Service Center's normal processing timeframe and evidently the delay in his case does not stem from Texas.    USCIS Texas Service Center Processing Dates Posted         October         15,         2007,         *available         at* https://egov.uscis.gov/cris/jsps/Processtimes.jsp?SeviceCenter=TSC (last visited March 3, 2008).

The Defendant's answer was due on January 22, 2008.    On January 16, 2008, counsel for the Defendants entered her appearance and requested a 30-day extension of time to file an answer to the Plaintiff's complaint, which Plaintiff's counsel did not oppose.    The extension request was granted by the Court nunc pro tunc and a new answer deadline was set for February 21, 2008.    On February 21, 2008, at 7:30pm Defendants' counsel moved for a second extension of time.    On February 22, 2008, Plaintiff filed an opposition to Defendants' motion for an extension and later in the day, Defendants' counsel filed their Motion to Dismiss or In the Alternative to Transfer and accompanying memorandum of points and authorities.    Defs.' Motion.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

4

Significantly, the Defendants' provide inconsistent statements regarding the source of delay in this case in response to the Plaintiff's complaint. The statement of government officials submitted in support of the Defendants' motion to dismiss are inconsistent, confusing, and lacking in detail. The declaration submitted by Genize Walker, Supervisory Adjudication Officer at the USCIS Texas Service Center, states the following:

> 14.    USCIS submitted the name check request to the FBI on or around December 3, 2002. USCIS received a response to the FBI fingerprint checks on or around September 21, 2006.

Defs.' Motion, Genize Walker Dec'l at ¶14 ("Walker Dec'l"). According to Ms. Walker, only the FBI *fingerprint* checks were completed on September 21, 2006; her declaration does not indicate when – or even if – the separate FBI *name* checks were completed and sent to USCIS. Remarkably, Ms. Walker attests further that "[t]his application is not impacted by the recent February 4, 2008 policy memo," attached hereto as Exhibit 16, because "[t]hat memo addresses circumstances where the FBI name check results remain pending." Walker Dec'l at ¶15. Yet according to Ms. Walker's own sworn declaration, USCIS has only received a response from the FBI to its fingerprint check inquiry. Her declaration appears to indicate that the name check remains pending, which corresponds to the information that was provided by USCIS to the Plaintiff.

To compound the confusion, the declaration submitted by Michael Cannon, Section Chief of the National Name Check Program Section, states that "the name check request for Plaintiff Kashif Aftab was received by the FBI from USCIS on or about December 29, 2002 and was completed on September 21, 2006." Defs.' Motion, Michael Cannon Dec'l at ¶41 ("Cannon Dec'l"). Where such disputed issues of fact exist, dismissal is inappropriate. *See* e.g. *Gelfer v. Chertoff,* 2007 WL 902382 (N.D.Cal.2007).

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

5

## III.    STANDARD OF REVIEW

A motion to dismiss may be granted only if the moving party is able to demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). "To that end, the complaint is construed liberally in the plaintiff's favor, and…the plaintiffs [are granted] the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271 (D.C. Cir. 1994).

A civil action brought against a U.S. Government defendant – such as the instant mandamus suit – is governed by the venue provision of 28 U.S.C. §1391(e), which provides:

> A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action.

The Plaintiff's choice of forum is entitled to "great deference" and is a "paramount consideration" in deciding whether to grant a defendant's transfer request. *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 24 (D.D.C. 2002); *see also Southern Utah Wilderness Alliance v. Norton*, 315 F. Supp. 2d 82, 86 (D.D.C. 2005) ("Courts give considerable deference to the plaintiff's choice of forum."). In deciding whether a transfer is appropriate, "unless contradicted by an evidentiary showing, the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor." *Jyachosky v. Winter*, 2006 WL 1805607, at *1 (D.D.C. Jun. 29, 2006) (citations and internal quotations omitted).

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC 20036
Phone: 202-483-0053  Fax: 202-483-6801

6

Notwithstanding, even where the plaintiff's choice of venue is found to be proper under 28 U.S.C. §1391(e), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. §1404(a). In the case at bar, the Defendants seek a transfer pursuant to 28 U.S.C. §1404(a) to the U.S. District Court for the Northern District of Texas, where, they contend, "venue is a more appropriate forum." Def' Motion at 3.

As the moving party, the Defendants bear the "heavy burden" of demonstrating that a transfer to the Northern District of Texas is proper. *See Pain v. United Tech. Corp.*, 637 F.2d 775, 784 (D.C. Cir. 1980); *Shenandoah Assoc. Ltd. Partnership v. Tirana*, 182 F. Supp. 2d 14, 25 (D.D.C. 2001); *Greater Yellowstone Coalition v. Bosworth*, 180 F. Supp. 2d 124, 127 (D.D.C. 2001). The Court is afforded broad discretion to decide whether transfer is warranted, employing "an 'individualized, case-by-case consideration of convenience and fairness" and honoring a plaintiff's venue selection unless "the balance of private and public interests weighs in favor of transfer." *Abusadeh v. Chertoff*, Slip Copy, 2007 WL 2111036, at *3-4 (D.D.C. July 23, 2007) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)); *see also SEC v. Savoy Indus., Inc.*, 587 F.3d 1149, 1154 (D.C. Cir. 1978). Such deference is lessened, however, if the Plaintiff's forum choice "lacks meaningful ties to the controversy and [has] no particular interest in the parties or subject matter." *Islamic Republic of Iran v. Boeing Co.*, 477 F. Supp. 142, 144 (D.D.C. 1979); *see also Southern Utah Wilderness Alliance*, 315 F. Supp. 2d at 86. Moreover, the Defendants' burden in a motion to transfer decreases if it is shown that the Plaintiff's choice of venue "has *no meaningful nexus* to the controversy and the parties." *Greater Yellowstone*, 180 F. Supp. 2d at 128 (emphasis added); *Wilderness Society v. Babbitt*, 104 F. Supp. 2d 10, 12 (D.D.C. 2000).

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC 20036
Phone: 202-483-0053 Fax: 202-483-6801

7

Under 18 U.S.C. §1404(a), the Defendants, who bear the burden of establishing that a transfer is appropriate, must make two showings to justify their desired change of venue. *See Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 65 (D.D.C. 2003); *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996). First, the Defendants must demonstrate that the Plaintiff could have brought this action in the proposed transferee district. *Sierra Club*, 276 F. Supp. 2d at 65; *see also Van Dusen*, 376 U.S. at 622. Second, the Defendants must establish that considerations of convenience and the interest of justice weigh in favor of a transfer to the Northern District of Texas. *Southern Utah Wilderness Alliance*, 315 F. Supp. 2d at 86; *Trout Unlimited*, 944 F. Supp. at 16. As to the second factor, the Court must weigh a number of case-specific private-interest and public-interest factors and "transfer a case *only* if the balance of private and public interests weighs in favor of transfer." *Abusadeh*, 2007 WL 2111036, at *4 (emphasis added); *Greater Yellowstone*, 180 F. Supp. 2d at 127; *see also Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).

The private-interest factors include the following: (1) the Plaintiff's choice of forum; (2) the Defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof. *Sierra Club*, 276 F. Supp. 2d at 65; *Trout Unlimited*, 944 F. Supp. at 16. The Court also evaluates the following public-interest considerations: (1) the degree to which the courts in both venues are familiar with the governing laws; (2) the relative congestions of the calendars of the transferee and transferor courts; and (3) the local interest in deciding local controversies at home. *See Abusadeh*, 2007 WL 2111036, at *4; *see also Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879-80 (3d Cir. 1995); *Southern Utah Wilderness Alliance*, 315 F. Supp. 2d at 86.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC 20036
Phone: 202-483-0053 Fax: 202-483-6801

8

## IV.    ARGUMENT

For the following reasons, the Court should deny the Defendants' motion to dismiss or transfer, and grant the relief sought by the Plaintiff in his mandamus complaint, to wit, order the Defendants and those acting under them to take all appropriate action to perform their duty to complete the background check process and adjudicate the Plaintiff's adjustment of status application without further delay.

### A.  THIS COURT HAS JURISDICTION OVER THE PLAINTIFF'S MANDAMUS ACTION

The Defendants argue that dismissal of the Plaintiff's mandamus complaint is warranted for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.  Defs.' Motion at 9.  According to the Defendants, this Court is stripped of subject matter jurisdiction over the Plaintiff's complaint by section 242(a)(2)(B)(ii) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §1252(a)(2)(B)(ii).  The Defendants contend that this provision precludes judicial review under the Mandamus Act (28 U.S.C. §1361) and the Administrative Procedure Act ("APA") (5 U.S.C. §§ 555(b), 702), in conjunction with jurisdiction of the district courts and federal question jurisdiction (8 U.S.C. §1329 and 28 U.S.C. §1331).

Specifically, the Defendants allege that 8 U.S.C. §1252(a)(2)(B)(ii) divests courts of jurisdiction to review Plaintiff's mandamus action because "the adjudication of an adjustment of status application is a discretionary action and decision." Defs.' Motion at 9.   Each of the Defendant's arguments centers on idea that the Court lacks subject matter jurisdiction because the statute provides "no time frame for the adjudication of I-485 applications" and "[the]

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

9

Attorney General's discretion over the process of adjudication an I-485 necessarily extends to the assessment of when, whether, and how to grant that application." Defs.' Motion at 10. The Defendants assert that the Court cannot review the Plaintiff's mandamus complaint under the Mandamus Act because "there are no statutory provisions or regulations that mandate the adjudication of adjustment applications within a particular period of time." Defs.' Motion at 15. They also argue that the APA "is inapplicable," as the APA only applies if there is no statute precluding judicial review and only if agency action is not discretionary by law. Defs.' Motion at 16. The Plaintiff will address each of these arguments in turn.

According to the Defendants, the delay in adjudicating Plaintiff's adjustment of status application arises from "USCIS's conclusion that national security interests preclude it from completing its adjudication of Aftab's application until its own inquiries following the FBI background investigations are complete." Defs.' Motion at 10-11.

However, the FBI name check program "has never been authorized by statute or regulation" and it and its fruits continued use as an excuse in the delay of adjudication of Plaintiff's application is unfounded. *Mocanu*, 2008 WL 372459, at *5-9; *see Aslam,* --- F.Supp.2d ----, 2008 WL 220708 at *5-6. Congress has authorized a "full criminal background check," but the *criminal* background checks in Plaintiff's case have long since been completed as noted in the Walker declaration. *Mocanu, 2008 WL 372459* at *8 ("there is simply no legislation which mandates or authorizes USCIS to employ an FBI name check as a prerequisite for a lawful permanent resident to become a naturalized U.S. citizen."). Further, USCIS has since decided that they will no longer wait for FBI name check results before adjudicating adjustment of status applications, but later, if derogatory or adverse information is obtained about an application, USCIS may "determine if rescission or removal proceedings are appropriate and warranted." *Id.*

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

10

at FN10; *see also* Exh. 16.    In the instant case, if derogatory or adverse information has been obtained regarding the Plaintiff that disqualifies him for the requested benefit, USCIS should act within its authority to deny Plaintiff's application for adjustment of status. *See* Exh. 16. But, if, after five years, USCIS has not yet obtained sufficient derogatory or adverse information that provides a basis to deny Plaintiff's application, his application should be approved. *Id.* If USCIS later discovers derogatory or adverse information regarding the Plaintiff that would warrant rescission of his adjustment of status or the institution of removal proceedings, they have the complete authority to do so. *Mocanu*, 2008 WL 372459, at *10 FN 10.

### 1.  JURISDICTION OVER PLAINTIFF'S MANDAMUS COMPLAINT IS NOT STRIPPED BY 8 U.S.C. § 1252(a)(2)(B)(ii)

The Defendants contend that this Court lacks subject matter jurisdiction over the Plaintiff's complaint pursuant to 8 U.S.C. § 1252(a)(2)(B)(ii), which strips the federal courts of jurisdiction to review "discretionary 'decisions or actions' of the Attorney General in immigration matters," and that the phrase "decision or action" includes the pace at which immigration decisions are made. Defs.' Motion at 10-11.

The Defendants' arguments are unpersuasive and are contrary to the overwhelming weight of authority on this issue, which clearly holds that USCIS has "a non-discretionary duty to process or adjudicate an adjustment application" and that "that duty supports a mandamus action." *Duan v. Zamberry*, Slip Copy, 2007 WL 626116 (W.D. Pa. Feb. 23, 2007); *see, e.g.*, *Shirmohamadali*, 2008 WL 508057 at *2; *Huang*, 2008 WL 418048; *Mocanu*, 2008 WL 372459; *Mohammed*, 2008 WL 360778; *Aslam*, 2008 WL 220708 at *3 n. 3; *Ren*, 2008 WL 191919; *Xia*, 2008 WL 168672; *Saleem*, 2007 WL 3132233 at *7; *Liu*, 509 F.Supp.2d 1, 4 ("[T]here is … significant district court authority holding that §1252(a)(2)(B)(ii) does *not* bar judicial review of

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

11

the pace of application processing or the failure to take an action"); *Han Cao*, 496 F.Supp.2d 569; *see also Ma &Liu,* 2007 WL 1655188; *Ibrahim,* 2007 WL 1558521; *Pool*, 2007 WL 1613272; *Chen*, 2007 WL 1468789; *Koren,* 2007 WL 1431948; *Dmitriev,* 2007 WL 1319533; *Huang,* 2007 WL 1302555; *Wu*, 2007 WL 1223858; *Song*, 2007 WL 1101283; *Mahd,* 2007 WL 891867; *Singh,* 470 F. Supp. 2d 1064; *Aboushaban;* 2006 WL 3041086; *Zahani,* 2006 WL 2246211; *Elkhatib*, 2005 WL 5226742.

The Plaintiff does not dispute that the Secretary of DHS – and the Defendant USCIS acting on his behalf – has discretion to grant or deny adjustment of status applications under section 245(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1255(a).  However, USCIS does *not* enjoy unfettered discretion to unreasonably and, as the Defendants implicitly argue, indefinitely delay adjudication of a properly filed application.  The agency's discretion applies only to the decision whether to *grant* or *deny* an individual claim, not to whether the application should be adjudicated in the first place.

Contrary to the Defendants' arguments, the process of adjudicating the Plaintiff's adjustment of status application is not a "'decision or action' . . . the 'authority for which is specified . . . to be discretionary,'" although either approval or denial of that application *would* be such a discretionary decision or action. 8 U.S.C. §1252(a)(2)(B)(ii).  Such discretion over the *result*, however, cannot be stretched to permit indefinite delay in the *adjudication* of a properly filed application.  *See e.g.  Liu*, 509 F.Supp.2d  at 4 ("[T]here is … significant district court authority holding that §1252(a)(2)(B)(ii) does *not* bar judicial review of the pace of application processing or the failure to take an action").  The Plaintiff is entitled to a decision on his application, because the failure to render any decision has become unreasonable as a matter of law.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

12

Section 242(a)(2)(B) of the INA, 8 U.S.C. §1252(a)(2)(B), as amended by the REAL ID Act of 2005, Pub. L. No. 109-13 (May 11, 2005), eliminated the authority of the federal courts to review decisions by the government to grant or deny discretionary relief, including adjustment of status. Specifically, subsection (ii) of §242(a)(2)(B) provides that "no court shall have jurisdiction to review . . . (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . ." 8 U.S.C. §1252(a)(2)(B)(ii).[3] Notwithstanding this jurisdiction-stripping provision, however, this Court may exercise jurisdiction in the instant case because the Plaintiff challenges only the government's failure to *adjudicate* his application for adjustment of status in the first instance. Section 1252(a)(2)(B)(ii) does not strip federal courts of jurisdiction where – as in this case – the government has a nondiscretionary duty to act. As was set forth in the original complaint, USCIS owes the Plaintiff a duty to process and adjudicate his application for adjustment of status, and it has unreasonably failed to perform that nondiscretionary duty. *See* Complaint ¶¶6-8; *see also* 8 U.S.C. § 1103; 8 C.F.R. §§ 245.2(a)(5)(i), 245.6.

In their motion to dismiss, the Defendants attempt to blur this critical distinction – between a discretionary act of decision-making and a non-discretionary failure to adjudicate – and urge this Court to find that the jurisdiction-stripping language of 8 U.S.C. §1252(a)(2)(B)(ii) is all-encompassing, and that the agency's latitude to decide applications is unfettered. According to the Defendants, INA §245, 8 U.S.C. §1255, vests the agency with discretion over the entire process of adjudicating an adjustment of status application, including "when, whether,

---

[3] "[T]his subchapter" refers to Subchapter II of Chapter 12 of Title 8 of the U.S. Code, which includes INA § 245, 8 U.S.C. §1255.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

13

and how to grant that application." Defs.' Motion at 10. However, the overwhelming majority of courts that have addressed the issue presented here – whether failure or delay in processing an application for adjustment of status constitutes an "action" by CIS under 8 U.S.C. §1252(a)(2)(B)(ii), thereby stripping the courts of jurisdiction to consider mandamus claim such as that brought by the Plaintiff – have rejected the government's arguments. These courts have concluded, to the contrary, that subject matter jurisdiction *does* exist and that mandamus relief may, under certain circumstances, be appropriate. *See, e.g.*, *Liu*, 509 F.Supp.2d 1, 4; see also FN 2 *supra* and cases cited therein. "These courts have reasoned" – as the Plaintiff argues in this case – "that even though the actual decision to grant or deny an application for adjustment of status is discretionary, the USCIS has a *non-discretionary duty* to act on applications *within a reasonable time*." *Pool*, 2007 WL 1613272, at *2 (emphasis added) ("[T]he obligation of the USCIS to process applications is not discretionary and is reviewable by this Court."). Consequently, the courts have time and again denied government motions to dismiss arguing a lack of jurisdiction under 8 U.S.C. §1252(a)(2)(B)(ii). *See, e.g.*, *Shirmohamadali*, 2008 WL 508057, *2; *Huang,* 2008 WL 418048; *Mocanu*, 2008 WL 372459; *Mohammed,* 2008 WL 360778; *Aslam,* 2008 WL 220708 at *3 n. 3; *Ren*, 2008 WL 191919; *Xia*, 2008 WL 168672; *Saleem*, 2007 WL 3132233 at *7; *Liu*, 509 F.Supp.2d 1, 4; *Han Cao***,** 496 F.Supp.2d 569; *see also Ma &Liu,* 2007 WL 1655188; *Ibrahim,* 2007 WL 1558521; *Pool*, 2007 WL 1613272; *Chen*, 2007 WL 1468789; *Koren,* 2007 WL 1431948; *Dmitriev,* 2007 WL 1319533; *Huang,* 2007 WL 1302555; *Wu*, 2007 WL 1223858; *Song*, 2007 WL 1101283; *Mahd,* 2007 WL 891867; *Singh,* 470 F. Supp. 2d 1064; *Aboushaban;* 2006 WL 3041086; *Zahani,* 2006 WL 2246211; *Elkhatib*, 2005 WL 5226742. As this parade of decisions makes clear, the "weight of authority" does not support the Defendants' position.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC 20036
Phone: 202-483-0053 Fax: 202-483-6801

14

A recent decision from this Court is particularly instructive.  *See Liu,* 509 F.Supp.2d at 1-10.  Like the Plaintiff Kashif Aftab, the plaintiff in *Liu* filed suit to compel the U.S. government defendants – including USCIS – to adjudicate his application for adjustment of status, which had been pending with the agency for more than five years, allegedly owing to uncompleted security background checks.  *Id.* at 2.  As in the instant case, the government moved to dismiss the plaintiff's complaint, asserting lack of subject matter jurisdiction and failure to state a claim, and moved also for summary judgment.  Specifically, the defendants argued (1) that the Court lacks jurisdiction pursuant to 8 U.S.C. §1252(a)(2)(B)(ii) and 8 U.S.C. §1252(g); (2) that mandamus is inappropriate because the defendants do not owe the plaintiff a non-discretionary duty; and (3) that federal question jurisdiction under the APA is unavailable because "adjustment of status is discretionary and thus unreviewable by courts."  *Id.* at 3-4.  This Court rejected each of the defendants' arguments in turn.

According to the *Liu* Court, although it is clear that the agency's decision to grant or deny an adjustment application is "'wholly discretionary' … and therefore barred from judicial review," it is a matter of dispute among federal courts whether 8 U.S.C. §1252(a)(2)(B)(ii) also bars their review of the government's delay or failure to adjudicate a properly filed application for adjustment.  *Id.* at 5 (quoting *Kim v. Ashcroft*, 340 F. Supp. 2d 384, 389 (S.D.N.Y. 2004)).  *Liu* acknowledged the authority relied upon by the Defendants in this case, *Safadi v. Howard*, 466 F. Supp. 2d 696 (E.D. Va. 2006), which concluded that courts lack jurisdiction under the "plain meaning" of section 1252(a)(2)(B)(ii), because "the term 'action' 'encompasses the entire process of reviewing an adjustment application, including the completion of background and security checks and the pace at which the process proceeds."  *Liu*, 509 F.Supp.2d at *5 (quoting *Safadi*, 466 F. Supp. 2d at 699).  However, the Court observed that "there is also significant

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

15

district court authority holding that § 1252(a)(2)(B)(ii) does *not* bar judicial review of the pace of application processing or the failure to take an action." *Id.* at 5 (emphasis added); *see Duan*, 2007 WL 626116, *2; *Batista v. INS*, 2000 WL 204535, at *2 (S.D.N.Y. Feb. 22, 2000); *see also Elmalky v. Upchurch*, 2007 WL 944330, at *5 (N.D. Tex. Mar. 28, 2007); *Kim*, 340 F. Supp. 2d at 389.

Having evaluated the arguments on both sides, the Court in *Liu* found "three reasons" for rejecting the defendants' jurisdiction-stripping arguments under §1252(a)(2)(B)(ii).  *Liu*, 509 F.Supp.2d at 6-7.

> First, the provision only applies to jurisdiction to review a "decision or action" of the Department of Homeland Security.  In this case, plaintiff is challenging the *absence* of a decision or action, specifically the *failure to adjudicate* his application.  Review over the lack of action is not barred.

*Id.* at 7 (emphasis added).  The Court was unpersuaded by the "plain meaning" argument in *Safadi*, "clever though it may be." *Id.*  The fatal deficiency of this line of reasoning – which the Defendants vigorously advance in the case at bar – is that *Safadi* "essentially finds that inaction is within the 'plain meaning' of action.  The established body of administrative law though, distinguishes between the two." *Id.* (citing *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987)).

Second, the Court held, §1252(a)(2)(B)(ii) applies not to all discretionary decisions, but only to the "narrower category of decisions where Congress has taken the additional step to specify that the sole authority for the action is in the Attorney General's discretion." *Id.* (internal quotation omitted).  *Liu* pointed out that the relevant subchapter of the statute at issue fails even to address, much less specify, any discretion associated with the *pace* of application processing.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

16

*Id.* (citing *Duan*, 2007 WL 626116, at *2).   "Thus, plaintiff's claim is not barred by §1252(a)(2)(B)(ii) for this reason as well." *Id.*

Third, the Court noted that all applicable presumptions favor concluding that jurisdiction exists to consider the plaintiff's mandamus suit.  *Id.* at 7.  The following operative principles were identified:   (1) Congress's intent to limit federal jurisdiction must be "clear and convincing" in order to preclude judicial review; (2) there is a general presumption in favor of judicial review of administrative acts; (3) statutory ambiguities in immigration laws are to be resolved in favor of immigrants.  *Id.*  "In light of all three principles, the Court concludes that §1252(a)(2)(B)(ii) does *not* eliminate this Court's jurisdiction over plaintiff's claim."  *Id.* (emphasis added).

Likewise, in *Duan v. Zanberry*, the U.S. District Court for the Western District of Pennsylvania denied the government's motion to dismiss a mandamus action brought by an adjustment of status applicant, who claimed that adjudication of his I-485 had been unreasonably held up by USCIS – specifically, for a period of more than two years.  *Duan*, 2007 WL 626116, at *1.  The court rejected the government's contention that INA §1252(a)(2)(B)(ii) stripped it of jurisdiction to consider the applicant's claim, because the subchapter within which the provision falls "specifies only that it is within the discretion of the Attorney General to adjust one's status; it does *not* address, much less specify any discretion associated with, the *pace* of application processing."  *Id.* at *2 (emphasis added).  Consequently, the court found §1252(a)(2)(B)(ii) "inapplicable" to the petitioner's claim of adjudicatory delay.  *Id.*; *see also Alaka v. Att'y General*, 456 F.3d 88, 95 (3d Cir. 2006) ("The jurisdiction stripping language [of Section 1252] applies not to all decisions the Attorney General is entitled to make, but to a narrower category of decisions where Congress has taken the additional step to specify that the sole authority for

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

17

the action is in the Attorney General's discretion."); *Khan v. United States*, 448 F.3d 226, 232 (3d Cir. 2006) (stating that, as a general matter, there is a "strong presumption in favor of judicial review of administrative action"). Drawing a clear distinction between discretionary agency actions that are explicitly immune to review and actions which fall outside the statute's jurisdiction-stripping influence, the court explained:

> Although the speed of processing may be "discretionary" in the sense that it is determined by choice, and that it rests on various decisions that Defendants may be entitled to make, *it is not discretionary in the manner required by the jurisdiction-stripping language of the IIRIRA.*

*Id.* (emphasis added); *see also, e.g.*, *Valenzuela v. Kehl*, Slip Copy, 2006 WL 2474088, at **19-20 (N.D. Tex. Aug. 23, 2006).

In reaching its determination, the *Duan* court expressly rejected the reasoning of *Safadi v. Howard*, 466 F. Supp. 2d 696 (E.D.Va. 2006), which is relied upon by the Defendants in support of their motion to dismiss. *See* Defs Motion at 10, 12. According to the *Duan* court's Chief Judge, "to read the jurisdiction-stripping statute as did the *Safadi* court would render toothless all timing restraints, including those imposed by the APA[.]" *Duan*, 2007 WL 626116, at *3. Judge Ambrose declared further,

> Such a result would amount to a grant of permission for inaction, and a purposeful disregard of the potential for abuse thereof, on immigration matters. I will not, therefore, follow the line of reasoning represented by *Safadi*. Instead, I find that Section 1252(a)(2)(B)(ii) *does not divest this Court of jurisdiction* over the Plaintiff's claims.

*Id.* (emphasis added). An extensive number of other district courts, from various judicial circuits, have concurred with *Duan*'s reasoning. *See, e.g.*, *Koren*, 2007 WL 1431948, at *4 ("[T]his Court is not persuaded by the *Safadi* court's reasoning. … Accordingly, this Court finds that §1252(a)(2)(B)(ii) does not divest this Court of subject matter jurisdiction over Plaintiffs'

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC 20036
Phone: 202-483-0053 Fax: 202-483-6801

18

claim that the adjudication of their applications for adjustment of status has been unreasonably delayed."); *Chen*, 2007 WL 1468789, at *3 ("[T]he Court is not persuaded by defendants' reliance on *Safadi v. Howard*" but finds, contrary to *Safadi*, "that section 1252(a)(2)(B)(ii) does not divest the Court of jurisdiction over plaintiff's claim."); *Huang*, 2007 WL 1302555, at *3 ("[T]he Court is not persuaded by defendants' reliance on *Safadi v. Howard*.").

The opinions discussed above are but recent examples of the numerous federal court decisions holding that applicants for adjustment of status are entitled to adjudication within a reasonable period of time, and that the government's actions to that end are not wholly discretionary. As these decisions demonstrate, with the dramatic increase in background check delays in recent years, the federal courts have witnessed a corresponding increase in mandamus litigation by non-citizens hoping to obtain a decision on their delayed applications for immigration benefits, in particular adjustment of status claims. The government has routinely urged dismissal of such actions, insisting that the plaintiffs are seeking review of a discretionary "decision or action" over which the federal courts have been stripped of jurisdiction. The courts, however, have consistently rejected the government's arguments, refusing to find that Congress intended such a sweeping elimination of judicial review. *See, e.g.*, *Razaq v. Poulos*, Slip Copy, 2007 WL 61884 (N.D. Cal. Jan. 8, 2007); *Haidairi*, 2006 WL 3544922, at *4 ("Plaintiffs are only asking this Court to compel Defendants to make *any* decision."); *Valenzuela*, 2006 WL 2474088; *Aboushaban*, 2006 WL 3041086, at *2; *Elkhatib*, 2005 WL 5226742, at *1-2; *Yu*, 36 F. Supp. 2d at 931-32; *Paunescu*, 76 F. Supp. 2d at 901.

As in *Liu* and *Duan* these courts agree that USCIS's non-discretionary duty to adjudicate an adjustment of status application supports a mandamus action. *Id.* Although there is, at present, no precedent in this circuit on the specific issue presented, "the majority of federal

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC 20036
Phone: 202-483-0053 Fax: 202-483-6801

19

courts who have considered similar claims have found mandamus relief appropriate." *Song*, 2007 WL 1101283, at *3.    The weight of authority holds that defendants have a non-discretionary duty to process adjustment applications and that this duty provides a jurisdictional basis for mandamus actions." *Song*, 2007 WL 1101283, at *3 n.6; *see also Duan*, 2007 WL 626116, at *3 (and cases cited therein).    The Plaintiff entreats this Court to likewise "find[] the weight of this authority persuasive" and deny the Defendants' motion to dismiss under 8 U.S.C. §1252(a)(2)(B)(ii).    *Ma &Liu*, 2007 WL 1655188, at *4.

Were this Court to hold otherwise, it would surrender its vital judicial oversight role and deprive countless deserving adjustment of status applicants – like the Plaintiff – of their sole avenue of recourse.    The cautionary words of the U.S. District Court for the Southern District of New York are particularly apt:

> Although there is no statutory or regulatory deadline by which the CIS *must* adjudicate an application, at some point, defendants' failure to take any action runs afoul of [the APA].    Were it otherwise, the CIS could hold adjustment applications in abeyance for decades without providing any reasoned basis for doing so.    Such an outcome defies logic – the CIS simply does no possess unfettered discretion to relegate aliens to a state of "limbo," leaving them to languish there indefinitely.

*Kim*, 340 F. Supp. 2d at 393.    In the case at bar, there has been, to date, no "actual exercise of discretion" by the Secretary of Homeland Security on the Plaintiff's application for adjustment, but only an unreasonable failure to adjudicate that application.    Consequently, this Court's jurisdiction endures.

Finally, the Defendants insist upon a broad reading of the jurisdiction-stripping language in §1252(a)(2)(B)(ii), arguing that the agencies require "wide discretion" to delay their adjudication while conducting all necessary background checks, in order to  ensure "that immigration benefits are not granted to an alien ineligible for the benefit due to fraud, criminal

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

20

convictions, or national security matters." Defs.' Motion at 15. However, well-established principles of statutory construction support a narrower interpretation of the statute, as counseled by the Plaintiff. *See, e.g.*, *Obioha v. Gonzales*, 431 F.3d 400, 405 (4th Cir. 2005); *see also Aslam*, 2008 WL 220708 at *3. First, there must be a showing of "'clear and convincing evidence' of a contrary legislative intent" to restrict access to judicial review. *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)). Second, there is a "strong presumption in favor of judicial review of administrative action," or, as in this case, administrative *in*action. *INS v. St. Cyr*, 533 U.S. 289, 298 (2001). Third, courts construe ambiguities in deportation statutes in favor of the alien. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987); *see also Obioha*, 431 F.3d at 405 (applying these principles to 8 U.S.C. § 1252(a)(2)(B)(i)); *Iddir v. INS*, 301 F.3d 492, 496-97 (7th Cir. 2002) (same). Because the language of 8 U.S.C. §1252(a)(2)(B)(ii) is "equally susceptible to a more narrow interpretation," barring review only of a decision to either grant or deny an adjustment application, but not of a decision to withhold adjudication altogether, "these principles guide that the narrower reading is appropriate." *Obioha*, 431 F.3d at 405.

In sum, as the Plaintiff's complaint does not seek review of a particular action or decision by the Secretary of the DHS, but seeks simply to compel the completion of necessary processing and the adjudication of an unreasonably delayed application for adjustment of status, the Court is not divested of its right to review by the jurisdiction-stripping provisions of 8 U.S.C. § 1252(a)(2)(B)(ii).

## 2.    JURSIDICTION OVER MANDAMUS ACTIONS UNDER 28 U.S.C. §1361

The Defendants next argue that the Plaintiff's complaint should be dismissed because he "lacks a clear right to immediate adjudication, and Defendant has no clear mandatory or

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC 20036
Phone: 202-483-0053 Fax: 202-483-6801

21

ministerial obligation to adjudicate the application within a particular time frame." Defs.'
Motion at 15. Once again, the Defendants' arguments are unpersuasive. Because the Plaintiff
seeks only to compel the Defendants to complete necessary processing and adjudicate an
application which has been unreasonably delayed, this Court has original jurisdiction under the
mandamus statute, 28 U.S.C. §1361. Contrary to the Defendants' claims, the Plaintiff has
established that he has a clear right to the relief requested, and that the agencies have a clear duty
to act.

Adjudication of the Plaintiff's adjustment application, including completion of all
necessary background checks, is a purely ministerial, non-discretionary act which the Defendants
are under obligation to perform in a timely manner. *See* 8 U.S.C. § 1103; 8 C.F.R. §§
1245.2(a)(5)(i), 1245.6. As one court has recently explained,

> The Defendants … have a nondiscretionary duty to process Liu's application;
> they cannot decide not to process an application. Such a decision would not be an
> exercise of discretion, but a refusal to perform assigned duties. This Court has
> jurisdiction to review whether the Defendants are refusing to act.

*Liu v. Chertoff*, Slip Copy, 2007 WL 1202961, at *3 (C.D. Ill. Apr. 23, 2007) (denying
government's motion to dismiss plaintiff's mandamus suit and finding two year delay in
completing plaintiff's FBI name check to be "highly unusual"); *see also, e.g.*, *Ma & Liu*, 2007
WL 1655188, at *4; *Pool*, 2007 WL 1613272, at *2 ("[T]he obligation of the USCIS to process
applications is not discretionary and is reviewable by this Court."); *Ibrahim*, 2007 WL 1558521,
at *5 ([T]he duty to adjudicate the applications is discretionary and ministerial."); *Chen*, 2007
WL 1468789, at *4 ([T]his non-discretionary duty to adjudicate an adjustment application
supports a mandamus action."); *Koren*, 2007 WL 1431948, at *7 ("Since CIS' obligation to
*adjudicate* adjustment of status applications is clearly prescribed, the failure to do so within a

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC 20036
Phone: 202-483-0053 Fax: 202-483-6801

22

'reasonable' period of time triggers mandamus jurisdiction in federal court."); *Dmitriev*, 2007 WL 1319533, at *3; *Huang*, 2007 WL 1302555, at *4; *Wu*, 2007 WL 1223858, at *2-3; *Song*, 2007 WL 1101283, at *3; *Duan*, 2007 WL 626116, at *3; *Mahd*, 2007 WL 891867, at *3; *Singh*, 470 F. Supp. 2d at 1067 ("[Petitioners whose applications for adjustment in status are properly before the INS … have a right, enforceable through a writ of mandamus, to have the applications processed within a reasonable time.") (internal citations omitted); *Aboushaban*, 2006 WL 3041086, at *2; *Zahani*, 2006 WL 2246211, at *1; *Elkhatib*, 2005 WL 5226742, at *2 ("[A]dministrative agencies do not possess discretion to avoid discharging the duties that Congress intended them to perform.").  As the Plaintiff has asserted, the delay of five years to adjudicate his properly filed application is per se unreasonable.  *See* Complaint ¶28.  The Plaintiff has fully complied with all the requirements for seeking adjustment of status, including making countless inquiries with USCIS into the unexplained delays in reaching a decision on his application and responding to all inquiries by USCIS.  *See* Complaint ¶¶10-20.

The district court's opinion in *Wu v. Chertoff* provides valuable guidance on this point. In *Wu*, the U.S. District Court for the Northern District of California considered a case presenting nearly identical facts to the case at bar.  *Wu*, 2007 WL 1223858.  Like Mr. Aftab, the plaintiff in *Wu* sought mandamus relief to expedite the processing of background checks.  *Id.* at *1.  The government moved to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), contending that the court lacked jurisdiction because the Defendant agency had "no clear, ministerial duty to act within a particular time frame."  *Id.* at *2.  The court rejected this argument, finding that jurisdiction exists under both the mandamus statute and the APA.

The Court agrees with the many district courts that have held that, taken together, the APA, the INA, and section 245.2(a)(5) of the CFR establish a *clear and*

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

23

> *certain right* to have immigration status adjustment applications adjudicated, and to have them adjudicated within a reasonable time.

*Id.* at *3 (emphasis added); *see also Singh*, 470 F. Supp. 2d at 1068; *Gelfer*, 2007 WL 902382; *Aboushaban*, 2006 WL 3041086; *Song*, 2007 WL 1101283. Furthermore, the court discerned "nothing to compel the conclusion that three years is a 'reasonable time' as a matter of law" for the plaintiff's name check and adjustment application to have been delayed, and thus denied the government's motion to dismiss. *Wu*, 2007 WL 1223858, at *3-4 ("Relief under mandamus and the APA are virtually equivalent when a petitioner seeks to compel an agency to act on a nondiscretionary duty."); *see also Song*, 2007 WL 1101283, at *3 n.4 (noting that even though the actual decision to grant or deny an application is discretionary, the agency "has a *non-discretionary* duty to act on applications within a reasonable time"). In addition, "[t]his non-discretionary duty to process or adjudicate an adjustment application supports a mandamus action." *Ma Liu,* 2007 WL 1655188 at *4. This Court should follow the well-reasoned opinions of the numerous district courts that have asserted jurisdiction over similar mandamus suits and should accordingly deny the Defendants' motion to dismiss.

### b.    JURISDICTION UNDER THE APA

The Defendants argue further that the Plaintiff's allegations of unreasonable delay in the adjudication of his adjustment of status application are unreviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. §§555(b), 702, because (1) the INA bars judicial review of challenges to adjustment of status decisions (2) adjustment of status adjudications are "expressly committed to agency discretion"; and (3) without any statutory timeframe for completing adjudications, "this Court would have to create a temporal standard out of whole cloth" jeopardizing national security concerns. Defs.' Motion at 16, 17, 19. On each count, the

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

24

Defendants' arguments are unavailing, unsupported, and contrary to the overwhelming weight of authority and facts of this case.

At the outset, the Defendants' assertion that "Plaintiff has no right to judicial review under the APA," is belied by this Court's explicit assertions of APA jurisdiction over nearly identical mandamus claims. Defs.' Motion at 16. For example, in the context of a similar mandamus action brought by a noncitizen petitioner under 28 U.S.C. §1361, the Court held that it "clearly has jurisdiction to review a claim of unreasonable delay of agency action" under the APA. *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 114 (D.D.C. 2005). Echoing the Plaintiff's complaint in this case, *Liberty Fund* explained that "[t]he Administrative Procedure Act requires an agency to act 'within a reasonable time,' 5 U.S.C. § 555(b), and authorizes a reviewing court to 'compel agency action … unreasonably delayed,' 5 U.S.C. § 706(1)." *Id.* at 114; *see also* Complaint ¶28. According to the Court, where a plaintiff "ha[s], in fact, demonstrated unreasonable delay," he has thereby established "a 'clear right' to relief under the Mandamus Act." *Liberty Fund*, 394 F. Supp. 2d at 114; *see also Liu,* 509 F.Supp.2d at 4.

### i. The APA Requires Defendants to Act "Within a Reasonable Time"

Contrary to the Defendants' claims, the government is obligated under the APA to carry out its duties – including the adjudication of properly filed adjustment of status applications – within a reasonable time. Under the APA, "[w]ith due regard for the convenience and necessity of the parties or their representatives and *within a reasonable time*, each agency *shall* proceed to conclude a matter presented to it." 5 U.S.C. § 555(b) (emphasis added). Resort to the APA is appropriate where, as here, no specific time frame for completion of agency action is mandated by the relevant statute. *See, e.g.*, *Liu*, 509 F.Supp.2d at 8 ("Accordingly, 28 U.S.C. §1331 in combination with the APA, vests the court with jurisdiction to compel agency action that is

unreasonably delayed or withheld"); *Aslam*, 2008 WL 220708 at \*4 ("As the government notes, a suit to compel agency action under the APA is conceptually similar to a suit for mandamus based on agency delay."); *Ma & Liu*, 2007 WL 1655188, at \*4 ("[T]his Court agrees that jurisdiction is proper under the APA and 28 U.S.C. §1331 to compel USCIS to adjudicate an application for adjustment to permanent status."); *Pool*, 2007 WL 1613272, at \*2 (same); *Koren*, 2007 WL 1431948, at \*6 (same); *Dmitriev*, 2007 WL 1319533, at \*3 (finding that "the USCIS has a statutory duty to adjudicate I-485 applications within a reasonable time" under the APA); *Huang*, 2007 WL 1302555, at \*3 (same); *Wu*, 2007 WL 1223858, at \*2-3 ("This Court has jurisdiction to hear plaintiff's complaint under both the writ of mandamus and the APA."); *Song*, 2007 WL 1101283, at \*4 (finding that jurisdiction exists under the APA "because while the agency has discretion to determine the outcome of an adjustment application, they do not have discretion concerning the timing of processing applications"); *Duan*, 2007 WL 626116, at \*4 ("I am persuaded by those courts that have found the exercise of jurisdiction proper, and 'this court now joins the majority and holds that jurisdiction is proper under the APA and 28 U.S.C. §1331 to compel the INS to adjudicate an application for adjustment to permanent status.'") (internal citations omitted); *Singh*, 470 F. Supp. 2d at 1072 ("[T]he Court concludes that, whether pursuant to mandamus or the APA, Mr. Singh is entitled to the relief he seeks."); *Fu v. Reno*, Slip Copy, 2000 WL 1644490, at \*6 (N.D. Tex. Nov. 1, 2000) ("[T]he court has subject matter jurisdiction over this case pursuant to the APA in conjunction with 28 U.S.C. §1331."); *Yu*, 36 F. Supp. 2d at 932; *Agbemaple v. INS*, Slip Copy, 1998 WL 292441, at \*2 (N.D. Ill. May 18, 1998); *see also Gelfer*, 2007 WL 90382, at \*3 ("Relief under mandamus and the APA are virtually equivalent when a petitioner seeks to compel an agency to act on a nondiscretionary duty."); c*f.*, *e.g.*, *Danilov*, 370 F. Supp. 2d at 445 (finding the APA inapplicable because "this matter is

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

26

controlled by the specific grant of subject matter jurisdiction set forth in 8 U.S.C. § 1447(b),"
which sets forth a specific 120-day deadline for completion of agency action).

Furthermore, timely adjudication of discretionary decisions is a fundamental requirement
of the APA and is distinct from non-reviewability of actions "committed to agency discretion by
law," pursuant to 5 U.S.C. § 701(a)(2). The former principle permits the courts to intervene to
determine *when* a case should be decided, whereas the latter principle bars review of *how* a case
is to be decided. A court generally will not order the government to exercise its discretion in any
particular manner. *See, e.g.*, *Silveyra v. Moschorak*, 989 F.2d 1012, 1015 (9th Cir. 1993) (stating
that, in general, "mandamus may not be used to instruct an official *how* to exercise discretion")
(emphasis added). However, the courts *are* empowered to order the government to take *some*
action. *See, e.g.*, *Ma & Liu*, 2007 WL 1655188, at *4; *Pool*, 2007 WL 1613272, at *2; *Koren*,
2007 WL 1431948, at *6; *Dmitriev*, 2007 WL 1319533, at *3; *Huang*, 2007 WL 1302555, at *3;
*Wu*, 2007 WL 1223858, at *2-3; *Song*, 2007 WL 1101283, at *4; *Duan*, 2007 WL 626116, at *4;
*Singh*, 470 F. Supp. 2d at 1072; *Fu*, 2000 WL 1644490, at *6; *Yu*, 36 F. Supp. 2d at 932;
*Agbemaple*, 1998 WL 292441, at *2 (N.D. Ill. May 18, 1998); *Gelfer*, 2007 WL 90382, at *3.

In similar cases where an adjustment of status applicant has brought a mandamus suit to
compel agency action on a stalled application, the federal courts have exercised jurisdiction
under the APA and found lesser delays by the government to be unreasonable. *See, e.g.*, *Kim*,
340 F. Supp. 2d 384 (noting that section 555(b) of the APA requires the government to act
within a reasonable amount of time); *see also Liu*, 509 F.Supp.2d at 8, *Ma & Liu*, 2007 WL
1655188, at *5 (stating that, even in the absence of any statutory or regulatory timeline, "federal
courts routinely assess the 'reasonableness' of the pace of agency action under the APA"); *Song*,
2007 WL 1101283, at *4-5 (same); *Duan*, 2007 WL 626116, at *4 (same).

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC 20036
Phone: 202-483-0053 Fax: 202-483-6801

27

The *Liu* Court addressed the government's insistence that no jurisdiction lies under the APA in conjunction with the federal question statute, 28 U.S.C. §1331, because adjustment of status decisions are "committed to the discretion of the Attorney General" and "cannot be brought under the APA."  *Liu*, 509 F.Supp.2d at 8.  At the outset, the Court recalled that "28 U.S.C. §1331 in combination with the APA, vests the court with jurisdiction to compel agency action that is unreasonably delayed or withheld."  *Id.*  Furthermore, under the law of this circuit, jurisdiction does exist to review certain kinds of agency inaction.  "One type are claims that allege that 'the pace of the agency decisional process lags unreasonably.'"  *Id.*  (quoting *Sierra Club*, 828 F.2d at 794).  Furthermore,

> In such cases, "the statutory duty involved … does not specify what course of action shall be taken.  Rather, regardless of what course it chooses, the agency is under a duty not to delay unreasonably in making that choice."  Agencies most often bear this duty of timeliness as a result of the APA's broad prohibition against "unreasonable delay."

*Id.* (internal citations omitted).  Consequently, *Liu* held, "the Court does have jurisdiction over plaintiff's APA claim that defendants have unreasonably delayed adjudicating his application."  *Id.*

Turning to the merits of Mr. Liu's claim, the Court was unpersuaded by the defendants' summary contention that "plaintiff's factual allegations do not demonstrate an unreasonable delay," particularly because the government offered no specific explanation for why the four-year delay had, in fact, been "reasonable."  *Id.* at 9.  Looking for authority on the issue from other jurisdictions, the Court noted that "[f]ederal courts have held that delays as long as four years are unreasonable for immigrant status adjustment applications."  *Id.*; *see also Singh v. Still*, 470 F. Supp. 2d 1064, 1071 (N.D. Cal. 2007); *Haidari v. Frazier*, 2006 WL 3544922, at *6 (D. Minn. Dec. 8, 2006); *Yu v. Brown*, 36 F. Supp. 2d 922, 935 (D.N.M. 1999).  The Court noted

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

28

further that the defendants' delay has acted to deprive the plaintiff of the benefits of permanent

resident status, which also favors a finding that the delay is unreasonable.  Moreover, as in the

case at bar, the government did not dispute that there was no active investigation of the plaintiff

by the FBI or any other agency, but simply claimed that "requiring the processing of plaintiff's

application may increase the delay for others."  *Liu*, 509 F.Supp.2d at 10.  Absent any

information on the extent of the potential impact, however, the Court was unconvinced by the

defendants' insistence that their delay in adjudication was not unreasonable.  *Id.*

Accordingly, the Court ruled that it has jurisdiction over the plaintiff's APA claim and

agreed with the plaintiff that the adjudication of his adjustment of status application had been

unreasonably delayed.  *Id.*

> Based on the nature of the security check process, the findings of other courts, and
> the prejudice to the plaintiff, the Court concludes that the present four-year delay
> in adjudicating plaintiff's application is unreasonable.  Though they had ample
> opportunity, defendants have failed to provide information that would allow the
> Court to find plaintiff's interests outweighed by the impact of a remedy on other
> agency activities.

*Id.*  The Court consequently denied the government's motion to dismiss and ordered the

defendants to complete adjudication of the plaintiff's adjustment of status application within 90

days of the Court's order.  *Id.*

In the case at bar, the Plaintiff has complied fully with all requirements imposed on him

and performed what should have been more than necessary to obtain his immigrant status.  In

response, the Defendants have engaged in unreasonable inaction and delay, failing to adjudicate

his adjustment of status application despite the Plaintiff's repeated inquiries and entreaties over

the past several years.  Under these circumstances, the Court should find – like the majority of

federal courts to have addressed this issue – that the Defendants' failure to adjudicate the

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

29

Plaintiff's application is unreasonable and a breach of its ministerial non-discretionary duty. *See, e.g.*, *Liu*, 509 F.Supp.2d at 8; *Aslam*, 2008 WL 220708 at *4; *Ma & Liu*, 2007 WL 1655188, at *4; *Pool*, 2007 WL 1613272, at *2; *Koren*, 2007 WL 1431948, at *6; *Dmitriev*, 2007 WL 1319533, at *3; *Huang*, 2007 WL 1302555, at *3; *Wu*, 2007 WL 1223858, at *2-3; *Song*, 2007 WL 1101283, at *4; *Duan*, 2007 WL 626116, at *4; *Singh*, 470 F. Supp. 2d at 1072; *Fu*, 2000 WL 1644490, at *6; *Yu*, 36 F. Supp. 2d at 932; *Agbemaple*, 1998 WL 292441, at *2 (N.D. Ill. May 18, 1998); *Gelfer*, 2007 WL 90382, at *3.

### ii.    The Court May Determine What is "Reasonable" Under the APA in the Absence of a Statutory Timeframe for Adjudication

The Defendants also contend that the APA affords this Court no jurisdiction to review the Plaintiff's mandamus complaint, because "without any mandatory time frame to adjudicate Plaintiff's claim that USICS has "unreasonably delayed" adjudication of the applications and the processing of Aftab's background checks, this Court would have to create a temporal stand out of whole cloth." 5 U.S.C. § 555(b), or 'unreasonably delayed' adjudication, id. § 706(1)." Defd's Motion at 19. The Defendants are mistaken. Although neither the statute nor the regulations provide a specific timeframe for adjudication of adjustment of status claims, this does not render the pace of application processing discretionary; there is an implied commitment under the statute to adjudicate meritorious claims within a reasonable period of time. As the court made clear in *Aslam*,

> as an agency of the Executive Branch, the Department of Homeland Security is subject to the catchall time requirement of the APA:

> With due regard for the convenience and necessity of the parties or their representatives and *within a reasonable time,* each agency shall proceed to conclude a matter presented to it.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

30

> 5 U.S.C. § 555(b) (emphasis added). Absent this timeliness requirement, the
> Secretary could defeat the clear intent of Congress simply by withholding
> performance of his statutory duty indefinitely.

2008 WL 220708 at *5; *see also Ibrahim*, 2007 WL 1558521, at *5 (observing that "the duty to adjudicate the applications is nondiscretionary and ministerial" and "the statute implies that this duty must be carried out within a reasonable time"); *Elmalky v. Upchurch*, Slip Copy, 2007 WL 944330, at *5 (N.D. Tex. Mar. 28, 2007) ("[T]he USCIS has a *nondiscretionary* duty to issue *some* decision . . . within a reasonable time.") (emphasis in original); *Lazli v. USCIS*, Slip Copy, 2007 WL 496351, at *4 (D. Or. Feb. 12, 2007) (finding an implied duty to adjudicate within a reasonable time); *Dmitriev*, 2007 WL 1319533, at *3 ("[T]he USCIS has a statutory duty to adjudicate I-485 applications within a reasonable time.").

Moreover, the USCIS itself publishes application processing times, which plainly afford a "meaningful standard" against which this Court can assess the reasonableness of agency delay. *See, e.g.*, *Ibrahim*, 2007 WL 1558521, at *7 (noting that "[w]hile Congress has not imposed a timetable for application processing, the CIS has established one" in the form of its published case processing times). As one district court has observed,

> [A]lthough there is no statutory or regulatory deadline by which the CIS *must* adjudicate an application, at some point, defendants' failure to take *any* action runs afoul of section 555(b). Were it otherwise, CIS could hold adjustment applications in abeyance for decades without providing any reasoned basis for doing so. Such an outcome defies logic – the CIS simply does not possess *unfettered* discretion to relegate aliens to a state of "limbo," leaving them to languish there indefinitely. *This result is explicitly foreclosed by the APA.*

*Kim*, 340 F. Supp. 2d at 393 (emphasis added).

In this case, if Plaintiff application was processed according to the standard processing times at the USCIS Texas Service Center, his application would have been long ago adjudicated.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

31

*See* USCIS Texas Service Center Processing Times *available at* https://egov.uscis.gov/cris/jsps/Processtimes.jsp?SeviceCenter=TSC (last visited Mar. 3 2008). However, it is clear that it is not the USCIS Texas Service Center that is holding up adjudication of Plaintiff's application.  It is some unknown variable, perhaps lack of resources at the USCIS Headquarters office which conducts background investigations, of which the Defendant's have been completely evasive.  *See, e.g., Aslam,* 2008 WL 220708 at *6 ("the unreasonableness of a particular delay is a highly fact-specific inquiry that looks to the nature of the adjudication at issue and the relative inters in play"); *Wu*, 2007 WL 1223858, at *3 (holding that "[t]he amount of time that is reasonable [for agency processing of an I-485 application] is a fact-specific inquiry" and finding "nothing to compel the conclusion that three years is a 'reasonable time' as a matter of law"); *Gelfer*, 2007 WL 902382, *2  ("Allowing the respondents a limitless amount of time to adjudicate petitioner's [I-485] application would be contrary to the 'reasonable time' frame mandated under [the APA]."); *Yu*, 36 F. Supp. 2d at 934 ("What constitutes an unreasonable delay in the context of immigration applications depends to a great extent on the facts of the particular case.").

Furthermore, the specific facts of the Plaintiff's case indicate that nothing has been done to move his application forward since September 21, 2006 and his I-485 application has been "lost in a bureaucratic shuffle," whereby his countless inquiries to CIS have fallen on deaf administrative ears and the now five year delay in adjudication has only continued to grow. *Pool*, 2007 WL 1613273, at *3.  Under such circumstances, the courts have held that the agency "must either adjudicate [the I-485 application] or provide a satisfactory explanation for the delay." *Id.*  As detailed in Section II above, the Defendants' explanation for the delay is not only inadequate, it also contains factual inconsistencies that undermine the Defendants' claims.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

32

Where such disputed issues of fact exist, dismissal is not appropriate.  *See, e.g.*, *Gelfer*, 2007 WL

902382, at *2; *Liu*, 509 F.Supp.2d at 4; *Agbemaple*, 1998 WL 292441, at *2.

> Finally, the Defendants contend that
>
> Following the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough security checks on aliens who are seeking immigration status in the United States has required procedures that result in certain individuals not receiving their documents and benefits as quickly as in the past.

Walker Decl. ¶10.   The agency's concerns, although perhaps legitimate with respect to

individuals who could reasonably be considered a "risk to the public or the nation's security,"

clearly do not apply to the Plaintiff.   Plaintiff has lived, studied, and worked in this country for

over 15 years and has faithfully complied with all U.S. immigration requirements, including

registration for NSEERS.   *See* Complaint at ¶¶ 13-21.   Furthermore, during the more-than five

years that his adjustment of status application has remained pending, the Plaintiff has been

granted permission to work, permission to travel, and permission to reside in the United States

by U.S. immigration authorities.   Were the Plaintiff truly perceived to be a "risk to the safety and

security of the nation," surely the proper course would not be to simply indefinitely delay his

adjustment of status application while consistently affording him the right to live, work, and

travel in and outside of this country.   Moreover, if the Plaintiff were truly a risk to national

security, Defendants presumably would have already denied his application for adjustment of

status.

The unreasonable delay in this case cannot fairly be attributed to anything other than

impermissible bureaucratic inaction.   Remarkably, notwithstanding the five year delay in

adjudication, the Defendants have not revealed any movement on background checks in

Plaintiff's case since September 21, 2006.   *See* Walker Dec'l at ¶14. Under these circumstances,

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

33

the agency has failed to demonstrate a good faith effort to resolve administrative errors and adjudicate the Plaintiff's application within a reasonable timeframe, which clearly weighs in favor of mandamus relief. *Cf. Liberty Fund v. Chao*, 394 F. Supp. 2d 105, 120 (D.D.C. 2005) (holding that "the good faith of the agency in addressing the delay weighs against mandamus").

Accordingly, the Plaintiff urges this Court to find, notwithstanding the Defendants' protestations, that the facts of this case clearly support his claim of unreasonable agency delay. The Court should order the Defendants and those acting under them to perform their non-discretionary legal duty and adjudicate the Plaintiff's meritorious adjustment of status application without further delay.

**B.    TRANSFER OF THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS IS NOT WARRANTED**

Venue is proper in this forum under 28 U.S.C. §1391(e) and the Defendants have not satisfied their steep burden to illustrate that a transfer to the Northern District of Texas is warranted under 28 U.S.C. §1404(a).  As explained below, the information provided by the Defendants in their motion and more notably the information missing from their motion indicates that this Court is the proper forum for Plaintiff's mandamus action.  In particular, the Defendants' assertion that "the fact that some of the Defendants are high government officials who reside in the District of Columbia does not establish a sufficient connection to this District" does not accurately represent the facts of this case.  Defs.' Motion at 22.  Rather, the evidence in this case suggests that the reason for the delay in Plaintiff's case stems primarily from policy decisions made by officials at the USCIS office in Washington D.C. and background investigations conducted by individuals at the USCIS headquarters in Washington D.C.,

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

34

particularly in cases such as the Plaintiffs where the Defendants claim that "national security considerations …permeate USCIS's adjudicative process." Defs.' Motion at 19.

The Defendants' contradictory affidavits are completely silent on the issue of *where* the additional investigations on Plaintiff's case are being conducted and whether they have even been initiated and the evidence suggests that background investigations involving national security issues are conducted by USCIS headquarters. *See* Exhs. 13-16.   Moreover, if an FBI name check has not been conducted since September 21, 2006, it is very likely that the name check will need to be resubmitted, illustrating further action outside the Northern District of Texas.   *See* Exh. 13 (FBI Name Checks Policy and Process Clarifications for Domestic Operations setting forth a 15 month validity period for FBI name checks).  The Defendants are silent on the issue of whether a second FBI name check request has been submitted to the FBI.

The Defendants' state that "any relief Plaintiff may obtain will involve [USCIS's Texas Service Center], which is located in Dallas, Texas.  *See* Defs.' Motion at 23.  Although the relief Plaintiff may obtain may "involve" the USCIS Texas Service Center, the evidence suggests that the five year delay in Plaintiff's adjustment of status application and the necessary actions to move forward Plaintiff's application, must occur *outside* of Texas.  *See* Exh. 13-16.   To the extent that the Defendants suggest that presentation of witnesses or evidence may be required, the Plaintiff notes that such discovery is contrary to the nature of a writ of mandamus, which is sought to compel performance by public officials of a purely ministerial duty that has been unreasonably delayed or withheld.  The Plaintiff also submits that most of the Defendants' witnesses in similar actions around the country originate from Washington, D.C. *See* Exhs. 13 – 16.  For instance, in relation to a mandamus action recently decided in the Eastern District of Pennsylvania, *Mocanu*, most of the USCIS affiants originated from USCIS offices in

Washington, D.C. *See Mocanu*, 2008 WL 372459, at FN 2 ("Certification of Supplement to the Administrative Record" and "Revised National Security Adjudication and Reporting Requirement" attached hereto as Exh. 15).

In addition, the Defendants' insistence that "the events giving rise to this complaint … either have transpired and will occur at the USCIS Texas Service Center" is contradicted not only by the very nature of the delay in this case, but also by the number of different USCIS offices outside of Texas that have been involved in Plaintiff's case and are likely the source of the delay in his case. *See* Complaint ¶¶ 15-20; *see also* Exhs. 13-16. At one point, it appears that USCIS, not necessarily the Texas Service Center, lost the original documents concerning Plaintiffs case, as they requested copies of documents from the Plaintiff, which USCIS themselves had issued or should have had in their possession. *See* Complaint at ¶ 20.

Decisions governing the imposition and processing of security and background checks on applicants for certain immigration benefits, including adjustment of status, occur at the Department of Homeland Security ("DHS") and USCIS offices in Washington, D.C. *See* Exh. 13-16. As the Defendants have acknowledged, the Plaintiff's adjustment application remains unadjudicated by USCIS because additional security checks must be completed, but Defendants' fail to state where those security checks are being completed. *See* Defs.' Motion at 10. Although the Defendants argue that the Texas Service Center is responsible for issuing the decision on Plaintiff's application, *id.* at 24, they offer no evidence that the additional background checks are actually being carried out by USCIS officials in Texas or that the delay in his case stems from that office. As stated earlier, of the USCIS Texas Service Center alone was responsible for moving forward Plaintiff's application, the application would have been adjudicated long ago, as the normal processing time for applications like the Plaintiff's at the

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC 20036
Phone: 202-483-0053 Fax: 202-483-6801

36

Texas Service Center is eleven months.  CIS Texas Service Center Processing Dates Posted Feb.

15, 2008, *available at* https://egov.uscis.gov/cris/jsps/Processtimes.jsp?SeviceCenter=TSC (last

visited Mar. 3 2008).  To the contrary, as described more fully below, the apparent reason for the

delay in Plaintiff's case, FBI name checks and national security investigations, are conducted

*outside* of Texas, both at the FBI's Criminal Justice Information Services facility located in West

Virginia and at USCIS headquarters in Washington, D.C.  *See* Exhs. 13-16 (exhibit 13 illustrates

that FBI name checks are only valid for 15 months, thus the Defendants' inconsistent statements

that Plaintiff's name checks were completed on September 21, 2006, over 15 months ago, is even

more confusing).

The Defendants argue that venue for this action "is more appropriate in the Northern

District of Texas" and consequently move this Court to transfer the case pursuant to 28 U.S.C.

§1404(a).  Defs.'  Motion at 1.  The Defendants' motion is unpersuasive and should be denied,

because relevant private-interest considerations, public-interest considerations, and the interest of

justice all weigh against a transfer out of this District.

### 1.      Private-Interest Consideration Weigh Against a Transfer

For the following reasons, the private-interest factors weigh in favor of keeping this case

in the District of Columbia.  *See, e.g.*, *Trout Unlimited*, 944 F. Supp. at 16 (defining the relevant

private interests as (1) the Plaintiff's choice of forum; (2) the Defendants' choice of forum; (3)

whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the

witnesses; and (6) the ease of access to sources of proof).

### a.      *The Plaintiff's choice of forum is entitled to deference.*

In evaluating the Defendants' motion, this Court must first determine whether venue in

this District is proper for the Plaintiff's claims, before turning to the threshold question whether

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

37

this action "might have been brought" in the Northern District of Texas.  *Van Dusen*, 376 U.S. at 616; *Abusadeh*, 2007 WL 2111036, at *3.  At the outset, as the Plaintiff argued in his Complaint, venue properly lies in the District of Columbia because three of the four named Defendants reside in this District and national policy concerning adjudication of applications for immigration benefits, such as adjustment of status to lawful permanent resident and imposition of required background and security checks, is formulated by the DHS and implemented by USCIS and the FBI.  *See Abusadeh*, 2007 WL 2111036, at *5; *Greater Yellowstone*, 180 F. Supp. 2d at 128-29; Complaint ¶9; Exhs. 13-16.  As stated earlier, if this case involved merely a decision to be made at the USCIS Texas Service Center, this application would have been long ago adjudicated, as is evidenced by the standard processing times for I-485 applications at the Texas Service Center. CIS Texas Service Center Processing Dates Posted February 15, 2008, *available at* https://egov.uscis.gov/cris/jsps/Processtimes.jsp?SeviceCenter=TSC (last visited Mar. 3 2008). But that is not the case here, and the Plaintiff has good reason to believe that his case has been delayed by action, or rather, inaction, outside of Texas; as the Defendants' describe in their motion to dismiss and accompanying affidavits, the important decisions in such cases are made at USCIS headquarters.  *See also* Exhs. 13-16. Accordingly, the Plaintiff's choice of forum merits deference.  *See Shawnee Tribe*, 298 F. Supp. 2d at 24 ("[A] plaintiff's choice of forum is afforded great deference, and is a 'paramount consideration' in any determination of a motion to transfer.") (quoting *Sheraton Operating Corp. v. Just Corporate Travel*, 984 F. Supp. 22, 25 (D.D.C. 1997)); s*ee also Southern Utah Wilderness Alliance*, 315 F. Supp. 2d at 86 ("The moving party 'bear[s] a heavy burden of establishing that plaintiffs' choice of forum is inappropriate.'") (quoting *Pain v. United Tech. Corp.*, 637 F.2d 775, 784 (D.C. Cir. 1980));

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

38

*Darby v. United States Dep't of Entergy*, 231 F. Supp. 2d 274, 276-77 (D.D.C. 2002); *Greater Yellowstone*, 180 F. Supp. 2d 124, 127 (D.D.C. 2001); *Trout Unlimited*, 944 F. Supp. at 16.

### b.    The Defendants' choice of forum is not entitled to deference.

Turning to whether the Court nonetheless ought to transfer venue to a different jurisdiction, under the discretionary language of 28 U.S.C. §1404(a), the Defendants contend that the Plaintiff's choice of forum "deserves little deference because he does not reside in this District, and because this District 'lacks meaningful ties to the controversy.'"  Defs.'  Motion at 24 (quoting *Southern Utah Wilderness Alliance v. Norton*, 315 F. Supp. 2d 82, 86 (D.D.C. 2005)).  The Plaintiff does not dispute that this is an action which "might have been brought" in the Northern District of Texas, as he himself resides there.  *See* 28 U.S.C. §1391(e).  However, the Defendants' insistence that the District of Columbia "lacks meaningful ties to the controversy" is plainly belied by the evidence.

Specifically, the evidence submitted by the Defendant's evidence is contradictory insofar as describing what background checks have been completed concerning Plaintiff's application. *Compare* Walker Dec'l at ¶14 (stating that "USCIS received a response to the FBI *fingerprint* checks on or around September 21, 2006) (emphasis added) *with* Cannon Dec'l at ¶41 (stating that it was the Plaintiff's *name check* request that was completed by the FBI on September 21, 2006) (emphasis added). Additionally, Defendant's evidence is completely silent regarding the location of the office responsible for completing the background checks that remain pending on Plaintiff's case.  *Id.*  Although the Defendants insist that final adjudication of Plaintiff's case will take place in Texas, they fail to indicate the location of the office that is the source for the delay and/or is responsible in conducting the "necessary" background investigations.  *See* Walker Dec'l at ¶¶9-14.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

39

This evidence clearly undermines the Defendants' insistence that "the only nexus between this District and the case is the fact that the agency heads names as defendants have offices in D.C." Defs.' Motion at 1; s*ee Greater Yellowstone*, 180 F. Supp. 2d at 128-29 (denying motion to transfer where "operative facts and impact of this case are linked to" District of Columbia); *Wilderness Soc'y*, 104 F. Supp. 2d at 14 (denying transfer away from District of Columbia where evidence established federal government official's "heavy involvement" in decision-making process). C*f. Abusadeh*, 2007 WL 2111036, at *6 (holding that "Plaintiff's choice of forum is entitled to less than ordinary deference as … this action bears no 'meaningful ties' to the District of Columbia"); *Southern Utah Wilderness Alliance*, 315 F. Supp. 2d at 86 (same); *Sierra Club*, 276 F. Sup. 2d at 67 (finding that "the parties' presence in the District of Columbia is overshadowed by the lack of evidence that federal officials in this forum played 'an active or significant role' in the decision" at issue in the case) (quoting *Airport Working Group of Orange County, Inc. v. United States Dep't of Defense*, 226 F. Supp. 2d 227, 230 (D.D.C. 2002)).

Furthermore, in support of their Transfer Motion, the Defendants have submitted a sworn declaration from Genize Walker, Supervisory Adjudications Officer at the USCIS Texas Service Center. *See* Walker Dec'l. Ms. Walker fails to acknowledge that the Plaintiff filed his adjustment application on October 4, 2002 with the USCIS Vermont Service Center and that his application was only transferred to the USCIS Texas Service Center in February 2007. *See* Complaint ¶¶ 15, 18; *see also* Exhs. 1, 4, 5. Moreover, Ms. Walker does not state which office is conducting the further background investigations in relation to Plaintiff's application or whether those investigations are even taking place. *See* Walker Dec'l.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

40

This is not a case where "there was no Washington-level involvement in any part of the decision-making process" or where "federal officials in the District of Columbia did not play an active role" in the complained-of delay.  *Sierra Club*, 276 F. Supp. 2d at 68.  To the contrary, the evidence indicates that "federal officials in this forum played an 'active or significant role'" in the processing of background and security checks on cases such as the Plaintiffs.  *Sierra Club*, 276 F. Supp. 2d at 67; *see Greater Yellowstone*, 180 F. Supp. 2d at 128-29 (deferring to plaintiffs' choice of forum in part because federal officials in District of Columbia were involved in grazing-permit decision at issue); *cf. Airport Working Group*, 226 F. Supp. 2d at 230 ("[T]here is *no* evidence to suggest that [government] officials had an active or significant role in this matter.") (emphasis added); *Trout Unlimited*, 944 F. Supp. at 16-18 (noting that none of the decision-making occurred in the District of Columbia); *see* Exhs. 13-16.

This conclusion is further bolstered by the nature of the background check process itself, which has apparently forestalled adjudication of the Plaintiff's adjustment application.  According to the Defendants, USCIS may not even proceed with the adjudication of the Plaintiff's adjustment application until the background investigations are completed.  Only *after* this process has been concluded will a decision to either approve or deny the Plaintiff's application be issued by the USCIS Texas Service Center.  These facts contradict the Defendants' insistence that "this case involves activities taking place in the Northern District of Texas" and that "there is local interest in resolving it there."  Defs.' Motion at 25.  To the contrary, the processing of requisite background and security checks – which is the admitted source of delay in adjudicating the Plaintiff's adjustment application –  and the decision not to move forward with Plaintiff's application until those checks have been complete takes place *outside* of Texas.  *See* Exhs. 13-16.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

41

Contrary to the Defendants' allegations, the "private interests" in this case do *not*, in fact, favor a transfer to the Northern District of Texas, because the "primary issue in this case" concerns decisions (on routine background and security checks) made *outside* the USCIS Texas Service Center. *See Greater Yellowstone*, 180 F. Supp. 2d at 129; *Wilderness Soc'y*, 104 F. Supp. 2d at 14; *cf., e.g.*, *Southern Utah Wilderness Alliance*, 315 F. Supp. 2d at 87; *Sierra Club*, 276 F. Supp. 2d at 67-68; *Shawnee Tribe*, 298 F. Supp. 2d at 24; *Airport Working Group*, 226 F. Supp. 2d at 230-31.

### c.    The Plaintiff's claim arose in this District.

Next, the Court looks to whether the action arose somewhere outside the Plaintiff's chosen forum. *E.g.*, *Sierra Club*, 276 F. Supp. 2d at 67. In *Abusadeh v. Chertoff*, for example, this Court granted the government defendants' transfer request, in part, because the plaintiff had previously filed a district court action in another jurisdiction – presenting the same factual allegations but different legal theories – and "only brought suit here after being *denied* the relief he sought in the Southern District of Texas." *Abusadeh*, 2007 WL 2111036, at *5 (emphasis added). No such facts exist here; to the contrary, the Plaintiff brought his original action in this Court and articulated in his Complaint valid reasons why venue is proper in this district. *See* Complaint ¶9. For this reason as well, the Court should defer to the Plaintiff's choice of forum.

### d.    The convenience of the parties does not favor a transfer.

The convenience of the parties carries no weight where the "action involves an administrative review that the court is likely to determine on the papers," as in this case. *Sierra Club*, 276 F. Supp. 2d at 69. Furthermore, the dispositive issue in this mandamus lawsuit is the delay in adjudicating the Plaintiff's adjustment application owing to uncompleted security and background checks. Processing and completion of those checks occurs *outside* the Northern

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

42

District of Texas.  *See* Exhs. 13-16. As the Defendants themselves concede, the Texas Service

Center does not conduct in-person interviews.  *See* Walker Dec'l at ¶5.  In fact, the location of

the service center in Texas means nothing to the public, as there is no public access to the

building either in person or by phone.  The contact information given for the Texas Service

Center is the USCIS office in Washington, D.C.  S*ee* USCIS Texas Service Center Webpage

*located                                                                                            at*

http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnexto

id=b0f860a07706d010VgnVCM10000048f3d6a1RCRD&vgnextchannel=52a46c854523d010Vg

nVCM10000048f3d6a1RCRD (last visited Mar. 4, 2008).  The office's physical location in

Texas is irrelevant to these proceedings.

        Although the final decision approving or granting Plaintiff's application may issue from

the Texas Service Center's physical address, the actions needed to move forward that application

will take place outside of Texas and in Washington, D.C., if this case truly involves national

security concerns as the Defendants allege.  *See* Defs.'  Motion at 10-11 (stating that "the alleged

delay is a direct consequence of USCIS's conclusion that national security interests preclude it

from completing its adjudication of Aftab's application until its own inquiries following the FBI

background investigations are complete").  The decision – whether to grant or deny the

Plaintiff's adjustment application – is not at issue in this lawsuit; in fact, such a discretionary

determination appears to be immune to judicial review.  *See* INA §242(a)(2)(B)(ii), 8 U.S.C.

§1252(a)(2)(B)(ii).

        The action before this Court pertains solely to the Defendants' unreasonable delay in

processing Plaintiff's application.  *See, e.g.*, *Liu*, 509 F.Supp.2d at 8 (finding that "28 U.S.C.

§1331, in combination with the APA, vests the court with jurisdiction to compel agency action

that is unreasonably delayed or withheld"). Accordingly, the Defendants have failed to identify any "local interest in resolving" this case in the Northern District of Texas, as the complained-of delay in adjudication is the result of background and security checks occurring outside the Texas District. C*cf., e.g.*, *Rosales v. United States*, 477 F. Supp. 2d 213, 216 (D.D.C. 2007) (granting transfer request because "this dispute involves individuals, real property, and Native American cultural items that are exclusively located in the Southern District of California"). Moreover, three of the four Defendants have offices in the District of Columbia. *See Greater Yellowstone*, 180 F. Supp. 2d at 129; *see also Abusadeh*, 2007 WL 2111036, at *5 ("Thus, on the face of the venue statute, it appears that venue properly lies in the District of Columbia because three of the four named Defendants in this case 'reside' in the District of Columbia.").

e.    *The convenience of the witnesses does not favor a transfer.*

For the same reason, the convenience of the witnesses likewise "is not a significant factor." *Sierra Club*, 276 F. Supp. 2d at 69; *Airport Working Group*, 226 F. Supp. 2d at 231 (finding that "the convenience of witnesses is likely to be of no relevance since this is a review of an administrative decision"); *cf. Rosales* , 477 F. Supp. 2d at 216 (granting request to transfer where "many witnesses, Plaintiffs' counsel, and Plaintiffs themselves reside in California, most of them in the Southern District"); *Trout Unlimited*, 944 F. Supp. at 18 (finding transfer from District of Columbia to District of Colorado appropriate because "the affected public, the water users and residents of [the affected body of water], are located in Colorado"). The Plaintiff anticipates that his mandamus complaint will be decided solely on the pleadings and, should the Court deem necessary, argument by counsel, without the need for witnesses or testimony. In fact, in most national security or background check related cases the majority of the government's witnesses originate in Washington D.C. *See e.g. Mocanu*, 2008 WL 372459, at

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

44

FN 2 ("Certification of Supplement to the Administrative Record" and "Revised National Security Adjudication and Reporting Requirement" attached hereto as Exh. 15).

In addition, the Plaintiff's counsel is located in Washington, D.C., as is counsel for the Defendants.  The Plaintiff himself has no objection to traveling to this District, if necessary, to litigate the case.  Therefore, unless the Court intends to grant the Plaintiff permission to conduct discovery, there is no basis for the Defendants' claim that the Northern District of Texas is a "more convenient jurisdiction in which to litigate this case." Defs.'  Motion at 25; c*f. Joyner v. District of Columbia*, 267 F. Supp. 2d 15, 21 (D.D.C. 2003) (finding that "interest of justice and convenience of the parties and witnesses" justify transfer to district "where the prison of Frank Joyner's murder is located, where the records and other physical evidence will be found, and where it is likely that most of the potential witnesses are located").

### f.    *Ease of access to sources of proof does not favor a transfer.*

Finally, the ease of access to sources of proof is of little significance, where the Court will likely decide this case on the administrative record.  *See Air Line Pilots Ass'n v. Eastern Air Lines*, 672 F. Supp. 525, 527 (D.D.C. 1987) (noting that since the record had to be shipped to the parties' District-based counsel, it was not "a significantly greater hardship" to send a copy to the courthouse as well).  However, in this case, as stated above, the critical decisions to move forward Plaintiff's application for adjustment of status come from Washington D.C. *See e.g. Mocanu*, 2008 WL 372459, at FN 2 ("Certification of Supplement to the Administrative Record" and "Revised National Security Adjudication and Reporting Requirement" attached hereto as Exh. 15).  Although the Defendants insist that final decision concerning Plaintiff's application will be made in Texas, the crucial actions leading up to that point, and the reason for the delay in Plaintiff's case, likely originate in Washington D.C. and will likely occur in Washington, D.C.

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

45

where issues involving national security are investigated and decided. *See* Exhs. 13-16. Again, unless the Court is prepared to grant the Plaintiff permission to conduct discovery, in order to fully investigate the source(s) of delay in processing his application, no witnesses or additional documents are needed to decide the Plaintiff's mandamus action.

### 2.    Public-Interest Considerations Weigh Against a Transfer

The public-interest factors in this case also weigh against a transfer of venue. *See Trout Unlimited*, 944 F. Supp. at 16 (defining the relevant public interests as (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home).

#### a.    *Transferee's familiarity with governing laws.*

First, with respect to the transferee's familiarity with governing laws, this case involves interpretation of federal statutes. The Plaintiff's complaint seeks this Court's intervention under the mandamus and federal question statutes and the APA, owing to Defendants' unreasonable delay in adjudicating her adjustment of status application. *See* Complaint ¶¶1-4, 35-39; *see also Liu*, 509 F.Supp.2d at 8 (finding that "28 U.S.C. §1331, in combination with the APA, vests the court with jurisdiction to compel agency action that is unreasonably delayed or withheld"). In other cases where this Court has found transfer to be warranted, the suits involved a localized dispute with little national significance and the alternative venue was more familiar with governing laws. *See, e.g.*, *Southern Utah Wilderness Alliance*, 315 F. Supp. 2d at 88-89; *Sierra Club*, 276 F. Supp. 2d at 71; *Trout Unlimited*, 944 F. Supp. at 19. By contrast, this case does not involve any issues of state or local law and, instead, touches upon an issue of national significance – delays in the processing of applications for immigration benefits as a result of

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

46

required security background checks.  Hence, there is no advantage to having a federal court in Texas, which might be more familiar or experienced with Texas state law, adjudicate this action, which pertains exclusively to federal laws that have nationwide application.  *See* Complaint ¶¶3-8, 32-34.

### b.    *Relative congestion of Courts' respective calendars.*

Second, the evidence offered by the Defendants indicates that the U.S. District Court for the Northern District of Texas is more congested and more burdened with filings than the U.S. District Court for the District of Columbia.  Consequently, this factor likewise does not "alter[] the balance in favor of transfer."  *Abusadeh*, 2007 WL 2111036, at *8.

### c.    *Local interest in deciding local controversies.*

Third, although the Defendants assert that "since this case involves activities taking place in the Northern District of Texas, there is local interest in resolving it there."  Defs.'  Motion at 25, they fail to identify any activities, let alone significant activities, taking place on Plaintiff's application in Texas or any other compelling local interest that favors a transfer.  In truth, this case arose in Vermont, where the Plaintiff originally filed his application for adjustment of status; it was subsequently transferred to Texas, almost two years after the Plaintiff moved there, and not until four years into his application process. *See* Complaint ¶¶15-21.  The delay in Plaintiff's case does not appear to stem from Texas and the Defendants have not offered any evidence to suggest otherwise. This is not a case, therefore, where local interest or local impact tips the public-interest balance in favor of a transfer.  *See Greater Yellowstone*, 180 F. Supp. 2d at 129-30; *Wilderness Soc'y*, 104 F. Supp. 2d at 13-14; *cf., e.g.*, *Shawnee Tribe*, 298 F. Supp. 2d at 27 (finding a compelling "local interest" favoring transfer where resolving the controversy at issue "would require not only knowledge and experience in interpreting Native American Indian

treaties, but examination of local property records and deeds and other documents"); *Airport Working Group*, 226 F. Supp. 2d at 231 (noting that the dispositive issue in the case "will have a profound effect on the local environment and the use of local resources").

Finally, this Court has previously cautioned that a transfer is disfavored if the possibility exists that the defendants are forum-shopping. *See Greater Yellowstone*, 180 F. Supp. 2d at 129; *see also Ferens v. John Deere Co.*, 494 U.S. 516, 527 (1990).

### 3.    Transfer of this Case Will Result in Further Unreasonable Delay

Most significantly, however, a grant of the Defendants' motion to transfer would unavoidably lead to further, unnecessary delay, and unreasonable delay by the Defendants is what is at issue in this case.   The prospect of additional delay weighs heavily against a grant of the Defendants' transfer request, where the Plaintiff has already waited more than five years for his adjustment of status application to be adjudicated. *Cf. Trout Unlimited*, 944 F. Supp. at 19 (granting government's transfer request where "[i]t is not evident that a transfer to the northern district of Colorado will lead to unnecessary delay").

The Defendants fail to explain how their transfer request "would promote efficiency and fairness." Defs.' Motion at 23.  Quite the contrary, shuttling this case to the Northern District of Texas would have a severe dilatory effect, which cannot reasonably be regarded as "in the interest of justice."  28 U.S.C. §1404(a); *see also Liu*, 509 F.Supp.2d at 10 ("Based on the nature of the security check process, the findings of other courts, and the prejudice to the plaintiff, the Court concludes that the present four-year delay in adjudicating plaintiff's application is unreasonable.   Though they had ample opportunity, defendants have failed to provide information that would allow the Court to find plaintiff's interests outweighed by the impact of a remedy on other agency activities.").

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

48

## V.    CONCLUSION

Based on the foregoing, the Plaintiff respectfully opposes the Defendant's motion to dismiss or in the alternative transfer venue and urges the Court to deny the motion in its entirety. Furthermore, the Plaintiff urges the Court to remand the Plaintiff's application for adjustment of status to USCIS, with instructions that all appropriate steps must be taken to adjudicate the Plaintiff's application within 30 days. *See Song*, 2007 WL 1101283, at *5 (denying government motion to dismiss and remanding to CIS "to complete adjudication of plaintiffs applications within thirty days"); *Haidari*, 2006 WL 3544922, at *6 (denying motion to dismiss and remanding to CIS to complete processing of plaintiffs adjustment applications within 30 days).

Respectfully submitted this <u>4th</u> day of March 2008,

KASHIF AFTAB

*By counsel,*


  __/s/ Thomas K. Ragland___
Thomas K. Ragland
DC Bar Number: 501021

MAGGIO & KATTAR
11 Dupont Circle, NW, Suite 775
Washington, DC 20036
Phone:  (202) 483-0053
Fax:  (202) 483-6801

*Counsel for Plaintiff*

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

49

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

KASHIF AFTAB               )
                           )
      Plaintiff,      )
v.                       )
                           )    Civ. No.: 07-2080(RWR)
                           )
EMILIO T. GONZALEZ, Director  )
U.S. Citizenship and Immigration Services,  )
Et al.                    )
                           )
      Defendants.    )
_____)

## ORDER

Upon consideration of the Plaintiff's Opposition to Defendants' Motion to Dismiss or in the Alternative to Transfer, it is hereby ORDERED that Defendants' Motion to Dismiss is hereby DENIED.

It is further ORDERED that Defendants' Motion to Transfer is hereby DENIED.

It is further ORDERED that Defendants will take all appropriate steps to adjudicate Plaintiff's application for adjustment of status within 30 days.

Done and Ordered this _____ day of _____, 2008.

_____
Richard R. Roberts
U.S. District Judge

Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

50

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

KASHIF AFTAB                                          )
                                                     )
            Plaintiff,                               )
v.                                                   )
                                                     )        Civ. No.: 07-2080(RWR)
                                                     )
EMILIO T. GONZALEZ, Director                         )
U.S. Citizenship and Immigration Services,           )
Et al.                                               )
                                                     )
            Defendants.                              )
---                                                  )

**CERTIFICATE OF SERVICE**

I, Thomas K. Ragland, hereby certify that on this the 4th day of March, 2008, I filed the foregoing Plaintiff's Opposition to Defendants' Motion to Dismiss or in the Alternative to Transfer via Electronic Case Filing System, and thereby caused a true and correct copy to be served upon:

                                        Brandon Lowy
                                        Special Assistant U.S. Attorney
                                        555 4th Street, NW
                                        Washington, DC 20530.


__/s/ Thomas K. Ragland_
Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW, Suite 775
Washington, DC 20036

Phone: (202) 483-0053
Fax: (202) 483-6801
tragland@maggio-kattar.com


Thomas K. Ragland
MAGGIO & KATTAR
11 Dupont Circle, NW Suite 775
Washington, DC  20036
Phone: 202-483-0053  Fax: 202-483-6801

51

# Exhibit 13

U.S. Department of Homeland Security
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529



U.S. Citizenship
and Immigration
Services

# Interoffice Memorandum

To:     Regional Directors
        Service Center Directors
        District Directors (except foreign)
        Officers in Charge (except foreign)
        National Benefit Center Director

From:  Michael L. Aytes
       Associate Director, Domestic Operations

Date:   DEC 2 1 2006

Re:     FBI Name Checks Policy and Process Clarification for Domestic Operations

## Background

Over the past few years, definitive FBI name checks (hereafter referred to as name checks) have
been mandated on several form types as part of the effort to ensure that immigration benefits are
provided only to those individuals who are eligible. Name checks search FBI administrative and
investigative files based on the name and date of birth of the applicant. These checks have proven to
be an effective tool in the identification of potential threats to our national security and in providing
other relevant information that may affect the eligibility of an applicant for a benefit. This
memorandum explains existing policy for domestic operations regarding name checks in order to
provide all employees with a thorough understanding of this specific type of background check and
of how the results affect the adjudication of applications for immigration benefits. In addition,
several policy changes, which are explained in more detail later in this memorandum, are being
instituted in the following areas:

1.  *Missing or Incorrect Date of Birth (DOB)* – A new name check is required for year of birth
    changes or discrepancies.
2.  *Validity Period* – A name check response can be used for multiple applications if the
    response is not more than 15 months old.
3.  *Duplicate Requests* – Only one definitive response is necessary per application or within the
    15-month validity period.

4. *Expedited Name Checks* – Mandamus filings will no longer be routinely expedited. The loss of Social Security benefits or other subsistence, however, continue to be a basis for routine expeditious processing.

This memorandum shall not apply to adjudications of I-589 and I-881 applications by the Asylum Division, which shall continue to be governed by the relevant sections of the Identity and Security Checks Procedures Manual. This memorandum also does not apply to adjudications of I-601 waiver applications filed overseas in conjunction with immigrant visa processing, which are subject to CLASS checks, and in some cases SAO clearances.

## General Name Check Process

A definitive name check is required for the following form types: I-485, I-589, I-601, I-687, I-698, and N-400. Name checks for Form I-192, Application for Advance Permission to Enter as Nonimmigrant, are still required and will be performed if the form is filed with USCIS. A case may be denied, dismissed, administratively closed, withdrawn, or referred to immigration court prior to obtaining the final results of a name check, but offices may only exercise this option if they implement a post-audit system to monitor for the completion of the name check[1]. A completed name check or an initiated check is required prior to the issuance of a Notice to Appear[2]. A name check is not required for a Native American who is being accorded permanent resident status under section 289 of the Immigration and Nationality Act. Most name checks are initiated through data entry of case information into the corresponding processing system. CLAIMS 3 / CLAIMS Mainframe initiate name checks for I-485s and CLAIMS 4 initiates name checks for N-400s. Name checks for I-687s and I-698s must be initiated using a manual spreadsheet process discussed below and in attachment B. An I-601 name check will generally be completed by the associated I-485 name check. However, if an I-601 is filed independently of an adjustment application, then that name check must be initiated using the manual spreadsheet process discussed later in this memo[3]. The manual spreadsheet process may also be used to initiate name checks that were not otherwise initiated by automated systems. However, there are additional areas of the name check process that require further guidance as follows:

### *Name Variations:*

Name checks are conducted using an applicant's name and date of birth, as listed on the application. Alias submissions and spelling variations do not require a separate check. Names are searched in a multitude of combinations, switching the order of the first, middle, and last names, as well as combinations of just the first and last names, first and middle names, etc (this is referred to as an 'around the clock' search). Through this process, the FBI automatically repositions the names submitted and the check will match against the primary name on record as well as any aliases.

For example, if the name submitted were Jose Garcia Rodriguez, the following names would be checked automatically:

---

[1] Refer to memorandum titled Closing of Cases with Pending Law Enforcement Checks, dated April 5, 2004.

[2] Refer to memorandum titled Security Check Requirements Preceding Notice to Appear Issuance, dated March 2, 2004

[3] Except for I-601s filed overseas in conjunction with immigrant visa applications.

FBI Name Checks
Page 3

Jose Garcia Rodriguez
Jose Rodriguez Garcia
Jose Garcia
Jose Rodriguez
Garcia Jose Rodriguez
Garcia Rodriguez Jose
Garcia Jose
Garcia Rodriguez
Rodriguez Jose Garcia
Rodriguez Garcia Jose
Rodriguez Jose
Rodriguez Garcia

The name check automatically includes a phonetic search and retrieves records with similar spelling variations (e.g. Rodriguez = Rodrigues). Due to these search methodologies, name checks shall not be resubmitted because of misspellings or use of alias names.

### *Missing or Incorrect Date of Birth (DOB):*

The name check also includes an automatic variation on the DOB that is submitted. The DOB is an important primary value used by the FBI in the name check process. The check includes a search on the exact full date of birth as well as an expanded search on the year of birth. This methodology accounts for the different ways that a date of birth can be written (e.g. the day and the month may be written in different positions). Discrepancies within the day and month of birth do not warrant resubmission of a name check and a new name check should only be initiated if the year of birth is incorrect. If a new name check is required, the manual spreadsheet process must be used.

### *Missing or Incorrect Place of Birth (POB):*

The POB is not used as a value in the initial stages of the name check process. The POB is used as an optional indicator or matching value in the later part of the name check process for only those cases that are returned with an initial response of "pending." See Attachment A for more information.

### *Missing or Incorrect A-Number:*

Name checks are conducted using biographical information relating to the applicant. The Alien Registration Number (A-number) is not used as a variable in the FBI's process. Therefore, name checks performed with an inaccurate or missing A-number are valid and should not be resubmitted for a new check.

In instances where the FBIQUERY system reflects an inaccurate A-number, the system may be corrected by providing the following information to your respective regional office or service center point of contact:

FBI Name Checks
Page 4

Applicant Name
Correct A-number
Incorrect A-number
Synopsis of reason(s) for requesting an A-number correction

Regional offices and service centers should submit A-number correction requests via E-mail to the designated POC at Headquarters' Office of Field Operations, presently Pam Wallace.

*Age Limits:*

Names checks are required for applicants age 14 years and older **at the time of adjudication** for all of the above-listed form types[4] **except** Form I-485, which has an upper age limit. CLAIMS 4 processes name check requests for applicants age 14 years and over (no upper age limit) while CLAIMS 3 submits name check requests for applicants between the ages of 14 and 80 years. The upper age limit of 80 years can be misleading in that a name check is conducted only if the applicant's 80th birthday falls on the same day that the USCIS name check utility is performed. If an applicant is 80 years and a day, a name check will not be performed. Until a CLAIMS 3 system modification to remove the upper age limit can be performed, the upper age limit of 80 years will remain in effect. For the purpose of the name check, the upper age limit of 80 years is defined as the date the applicant turns 80 years old. Further, if an applicant is less than 14 years of age at the time of filing but turns 14 years old while the application is pending, then a name check is required. If a new name check is required, the manual spreadsheet process must be used.

*Validity Period:*

A definitive (No Record "NR" or Positive Response "PR") name check response is valid indefinitely for the application for which it was conducted. If a definitive name check response is used to support other applications, the name check response is only valid for 15 months from the FBI process date. For example, an I-485 is filed on June 1, 2004 and a definitive name check response is processed for that application on December 1, 2004. The I-485 is denied on February 15, 2005, and another I-485 is filed for the same applicant on May 15, 2005. The December 1, 2004, FBI response may be used for the I-485 filed on February 15, 2005, even if another name check has been initiated. However, final adjudication or naturalization must occur within the 15-month validity period or a new name check will be required. Additional information, including a set of frequently asked questions, is included in this memorandum as Attachment A.

*Duplicate Requests:*

In many instances, duplicate name checks are initiated for a single application. The causes for multiple name check requests are primarily systems issues or resubmission requests made by local offices in an effort to facilitate a name check that is already in a "pending" status. Duplicate requests for the purpose of resolving "pending" name checks must not be initiated. Duplicate requests do not facilitate the resolution of "pending" name checks and only add to the backlog. In addition, duplicate requests for a single application result in multiple name check responses being

---

[4] Refer to Operating Instructions 105.10.

FBI Name Checks
Page 5

posted to the FBIQUERY system. Often, a final response will be received from the FBI and posted
to FBIQUERY, but because duplicate requests were made there are additional "pending" responses
in the system. **Only one** definitive response is necessary and adjudication may continue in those
instances where a final FBI response has been processed, and is within the **15-month validity
period**, even though additional "pending" responses remain unresolved for that application.

*Manual Spreadsheet Process:*

A manual spreadsheet is available to domestic offices to be used when a name check cannot be
performed or was not initiated by one of the automated systems. The local offices send their
spreadsheets to their respective regional offices on a weekly basis as needed. Regional offices and
Service Centers forward the spreadsheets to designated points of contact in Headquarters' Office of
Field Operations to initiate the name checks with the FBI. The initial response should appear in
FBIQUERY within forty-five (45) days from the date of submission by the local office. See
Attachment B for manual spreadsheet instructions and a sample spreadsheet.

There are several situations that may necessitate the initiation of a check outside of the normal data
entry process:

1.    An applicant turns fourteen (14) years of age during the time his/her case is pending
      and, therefore, requires a name check to be completed.

2.    "NO DATA" response cases: If the FBIQUERY system shows "NO
      DATA" for a case more than ninety (90) days after the date the information was
      entered into CLAIMS 3 / CLAIMS Mainframe or CLAIMS 4. If a name check
      request was submitted through the spreadsheet process and ninety (90) days have
      passed without a response posted in the database, the local office should contact their
      regional or service center point of contact in order to verify that the name was
      included on the weekly report submitted to HQ. If it is verified that the name check
      was included on the submission to HQ, the regional or service center point of contact
      should report the missing name check to the HQ point of contact. If the name check
      cannot be verified as having been forwarded to HQ, then the local office will need to
      resubmit the name check request on the spreadsheet to their regional or service center
      point of contact.

3.    "ERROR" response cases: If FBIQUERY shows an "ERROR" response, the office with
      the case must resubmit the case data on the manual spreadsheet if the error has not been
      corrected in 30 days.

4.    Prior to issuance of an NTA if an FBI name check has not been initiated.

*Expedited Name Checks:*

Cases with significant and compelling issues can have the name check expedited. Cases that are
simply "old" or the subject of a congressional inquiry *do not* qualify for an expedited name check
unless one or more of the expedite criteria are met. An expedite can be requested by an office

FBI Name Checks
Page 6

whether the FBIQUERY system shows "NO DATA" or "PENDING." Requests must meet at least one of the following criteria for expeditious treatment:

1. Military Deployment
2. Age-out cases not covered under the provision of the Child Status Protection Act (CSPA) and applications affected by sunset provisions such as Diversity Visas (DVs).
3. Compelling reasons as provided by the requesting office (e.g. critical medical conditions)
4. Loss of Social Security benefits or other subsistence in the discretion of the District Director

NOTE: In the interest of fairness and in processing cases chronologically mandamus filings are no longer routinely treated expeditiously.

Expedite processing is done via fax to a designated headquarters point of contact. HQ will fax a response to the initiating office, which will serve as evidence that the name check was completed. The fax will be annotated with the final response from the FBI. There may be a delay of 3 weeks or more in updating the FBIQUERY system with the results of an expedited check. However, the faxed response is acceptable for adjudication purposes and should be placed with the case file. See Attachment C for additional information regarding expedited name checks. Expedite requests shall be faxed to the attention of Pam Wallace at (202)-272-1008.

## Use of the FBIQUERY System:

The official repository for name check responses is the FBIQUERY system, located on the FBI Tracking Menu in National Systems. A user can access the name check database through the CLAIMS, RNACS, or RAPS sub-menu, or from the CIS system by pressing the 'CLEAR' button and typing 'FBIQUERY.'

Normally, a user should initiate a query in the name check database by using the alien registration number (A#) of the applicant; however, a search can also be initiated by using the name and date of birth. When querying the system by name, it is recommended to broaden the search by changing the "Name Search" value from "F or Full" to "P or Partial." The name check database will provide one of several different results in response to a query. All name check responses from the FBI with process dates on or after December 1, 2002 are valid responses. The system default is to display the most recent data. The table below is a synopsis of the specific codes that a user will see in the name check database:

## FBIQUERY System Responses

| Code | Description | Action |
|------|-------------|--------|
| NR | No Record | Proceed with the adjudication of the application. A printout of the FBI response or the faxed expedited response must be included in the case file. |

FBI Name Checks
Page 7

| | | |
|---|---|---|
| PR | Positive Response | An FBI report was sent to HQ FDNS and will be forwarded to the local office. HQ FDNS forwards the report to the office shown as the File Control Office (FCO) in CIS. Do not proceed with the adjudication until the FBI report has been reviewed by the adjudicator and a determination is made based on the content of the report. |
| IP H I | Pending | The FBI has not completed the background check. Except for N-400 applications[5], an interview can be conducted, but an approval cannot be rendered until a definitive response (either NR or PR) has been received from the FBI. A case may be denied or withdrawn if the office implements a post-audit system. |
| E | Error | The name check request could not be processed due to formatting or code error. Do not proceed with the adjudication until a definitive response has been received from the FBI. If the error has not been corrected in 30 days, the office should submit a manual name check using the manual spreadsheet process. |
| D/DD | Duplicate | The FBI previously processed the name check. The original response should be displayed in the name check response database either under the same A# or under the same name/DOB. If no original response can be found, the 'Duplicate' response can be used in its place. In the 'Duplicate' response, the final response information will show the date and the response on the right side of the 'FBI RESPONSE INFORMATION' section. 'FN' means final response and it will be followed by the date and a code for a No Record response (NR) or a code for a PENDING response (H or I). |
| RC | Request Cancelled | The name check request has been cancelled. |
| UN | Unknown Response | This is actually a POSITIVE response and follows |

---

[5] Refer to memoranda regarding N-400 interview without completed FBI name checks, titled Background Checks and Naturalization Interview Scheduling, dated April 25, 2006, and Background Checks and Naturalization Interview Scheduling Follow-Up Memo, dated May 22, 2006.

FBI Name Checks
Page 8

|  |  | the action of "PR" above. The UN code appears because a new code was added by the FBI that is not included in the USCIS conversion tables. Therefore the system defaults to UN or Unknown. The HQ FBIQUERY system technical team has been tasked to correct the response information in the system. |
|---|---|---|
| No Data Found | No Data Found | The query provided no information that a name check has been initiated. If you checked by A#, you should also search by the name/DOB. Change the "F" to a "P" in the NAME SEARCH field in the lower part of the FBI Query screen when querying by name/DOB.  If, after 90 days from the data entry date of the case, or if 90 days after the name data was provided on a manual spreadsheet, the database still shows 'no data', then the case information should be submitted (or resubmitted) using the manual spreadsheet process. |

The response codes listed above are not necessarily the actual response codes returned by the FBI. The FBI uses many different response codes but for purposes of consistency and simplicity, USCIS consolidates the original FBI responses into the codes noted above. On occasion, primarily with manual Name checks and duplicate responses, the internal FBI response code will appear in the FBIQUERY database. The following codes are considered NO RECORD responses: ND, NP, and NR. The codes DS, RP, OC, and RF, are considered POSITIVE RESPONSE results and offices must wait for a report from FDNS. Additional information regarding the processes supporting positive responses is explained later in this memorandum.

*Positive Responses (PR):*

In instances where the name check produces a positive response, a report detailing the information contained in the FBI record is returned to USCIS and, ultimately, the report is forwarded to the field office or service center shown as the A-file File Control Office (FCO) in the Central Index System (CIS). Prior to June 7, 2004, the Immigration and Customs Enforcement (ICE) Law Enforcement Support Center (LESC) forwarded FBI G-325 positive responses to the field offices and service centers, but on June 7, 2004, the HQ Office of Fraud Detection and National Security (HQ FDNS) assumed that responsibility[6]. All FBI reports are sent to HQ FDNS for preliminary review before being forwarded to field offices and service centers.

---

[6] Refer to memorandum titled FDNS Processing of Positive FBI Responses to G-325 Name Checks, dated October 21, 2004

FBI Name Checks
Page 9

HQ FDNS will contact the third agencies identified by the FBI for the files referenced in the FBI's positive response record, unless the third agency is identified as a local agency in respect to the local USCIS office. Further, if FDNS determines the FBI report includes information relating to National Security, the case will be referred to the National Security Adjudication Unit.

If more than 90 days have elapsed after the posting of a "PR" result in the FBIQUERY system without a report being received, and the office is the FCO as shown in CIS, the office should contact HQ FDNS to inquire about the status of the PR record. Offices may contact Mr. Robert Kruszka at HQ FDNS via E-mail.

*Hardcopy Responses:*

Hardcopy responses are acceptable for documenting the name check results. In nearly all instances, hardcopy responses will be used for expedited checks, but hardcopy responses are not limited to expedited cases.

**Points of Contact**

Questions regarding this memorandum should be directed through appropriate supervisory and operational channels to the attention of Greg Collett, 202-272-1023, HQ Field Operations. Local offices should work through their regional offices.

## ATTACHMENT A
### Frequently Asked Questions Regarding FBI Name Checks

What do I do if there is an NR and an IP/E update in the FBIQUERY system?

If multiple records appear for the same application, only one definitive response is necessary. Adjudication may continue in those instances where a final FBI response has been received even though additional "pending" responses remain unresolved for that name. Likewise, a definitive response may be used with another application if final adjudication occurs within 15 months of the FBI process date. Applications can continue to be denied, dismissed, administratively closed, withdrawn, or referred to immigration court because of reasons other than the name check, but only if the office implements a post-audit system to monitor for the completion of the name check[7].

At the time of final adjudication, or at time of oath for naturalization applicants, the FBIQUERY system shall be checked again to determine if any "pending" responses have subsequently resulted in a "PR." In instances where a "PR" is returned, adjudication shall cease and offices are to follow the guidance provided in the memo relating to positive responses.

If an applicant's primary name changes between the time of filing and the time of adjudication, does the new name need to have a name check conducted prior to an approval adjudication?

No. USCIS does not need to conduct a name check on the applicant's new name.

What do I do if the DOB in the system is wrong?

For name checks initiated by automated systems (CLAIMS 3, CLAIMS 4, RAPS) and for name checks submitted on the manual spreadsheet, the FBI searches the entire year of the submitted date of birth. For example, if a date of birth is March 1, 1980, the FBI will do a search for all dates in the year 1980. Therefore, if the year of the date of birth is incorrect, you should resubmit the name via the manual spreadsheet using the correct year of the date of birth. Stated another way, if only the month and/or the day of the date of birth are incorrect, a new name check is not required.

For expedited name checks that are faxed to HQ and manually checked at the FBI, the FBI will search the date of birth provided and also do a search by reversing the day and the month of the date provided. The FBI will not search the entire birth year for these expedited checks. For example, if an expedited name check has a date of birth of March 10, 1980, the FBI will also search using a date of birth of October 3, 1980.

If the date of birth does not meet the above guidelines and a new name check is needed with the corrected date of birth, you should resubmit the name using the correct date of birth on the

---

[7] Refer to memorandum titled Closing of Cases with Pending Law Enforcement Checks, dated April 5, 2004

> manual spreadsheet or, if for an expedited name check, via fax to the HQ point of contact for expedited name checks.

### What do I do if the applicant's A-number is wrong in the FBIQUERY system?

The name search is based on the name and date of birth of the applicant. If a record can be located in the name check database using a name/DOB search, the record can be used. Name checks performed with an inaccurate or missing A-number are valid and should **not** be resubmitted for a new check. See page 3 and 4 of this memo for information on how to submit an A-number correction.

### What do I do if the applicant's Place of Birth is incorrect/missing?

The place of birth does not need to be displayed in the response to make the response valid. The FBI does not consider the POB in the initial query so if the initial response from the FBI is No Record, the POB was not needed. If the incorrect POB was submitted and the initial response is PENDING, a new name check is required and the manual spreadsheet process must be used.

### What do I do if the applicant's name is misspelled in FBIQUERY?

Misspelled names are not required to be re-run. The FBI uses an "around the clock" name search engine combined with a phonetics search logic that takes into account misspellings, name variations, and alias names. This means that all probable variations of a name are checked to include spelling and the order of names.

### Does a name check expire?

A name check response is valid indefinitely for the application for which it was conducted. In addition, a definitive name check response may be used to support other applications but, when used for another application, the response is only valid for 15 months from the FBI response date.

### How do I obtain third agency information?

Prior to June 7, 2004, the Immigration and Customs Enforcement (ICE) Law Enforcement Support Center (LESC) forwarded FBI G-325 responses to the field when the name check was updated as "PR." Since June 7, 2004, the HQ Office of Fraud Detection and National Security (HQ FDNS) assumed that responsibility[8]. For additional information, refer to the October 21, 2004 memorandum issued by Don Crocetti entitled FDNS Processing of Positive FBI Responses to G-325 Name Checks.

---

[8] Refer to memorandum titled FDNS Processing of Positive FBI Responses to G-325 Name Checks, dated October 21, 2004

FBI Name Checks
Page 12

If more than 90 days have passed after the posting of a "PR" result without a report being received and the office is the FCO as shown in CIS, then the office should contact HQ FDNS to inquire about the status of the PR record.   Offices may contact their regional or service center point of contact for assistance in requesting another copy of the PR report, if that is required.

A case has been listed as PENDING for several months; should I resubmit it?

No.  Although some cases seem to take an inordinate amount of time to move from a PENDING response to a final response, submitting a second check will actually delay clearance.  Check with your supervisor to determine if the case warrants expeditious processing.

# Exhibit 14

# DEPARTMENT OF HOMELAND SECURITY

# Office of Inspector General

A Review of U.S. Citizenship and Immigration Services' Alien Security Checks



**Office of Inspections and Special Reviews**

**OIG-06-06**

**November 2005**



*Office of Inspector General*

**U.S. Department of Homeland Security**
Washington, DC 20528

Preface

The Department of Homeland Security (DHS) Office of Inspector General (OIG) was established by the Homeland Security Act of 2002 (*Public Law 107-296*) by amendment to the Inspector General Act of 1978.  This is one of a series of audit, inspection, and special reports prepared as part of our DHS oversight responsibility to promote economy, effectiveness, and efficiency within the department.

This report assesses the strengths and weaknesses of the use of security checks by U.S. Citizenship and Immigration Services when processing applications for immigration benefits.  It is based on interviews with employees and officials, direct observations, and a review of applicable documents.

The recommendations have been developed to the best knowledge available to the OIG, and have been discussed in draft with those responsible for implementation.  It is our hope that this report will result in more effective, efficient, and economical operations.  We express our appreciation to all of those who contributed to the preparation of this report.

Richard L. Skinner
Inspector General

# Contents

Executive Summary ................................................................................................. 1

Background ............................................................................................................. 2

Results of Review .................................................................................................. 5

    Scope of security checks should be improved with biometrics and strategic planning ........... 5

    USCIS should continue to improve accuracy and timeliness of check completion ............... 15

    USCIS can administer security checks more efficiently ........................................ 28

Recommendations ................................................................................................. 35

Management Comments and OIG Evaluation ........................................................... 36

## Appendices

Appendix A:    Purpose, Scope and Methodology ................................................... 39
Appendix B:    Management Response to Draft Report ........................................... 40
Appendix C:    Security Checks for USCIS Immigration Forms ............................. 43
Appendix D:    Major Contributors to Report ......................................................... 46
Appendix E:    Report Distribution ......................................................................... 47

## Abbreviations

| BCS | Background Check System |
|-----|--------------------------|
| BSS | Biometric Storage System |
| CBP | Customs and Border Protection |
| CIO | Chief Information Officer |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| EOIR | Executive Office for Immigration Review |
| FDNS | Office of Fraud Detection and National Security |
| FY | Fiscal Year |
| GAO | Government Accountability Office |
| HSPD | Homeland Security Presidential Directive |
| IAFIS | Integrated Automated Fingerprint Identification System |

# Contents

| | | |
|---|---|---|
| IBIS | Interagency Border Inspection System | |
| ICE | Immigration and Customs Enforcement | |
| IDENT | Automated Biometric Identification System | |
| INS | Immigration and Naturalization Service | |
| ISRS | Image Storage and Retrieval System | |
| IT | Information technology | |
| NAILS | National Automated Immigration Lookout System II | |
| OIG | Office of Inspector General | |
| RAPS | Refugee Asylum and Parole System | |
| SOP | Standard operating procedure | |
| USCIS | United States Citizenship and Immigration Services | |
| US-VISIT | United States Visitor and Immigrant Status Indicator Technology | |

## Figures

Figure 1:    USCIS Quality Assurance – Errors Found  ........................................................... 17
Figure 2:    OIG Sampling Results – Total Errors Found ....................................................... 18
Figure 3:    OIG Sampling Results –Type of Errors Found  ....................................................19
Figure 4:    Security Checks for USCIS Immigration Forms ...................................................43

**A Review of U.S. Citizenship and Immigration Services' Alien Security Checks**

# OIG

*Department of Homeland Security*
*Office of Inspector General*

## Executive Summary

The staff of the National Commission on Terrorist Attacks upon the United States reported that the Immigration and Naturalization Service's "inability to adjudicate applications quickly or with adequate security checks made it easier for terrorists to wrongfully enter and remain in the United States throughout the 1990s." [1]  The full Commission recommended:

> The Department of Homeland Security, properly supported by the Congress, should complete, as quickly as possible, a biometric entry-exit screening system, including a single system for speeding qualified travelers.  It should be integrated with the system that provides benefits to foreigners seeking to stay in the United States.  Linking biometric passports to good data systems and decision making is a fundamental goal.  No one can hide his or her debt by acquiring a credit card with a slightly different name.  Yet today, a terrorist can defeat the link to electronic records by tossing away an old passport and slightly altering the name in the new one. [2]

The Immigration and Naturalization Service (INS), followed by U.S. Citizenship and Immigration Services (USCIS), made multiple changes over the past decade to improve the adequacy of security checks, detect applicants who pose risks to national security and public safety, deter benefits fraud, and ensure that benefits are granted only to eligible applicants.

As part of its ongoing responsibilities to evaluate the effectiveness of Department of Homeland Security (DHS) programs and activities, the Office of Inspector General (OIG) conducted a review of USCIS security check activities.  Our review assessed whether USCIS (1) selected security checks of appropriate scope; (2) properly completed checks and concluded them with timely referrals and denials when appropriate; and (3) conducted the checks in an efficient manner.  The scope and methodology of this review are discussed in Appendix A.

---

[1] *9/11 and Terrorist Travel*, staff report of the National Commission on Terrorist Attacks upon the United States, p. 99, August 21, 2004.
[2] *The 9/11 Commission Report,* National Commission on Terrorist Attacks upon the United States, p. 389, July 22, 2004.

USCIS has several significant changes planned and underway for the conduct of security checks. The Office of Fraud Detection and National Security (FDNS), created in May 2004, has begun to provide centralized support and policy guidance for security checks. In addition, USCIS has two automated systems in development–the Background Check System and Biometric Storage System–that could streamline how USCIS runs, documents, and monitors checks.

Security checks need continued management attention. First, USCIS' security checks are overly reliant on the integrity of names and documents that applicants submit; consequently, better use of biometric data is needed to verify applicants' identity. USCIS has not developed a measurable, risk-based plan to define how USCIS will improve the scope of security checks. Second, except for a small number of benefits, USCIS' management controls are not comprehensive enough to provide assurance that staff completes checks correctly. For a minority of cases, slow, inconclusive, or legally inapplicable security check results cause applications to stall, but USCIS is pursuing several solutions to conclude stalled cases. Finally, USCIS needs improved automation to eliminate paper-based, duplicative, and inefficient security check processes. Because USCIS' management of security checks is still somewhat decentralized, more coordination will be required to ensure efficient progress in implementing the changes USCIS envisions.

We are recommending that USCIS: 1) expand the use of biometric identification techniques; 2) establish a comprehensive, risk-based plan for the selection and completion of security checks; 3) set objectives for the conduct and completion of checks and organize management controls to ensure they are met; 4) implement the Background Check Analysis Unit, Background Check System, and Biometric Storage System; and 5) define accountability and timelines for implementing these changes.

## Background

On January 24, 2003, USCIS was created as part of the Department of Homeland Security. Along with Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE), USCIS became responsible for providing services formerly provided by the Immigration and Naturalization Service. USCIS processes over 50 types of benefits for immigrants and non-immigrants, including citizenship, asylum, legal permanent residence, work

authorization, and extension of stay.  In Fiscal Year (FY) 2004, USCIS completed approximately 7.3 million benefit applications and received 5.9 million more.  Five large processing centers managed most applications, but others were processed in more than 33 district offices and sub-offices, eight asylum offices, and USCIS headquarters.  USCIS' FY 2004 budget of $1.8 billion was composed of $236 million in appropriated funds and about $1.6 billion in fee revenues.

USCIS' first of six strategic goals is to ensure the security and integrity of the immigration systems, noting that "a secure homeland depends on the integrity of our immigration system."[3]  During the benefit application process, USCIS conducts security checks in order to prevent ineligible applicants from obtaining benefits and to help law enforcement agencies identify people who pose risks to national security or public safety.  Depending on the application submitted, USCIS conducts up to four different types of security checks:

- **Interagency Border Inspection System name checks (IBIS).** Managed by CBP, IBIS is a database of lookouts, wants, warrants, arrests, and convictions consolidated from over 20 agencies.  A complete IBIS query also includes a concurrent check of selected files in the Federal Bureau of Investigation's (FBI) National Criminal Information Center.  USCIS began conducting automated, name-based queries of IBIS for all USCIS applications in 2002.  With an average of 3.7 names per application to check,[4] USCIS conducted over 27 million IBIS checks in FY 2004.

- **FBI fingerprint check.** The FBI's Integrated Automated Fingerprint Identification System (IAFIS) matches criminal history records from federal, military, and most state apprehensions.  USCIS collects and electronically submits applicants' fingerprints for selected benefits such as naturalization, permanent residence, and asylum.  IAFIS has been in place since 1999; before that time, INS manually submitted fingerprint cards for criminal history records checks.  USCIS submitted 1.9 million fingerprints at a cost of $31.9 million in FY 2004.

- **FBI name check.** This partially automated, name-based check searches over 86 million files documenting people who are the main

---

[3] *USCIS Strategic Plan: Securing America's Promise*, p. 6, 2005.
[4] Additional names per application may include family members and aliases, such as married names.

subject or referenced in an FBI investigation. USCIS electronically submits applicant names to the FBI National Name Check Program for benefits such as naturalization, permanent residence, and asylum. The legacy INS queried the main files since 1985 but added reference files to security checks in 2002. USCIS submitted 1.5 million names at a cost of $6.0 million in FY 2004.

- **Automated Biometric Identification System (IDENT).** Asylum offices have used this automated fingerprint identification system since 1998. Managed by US-VISIT, IDENT enables agencies to screen fingerprints against several different database repositories. USCIS enrolls aliens applying for asylum in the IDENT-Asylum database, screening them against previously enrolled asylum applicants, the immigration lookout database of criminal aliens, and the immigration recidivist database of repeat immigration offenders. Asylum offices completed approximately 146,000 applications receiving this three-part check in FY 2004.

Appendix C summarizes which checks selected forms receive. In addition, depending on the benefit, USCIS checks administrative systems to review applicants' prior immigration history, entry and exits into the United States, student records, and immigration court records. When checks result in confirmed derogatory information, USCIS has an established process for completing the cases with denials and referrals to fraud investigators, law enforcement, and the immigration courts.

USCIS' current structure for conducting security checks has undergone many changes during the past decade. Previous Government Accountability Office (GAO) and OIG reports criticized the INS for its failure to complete fingerprint checks, failure to review check results during adjudication, inadequate controls to deter impostor applicants, inadequate security check procedures and training, and an improper emphasis on productivity at the expense of accuracy in determining whether applicants were eligible for benefits.[5] INS, and later USCIS, made multiple changes to the security check process to control the conduct and use of security checks. These include the

---

[5] *Alien Fingerprint Requirements in the Immigration and Naturalization Service*, Department of Justice (DOJ) OIG Report Number I-93-13, February 1994; *INS Fingerprinting of Aliens: Efforts to Ensure Authenticity of Aliens' Fingerprints*, GAO-GGD-95-40, December 22, 1994; *INS Criminal Record Verification: Information on Process for Citizenship Applicants*, GAO-GGD-97-118R, June 4, 1997; *An Investigation of the Immigration and Naturalization Service's Citizenship USA Initiative*, DOJ OIG, July 2000; and *Immigration And Naturalization Service's Premium Processing Program*, DOJ OIG Report Number 03-14, February 2003.

creation of application support centers to collect applicant fingerprints and naturalization quality procedures to guide adjudicators. A more recent change is USCIS' May 2004 creation of the Office of Fraud Detection and National Security to provide centralized support and policy guidance for security checks and anti-fraud operations.

USCIS continues to operate under production pressures, decreasing a FY 2003 backlog of approximately 3.7 million applications to less than one million by June 30, 2005. USCIS publicly attributed part of the backlog accumulation to the 2002 addition of IBIS name checks for all applications. Without compromising security, USCIS plans to eliminate the backlog by the end of FY 2006.

# Results of Review

# Scope of security checks should be improved with biometrics and strategic planning

USCIS standards for verifying applicant identity are vulnerable to fraud, which lessens the reliability of security checks based on those identities. USCIS intends to increase use of biometric identification but has no defined plans to do so. However, key changes in screening policy integration and information technology (IT) systems design and access are outside USCIS control. In order to align the layers of immigrant screening, and ensure USCIS' access to immigrant and screening data sources, greater DHS coordination is needed.

## USCIS needs to do more to verify applicants' identity

The security and integrity of USCIS' benefits process is overly reliant on the integrity of applicants to provide accurate information about their identity and history. The majority of USCIS security checks examine information that applicants provide: names, dates and places of birth, and other biographic information. Name-based checks are necessary to query records such as those in IBIS, but they are vulnerable to identity fraud and have several other weaknesses. USCIS supplements name-based checks with automated and manual biometric checks using IDENT, IAFIS, the Image Storage and Retrieval System (ISRS), and paper records. Biometric checks help to verify identity and improve the accuracy of security check results. However, less

than a quarter of USCIS' application workload is subject to fingerprint checks; and only two percent receive automated biometric checks that verify identity throughout the application process. USCIS is building a Biometric Storage System (BSS) that will support using fingerprints in identity verification. Other plans to expand biometric checks require definition.

## Relevance and accuracy of name-based security checks

Name-based checks are the majority of USCIS' security check workload. They enable USCIS to review a wide variety of lookout and criminal history records. Depending on the benefit involved, USCIS must determine whether applicants meet adjudicative standards related to national security, criminal history, and even good moral character. Therefore, USCIS considers beneficial the broad, name-based checks of FBI investigative files and IBIS, which includes records from over 20 agencies. Checking one of IBIS's sources alone, such as the FBI's Terrorist Screening Database, would not provide USCIS with the broad range of information relevant to adjudication. USCIS screens all applicants against IBIS, about 7.3 million completed applications in FY 2004. Depending on the benefit, a portion of applicants also receives the FBI name check and name-based checks against administrative records such as the Student and Exchange Visitor Information System. These systems do not support queries based on fingerprints or other biometric information.

However, the name-based checks are only as accurate as the supporting biographic information used to conduct them. For several reasons, USCIS has little assurance that the supporting biographic information is accurate and matches the identity of the applicant. First, the information is self-reported by applicants, who have an incentive to falsify the information to obtain benefits if they are not otherwise eligible. Second, U.S. documents that support the self-reported information, such as birth certificates and driver's licenses, are easy to falsify[6]–and USCIS accepts documents from all other countries. Plus, in many cases, USCIS accepts photocopied documents, which are more easily altered than originals. Third, USCIS does not routinely verify identity with alternative means, such as contacting bureaus of vital statistics to confirm birth certificates or crosschecking addresses with national records. GAO reported that alien use of fraudulent documents and identity theft is "extensive," and the staff of the National Commission on Terrorist Attacks

---

[6] GAO reported that its staff "easily" created fictitious identities and obtained driver's licenses, birth certificates, and social security cards, using computer equipment "readily available to any purchaser." *Security: Counterfeit Identification Raises Homeland Security Concerns,* GAO-04-133T, p. 1, October 1, 2003.

reported multiple instances of terrorists obtaining and using fraudulent identity documents.[7]

The effectiveness of name-based checks is further limited by how the checks are run. Because of the manual data entry involved in creating and searching the records, misspellings and typographical mistakes can skew results. When people change their names, such as after marriage, the search may miss criminal records associated with the old names. Transliterations of non-English and hyphenated spellings also complicate name-based searches. Finally, name-based checks create a processing burden to sort through hits that do not relate to the applicant searched, which occurs frequently with common names. After an analysis comparing name-based and fingerprint-based checks of criminal history records, the FBI reported, "The great weight of the evidence supports the FBI and the CJIS APB's [Criminal Justice Information Services Advisory Policy Board] conclusion that a name check of criminal history record systems is a 'rough' process which produces many 'false negatives' (in which a criminal is not identified) and 'false positives' (in which an individual without a criminal record is identified as having a record)."[8]

### Limited use of biometric checks

Biometric information–photographs, fingerprints, iris scans, and other identifiers–provides a more reliable means of verifying identity and querying screening databases because people's biometrics are unique and more difficult to falsify. They limit identity fraud as well as reduce false positive and false negative screening results. USCIS collects photographs with many applications but does not have a system for automated, facial recognition screening. Most of the biometric checks USCIS conducts involve fingerprints, which USCIS collects for about a quarter of its applications. Fingerprints enable USCIS to screen applicants against existing FBI and DHS databases.

- **The Automated Biometric Identification System (IDENT).** About two percent of applications completed in FY 2004 were screened in IDENT. By comparing the stored biometric data with fingerprints and

---

[7] *Identity Fraud: Prevalence and Links to Alien Illegal Activities,* GAO-02-830T, p. 1, June 25, 2002; *9/11 and Terrorist Travel*, staff report of the National Commission on Terrorist Attacks upon the United States, August 21, 2004.
[8] House Judiciary Subcommittee on Crime Regarding H.R. 3410 and Name Check Efficacy, Hearing on Crime Regarding HR 3410 and Name Check Efficacy, May 18, 2000 (statement of David R. Loesch, Assistant Director in Charge, Criminal Justice Information Services Division, FBI).

photographs that applicants resubmit at several points during the application process, the Asylum Branch "locks" an applicant's identity to a single set of biometric and biographic information.  This helps the Asylum Branch to prevent impostors from interviewing or collecting asylum decisions, to identify applicants who apply under more than one name, and to find and consolidate multiple application files.  Staff said that IDENT has been very useful in reducing duplicate filings since its implementation in 1998.  In FY 2004, the Asylum Branch's screening against three IDENT databases (asylum enrollees, immigration lookouts, and immigration recidivists) yielded 2,000 confirmed hits, mostly immigration recidivists.

On an exception basis, when other security checks reveal derogatory information and the applicant's identity is in question, some district office staff screen a walk-in applicant's fingerprints with IDENT equipment left over from the 2002-2003 National Security Entry/Exit Registration.[9]  However, this is an unofficial practice.  District offices do not store and re-check fingerprints to "lock" applicant identity as asylum offices do.

- **FBI fingerprint check.**  Through IAFIS, USCIS submits applicants' fingerprints to the FBI for a biometric check against criminal history records from federal, military, and most state apprehensions.  As the FBI reported, the fingerprint-based check is more accurate than a name-based check of these records.  USCIS conducted 1.9 million fingerprint checks in FY 2004; we calculated that almost a quarter of that year's completed applications included this check.  Even though it is fingerprint-based, this check has limited ability to verify applicants' identity because the FBI does not keep fingerprints to crosscheck them against USCIS' previous submissions.[10]  USCIS' fingerprint storage system is still in development.

- **Other biometric checks.**  For some cases, USCIS staff performs visual comparisons of photographs, fingerprints, and signatures stored in paper application files and the automated ISRS to help verify an applicant's identity.  Manual review of biometric information occurs for about half of the application workload and before fingerprint

---

[9] The INS deployed IDENT-ENFORCE (Enforcement Case Tracking System) equipment to district offices to collect fingerprints and register aliens from selected countries.  CBP and ICE now administer this program.

[10] USCIS checks are considered administrative.  The FBI does not keep fingerprints on file unless they were checked for criminal purposes.

collection at application support centers. Manual checks are slower and more vulnerable to error than automated ones, and they are not readily accessible to all staff. Staff said that paper applications are rarely on hand for immigration information officers handling walk-in appointments, and even adjudicators are sometimes unable to obtain files stored in different offices. In addition, staff we interviewed in late 2004 was still seeking access to ISRS, which the 2003 *Security Matrix Project Recommendations Report* encouraged USCIS to expand.

The government is moving toward greater use of biometric screening. Homeland Security Presidential Directive (HSPD) 11, "Comprehensive Terrorist-Related Screening Procedures," directed the Secretary of Homeland Security and an interagency working group to submit to the President a plan to improve terrorist-related screening that includes security features "that resist circumvention to the greatest extent possible" and that defines what identifiers to use in screening, including biometric ones. As of October 2004, the Department of State collects fingerprints and photographs from all visa applicants, about 7 million per year, to screen against IDENT. For applicants exempt from fingerprinting, such as children under 14, the Department of State conducts automated facial recognition screening, which along with the fingerprinting, serves to lock identity. Between October 2004 and March 2005, the system identified almost 5,000 mala fide applicants. The biometrics collected by the Department of State are linked with United States Visitor and Immigrant Status Indicator Technology (US-VISIT), which also uses IDENT technology, and screens applicants with biometric identifiers.

USCIS' limited ability to verify and lock applicants' identity poses several problems. Without automated biometric identification, establishing that the hit from a name-based check matches the identity of the applicant can be labor-intensive. For example, USCIS reported that one service center required an average of 5.4 additional database queries to verify an identity match for each positive IBIS name check. Delays in obtaining file biometric information to verify identity can interfere in acting on lookouts and warrants. An immigration information officer reported an instance when he could not obtain a file containing biometric information in time to verify a walk-in applicant's identity so that he could act on a security hit's warrant before the day's appointments ended and the applicant departed. The ultimate problem caused by limited identity verification, however, is that USCIS may provide ineligible aliens with benefits. Staff said rescission or revocation of benefits is rare and has a high legal threshold. Furthermore, a benefit from USCIS

assists aliens in applying for other benefits–driver's licenses, social security numbers, bank accounts, and in some states, gun licenses–enabling the alien to embed into society legally.

The ten-year business and information technology modernization plans that INS's Immigration Services published in 2001 support increased use of biometrics, as does the USCIS Strategic Plan issued in 2005. USCIS has not developed a risk-based plan that outlines how, when, and for what benefits expansion should occur, or that assigns accountability, timelines, and milestones for plan implementation. Nevertheless, USCIS is expanding its biometric capacity on an ad hoc basis. In late 2004, USCIS added fingerprinting for temporary protected status holders re-registering for benefits. In spring 2005, USCIS awarded a contract to build, test, and implement BSS to store applicant fingerprints and photographs. Under development for several years, BSS will support FBI fingerprint checks and will potentially compare BSS biometrics with alien biometrics in US-VISIT collected by the Department of State and CBP.

Senior officials said that USCIS' use of biometrics has been constrained by the capacity of application support centers to collect the data. Application support centers collected 1.9 million fingerprint submissions in FY 2004, while USCIS' full application volume was about 5.9 million receipts. Staff said that most application support centers could process more applicants, but they are limited by an inefficient computerized scheduling system and labor. Staff estimates that consolidating the five-part scheduling system could increase capacity by more than a million appointments per year. Draft information technology architecture documents from the Chief Information Officer discuss improving the scheduling system. USCIS is adding 173 federal and contract staff to application support centers in FY 2005.

## USCIS should develop a comprehensive, strategic plan for enhancing security checks

Since 2001, USCIS has made a number of changes to enhance the coverage of security checks for immigration benefits applicants. The changes USCIS has made to the content of security checks have been reactions to perceived gaps, a 2003 review, and separate office initiatives. There is no apparent effort to develop a strategic plan for selecting and conducting security checks. USCIS needs to develop such a plan, using risk assessment to prioritize efforts and allocate screening resources.

In response to incidents in 2001 and 2002 involving benefits granted to members of terrorist groups, staff added IBIS checks for all applications, greater use of entry-exit data, and FBI name check screening of reference files.[11]  In 2003, USCIS subject matter experts reviewed the battery of administrative and security checks to identify additional check needs and redundancies.[12]  The resulting report recommended retaining existing IBIS and FBI name checks, expanding biometric checks, and increasing adjudicators' access to databases for further, optional checking.  USCIS implemented several of its recommendations, such as increasing the validity period of IBIS checks from 35 to 90 days.[13]  Some recommendations were not completed, and at the time of our review, no staff was monitoring their implementation.  However, discrete initiatives from FDNS and other offices continue to refine the security check structure.  For example, the Asylum Branch recently added FBI name checks of asylum applicants' aliases.

USCIS has not used more comprehensive program analysis to allocate screening resources and develop a plan for security checks.  In essence, USCIS has not determined whether the resources used for certain checks might be used to greater effect with other checks.  USCIS has limited program and performance information in order to make such a determination.  For example, there is no statistically valid measurement of the prevalence of mala fide applicants in different application pools.[14]  In addition, USCIS has collected little measurement information on the effectiveness of different checks.  USCIS' automated systems do not provide program management information that ties together security check results and adjudication outcomes.  FDNS is beginning to develop both types of information.  Through the Benefits Fraud Assessment, expected to be completed in 2005, FDNS has begun to measure the frequency of mala fide applicants for six benefits that staff considers historically prone to fraud or high-risk.[15]  Also in 2005, FDNS began manually to collect information on adjudication outcomes associated with a sample of positive FBI name checks.

---

[11] *The Immigration and Naturalization Service's Contacts with Two September 11 Terrorists: A Review of the INS's Admissions of Mohamed Atta and Marwan Alshehhi, its Processing of their Change of Status Applications, and its Efforts to Track Foreign Students in the United States,* DOJ OIG, May 20, 2002; *Review of the Circumstances Surrounding the Naturalization of an Alien Known to be an Associate of a Terrorist Organization,* INS Office of Internal Audit, December 13, 2002.

[12] USCIS, "Security Matrix Project Recommendations Report," May 2003.

[13] Increasing the validity period reduced the number of IBIS checks USCIS conducts.

[14] *Immigration Benefit Fraud: Focused Approach is Needed to Address Problems,* GAO-02-66, January 31, 2002.

[15] USCIS processes over 50 types of benefits.

Changes to the security check structure should be guided by these kinds of analyses and a comprehensive, prioritized plan that assigns accountability and timelines for implementation.  For example, although USCIS has intended to expand biometric identification since at least 2001, it has not determined when and for which forms biometric checks should be added, and it is not clear who is responsible for the determination.  To improve its ad hoc arrangement for enhancing security checks, USCIS should 1) assess the risks posed by different applicant types and the effectiveness of checks in addressing that risk; 2) select improvements that maximize the benefit to the integrity of the immigration system while managing cost; and 3) plan for any improvements by assigning accountability and timelines, in order to ensure aggressive progress and results in meeting objectives.

## Need for Increased DHS Role

The comprehensiveness of any USCIS plan will be limited by its dependence on systems and policies developed outside of USCIS.  In order to align the layers of immigrant screening, and ensure USCIS' access to immigrant and screening data sources, greater DHS coordination is needed.

The plans and policies of US-VISIT, CBP, and ICE shape the checks USCIS conducts:

- The US-VISIT systems architecture houses the biometric data that USCIS collects for asylum applicants and plans to collect for other applicants.  US-VISIT has the potential to permit USCIS to screen IDENT-Asylum and BSS enrollees against US-VISIT records of visas, entries, and exits, in order to establish identity and travel history.  This capacity is not yet established, but US-VISIT staff began in 2005 to discuss plans to link these databases.

- CBP manages the IBIS lookout system on which USCIS depends for the majority of its security checks.  Currently, CBP sets the user profile that determines which IBIS records USCIS views.  In December 2004, CBP folded into IBIS the National Automated Immigration Lookout System II (NAILS), which was USCIS' primary tool for managing lookouts and fraud alerts.  CBP did not fully retain NAILS features during the consolidation, reducing USCIS' ability to adjust lookout records with information such as changes of immigration status that may resolve lookouts.

- ICE sets the policy for security checks for aliens seeking benefits through Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR). USCIS staff conducts these security checks and provides documentation of status when the immigration court grants benefits. Previously, ICE had no standardized requirements for checking aliens applying for benefits through the courts, and USCIS completed checks according to its own standards before issuing documentation. Delays in completing USCIS security checks for court grantees exposed USCIS to several lawsuits. Starting in April 2005, ICE standardized a process that requires the completion of IBIS and FBI fingerprint checks and the initiation of FBI name checks. With limited exceptions, USCIS will no longer withhold documentation of status from court grantees until checks are complete according to USCIS standards.

DHS could do more to coordinate screening between its components. For example, USCIS and ICE disagree about the cost-benefit of holding a case until the FBI finalizes a pending response to name check hits, which takes over six months for one percent of cases. For example, ICE security check procedures allow an applicant to receive asylum while the FBI name check is still pending, which means the FBI believes it has investigative records on the applicant but has not completed collecting and reviewing them for transmittal to ICE. In contrast, USCIS holds asylum applications until the FBI name check is complete. Also, USCIS refused to provide documentation of status to ICE-processed asylees until they passed an FBI name check, which USCIS initiated for them. DHS headquarters and the Directorate of Border and Transportation Security did not resolve the disagreement between USCIS and ICE about whether waiting for completed FBI name checks has benefits outweighing its costs. After discussions, USCIS agreed to continue to initiate FBI name checks for its own and for ICE-processed applicants, but neither agency will wait for ICE-processed applicants to pass the FBI name checks before the case decision and documentation of status. Thus, screening procedures for the same benefits are inconsistent. DHS should reconcile the inconsistent interpretations of the check's cost-benefits to improve security and efficiency.

In coordinating screening, DHS may further assist USCIS by facilitating information sharing, not only within DHS but also with the FBI and other external agencies. The Memorandum of Understanding by which USCIS accesses IBIS is a 1993 document between the INS and U.S. Customs. It should be updated to clarify USCIS and CBP responsibilities for information

sharing. The memorandum specifies that INS must have separate agreements with the other users of IBIS in order to view their lookout records, which raises the question of whether USCIS must recreate agreements since the 2003 division of INS, or whether other agreements within DHS provide USCIS with lookout access. In another example, for several years USCIS asked the FBI to remove restrictions on USCIS' name-based queries of the National Crime Information Center. Citing the Privacy Compact of 1988, the FBI permits USCIS to submit fingerprint-based queries via IAFIS but restricts name-based ones.[16] USCIS argues that name-based queries provide information more rapidly and efficiently. GAO recently reported that the Department of State visa adjudication process would be more efficient with greater access to these name-based queries.[17] USCIS has been working with the Department of State to gain access.

DHS should facilitate USCIS' access to screening information and assist in the coordination of screening strategies among DHS components. Moving toward greater coordination of screening efforts, DHS recently established a Screening Integration Working Group, including USCIS and other DHS components, to plan a coordinated strategy for screening individuals. This fits the intent of HSPD-11 to emplace "a coordinated and comprehensive approach" to screening across immigration, law enforcement, intelligence, and security components throughout the government. As DHS expands its efforts to coordinate screening, USCIS screening should receive greater attention and support. Aliens are eligible for some USCIS benefits, such as interim employment authorization documents, even when security checks return derogatory results. Furthermore, USCIS serves as the sole screener of some immigrants who enter without inspection or visas, thereby avoiding screening by CBP and the Department of State. Benefits for which unscreened immigrants apply to USCIS include asylum, adjustment of status under INA § 245(i), temporary protected status, and potentially, proposed guest worker programs. The USCIS benefits process is the government's first opportunity to screen these aliens against intelligence and lookout records.

---

[16] These fingerprint- and name-based queries of the National Crime Information Center review federal and state criminal history records (charges and convictions) in the Interstate Identification Index. Currently, USCIS uses name-based queries of the National Crime Information Center only when other screening indicates the applicant has a criminal history. The FBI name check discussed elsewhere in this report, which is conducted through the National Name Check Program, reviews records of previous and ongoing FBI investigations.

[17] *Strengthened Visa Process Would Benefit from Improvements in Staffing and Information Sharing*, GAO-05-859, September 13, 2005.

# USCIS should continue to improve accuracy and timeliness of check completion

USCIS quality assurance and OIG sampling show that USCIS staff completes most required security checks. However, USCIS does not have comprehensive controls to prevent and identify mistakes when they occur. Further, USCIS has difficulty creating and retrieving historical records that show what checks were done when. Additionally, for a minority of cases, delayed and inconclusive security check results stall application processing for long periods. USCIS is strengthening its structure for processing security check hits and concluding cases that involve fraud or national security concerns with timely denials and law enforcement referrals.

## Management controls to ensure check completion need improvement

Because of the manual effort and judgment involved in adjudicating immigration benefits, including security checks, the process is vulnerable to human error. Although USCIS staff performs most security checks in compliance with procedures, file sampling conducted during routine USCIS quality assurance and our inspection revealed security check errors for every form type reviewed. The errors vary in significance from incomplete file documentation to the approval of benefits without review of positive security check hits. They also vary in frequency, from less than one percent per sample, which meets USCIS' designated acceptable quality level, to over 95 percent for one form sampled. Though there are few reports of USCIS approving benefits for the mala fide, incomplete checks present a security vulnerability. Management controls to ensure check completion, including documentation and quality assurance reviews, are not comprehensive and should be improved.

In its March 2005 Backlog Elimination Plan report, for the fourth quarter of FY 2004, USCIS indicated that application processing errors are controlled:

> For cases reviewed during the fourth quarter of 2004, USCIS achieved an overall processing accuracy rate of 99.6% and a critical processing accuracy rate of 99.7%, exceeding the minimum acceptable accuracy rates of 96% and 99% respectively. In all cases, corrective actions to prevent future problems were implemented. It was also verified that in applications where errors were detected, no applicant received a benefit for which he/she was not eligible.

"Critical" errors, which may occur in no more than one percent of forms reviewed in order to meet the acceptable quality level, include errors in security checks.  In fact, security check errors are the most common critical error found during national quality assurance reviews.  For the quarter described, the 80 critical processing errors involved IBIS name checks (72 instances) and FBI fingerprint checks (three instances).  Critical errors found in the remainder of FY 2004 are in similar proportion.  USCIS' fourth quarter FY 2004 quality assurance report added, "Although, the Service is experiencing a trend in IBIS errors (a trend indicates that there is a system, process or procedural problem that needs to be addressed), the errors are within the Acceptable Quality Levels."  The trend continued in the first quarter of FY 2005, and USCIS reported it was studying IBIS name checks and anticipating improvements in procedures and training.[18]

However, these reports do not reflect all USCIS application processing.  The national quality assurance program discussed above involves only the N-400 *Application for Naturalization,* which was 8.7 percent of USCIS' completed applications in FY 2004.  Because the N-400 is completed with different automated systems and standard operating procedures (SOPs), its quality results are not indicative of other forms'.  In February 2005, USCIS added national quality assurance reviews for the I-485 *Application to Register Permanent Residence or to Adjust Status*, covering service center and district office processing.  Additional monthly quality assurance reviews are conducted by Service Center Operations, which in FY 2004 reviewed the I-485, I-130 *Petition for Alien Relative,* and I-539 *Application to Extend/Change Nonimmigrant Status.*  Service Center Operations suspended review of the I-539 in June 2004 and began reviewing the I-130 in August 2004.  In sum, each month up to a third of USCIS' completed applications is subject to random sampling for quality assurance.

Overall error rates are higher for the I-539, I-130, and I-485 than for the N-400.  Furthermore, errors in the I-130 and I-485 samples exceed the one percent acceptable quality level for critical errors.  Although USCIS does not monitor the proportion of security check errors as a whole, we extrapolated the following from monthly and quarterly reports:

---

[18] "Quality Management Summary, Consolidated Service-Wide Quality Results – 1st Quarter FY 2005," April 14, 2005.

Figure 1: USCIS Quality Assurance – Errors Found

| Form | Months reviewed | Files reviewed | Files with errors | Proportion of files with errors | Files with security check errors[19] | Proportion of files with security check errors |
|---|---|---|---|---|---|---|
| **I-130** *Petition for Alien Relative* | 8/04-9/04 | 2,707 | 177 | 6.5% | 44 | 1.6% |
| **I-485** *Application to Register Permanent Residence or to Adjust Status* | 10/03-9/04 | 9,521 | 539 | 5.7% | 190 | 2.0% |
| **N-400** *Application for Naturalization* | 7/04-9/04[20] | 10,246 | 272 | 2.7% | 75 | 0.7% |
| **I-539** *Application to Extend/Change Nonimmigrant Status* | 10/03-6/04 | 12,399 | 533 | 4.3% | 70 | 0.6% |

To extend our assessment of the risk of security check errors among USCIS applications, we sampled eight of the remaining forms that do not receive quality assurance reviews from USCIS. The eight forms represent an additional 51.3 percent of USCIS' FY 2004 workload and require different combinations of IBIS name checks, FBI fingerprint checks, and FBI name checks. We narrowed our sample to FY 2004 approvals in order to identify whether applicants received benefits despite incomplete checks. For further description of the sampling methodology, see Appendix A.

Every form type in our sample showed files with undocumented, untimely, or missing security checks. For the N-400, USCIS guidelines consider all these error types, including incomplete file documentation, to be critical errors. Although our sample and the quality assurance samples are not strictly comparable because of their different methodology, we note that the same types of errors occurred in higher proportion in every form in our sample, than in the forms receiving routine quality assurance reviews.

---

[19] Individual errors noted on the reports included missing, untimely, unresolved, or undocumented IBIS name checks, FBI fingerprint checks, and FBI name checks. Untimely checks are ones processed after adjudication or more than 90 days prior for IBIS, or 15 months prior for FBI fingerprint checks. Unresolved checks are ones with hits confirmed on the applicant but not explained in the required resolution memorandum. The I-539 and I-130 receive only IBIS name checks.

[20] National quality assurance for the N-400 included all months of FY 2004, but until the fourth quarter, staff reported results by review item rather than by application file.

Figure 2: OIG Sampling Results – Total Errors Found

| Form | FY 2004 approvals | Files reviewed | Files with security check errors | Proportion of reviewed files with security check errors |
|---|---|---|---|---|
| **I-765**<br>*Application for Employment Authorization* | 1,213,534 | 112 | 10 | 8.9% |
| **I-90**<br>*Application to Replace Permanent Resident Card* | 1,016,146 | 100 | 15 | 15.0% |
| **I-129**<br>*Petition for A Nonimmigrant Worker* | 486,051 | 116 | 11 | 9.5% |
| **I-821**<br>*Application for Temporary Protected Status* | 66,356 | 66 | 8 | 12.1% |
| **I-881**<br>*NACARA–Suspension of Deportation or Application for Special Rule Cancellation of Removal* | 31,106 | 69 | 3 | 4.3% |
| **I-730**<br>*Refugee/Asylee Relative Petition* | 24,492 | 47 | 30 | 63.8% |
| **I-589**<br>*Application for Asylum* | 14,331 | 69 | 2 | 2.9% |
| **I-192**<br>*Application for Advance Permission to Enter as Nonimmigrant* | 84 | 52 | 50 | 96.2% |

In a follow-up to the sample, USCIS was able to demonstrate with automated and other records that many of the checks that appeared to be missing were in fact conducted but not documented in the file. Four form types showed errors solely in documentation and did not appear to be missing security checks. The following table reflects the common error types we observed:

Figure 3: OIG Sampling Results –Type of Errors Found

| Form | Total files with security check errors | Files with improperly documented checks | Files with missing, untimely, or unresolved security checks | Error type for missing, untimely, or unresolved security checks | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | IBIS Name check | | FBI Fingerprint check | | FBI Name check |
| | | | | Missing | Untimely | Missing | Untimely | Missing |
| I-765 | 10 | 10 | 0 | 0 | 0 | NA | NA | NA |
| I-90 | 15 | 15 | 0 | 0 | 0 | NA | NA | NA |
| I-129 | 11 | 10 | 1 | 0 | 1 | NA | NA | NA |
| I-821 | 8 | 4 | 4 | 1 | 1 | 1 | 1 | NA |
| I-881 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-730 | 30 | 16 | 14[21] | 6 | 8 | NA | NA | NA |
| I-589 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| I-192 | 50[22] | 0 | 50 | 0 | 0 | 0 | 3 | 49 |

In particular, the I-192, I-730, and I-821 show substantial errors in processing security checks. For the IBIS check to appear missing in both the paper file and the automated case history, as seven I-730 and I-821 forms show, indicates that an automated IBIS check resulted in a positive hit, but the adjudicator did not review or resolve it before approving the case.[23] The other major error our sampling shows is a lapse in following the guidelines to conduct FBI name checks for I-192 forms. Of 52 files, 49 (94.2 percent) lacked FBI name checks. Staff at Vermont Service Center, which processed most of the I-192s in our sample, questioned whether the FBI name check is required for the I-192. But Chapter 42 of the *Adjudicators Field Manual* and several headquarters documents require the FBI name check and fingerprint check for the I-192.

**Management controls to ensure check completion are inadequate**

One explanation for the number of security check errors is that USCIS has not implemented sufficient management controls to limit errors. The low

---

[21] USCIS claims that 13 of the missing or untimely I-730 IBIS checks may be solely documentation errors. The USCIS paper and automated records show no current check, but original forms were forwarded to Department of State for visa processing. For nine other original I-730 forms returned to USCIS, eight showed current IBIS checks and one did not.
[22] Because some files contained more than one error type, the number of files with errors is not a sum of errors found.
[23] All of the forms in our sample, which excluded forms processed manually at the district offices, receive automated IBIS checks for the primary name that is data-entered. According to the processing rules, the Interim IBIS program updates the CLAIMS 3 automated case history when the IBIS check results in no hit. If a check results in a hit, CLAIMS 3 history will show no record of it; therefore, a history that is blank regarding IBIS checks implies an IBIS hit.

proportion of errors now shown on N-400s is achieved by several means,[24] including:

- Detailed, form-specific standard operating and quality review procedures;
- An automated processing system (CLAIMS 4) that prohibits adjudicators from approving cases until certain security checks are complete;
- Monthly quality assurance reviews, including correction of errors discovered and analysis of error trends; and
- Recurrent training for staff on processing standards and changes.

But the management controls for other forms vary, and in some cases, they are far less comprehensive. We identified several types of controls that USCIS could use more fully to limit errors. We acknowledge that varying levels of control can reflect management judgment about the risk involved in granting a specific benefit to a mala fide or unqualified alien and the costs of implementing stricter controls. Not all of the following controls are high-cost, however.

First, USCIS needs to improve how it documents and disseminates the policies and procedures for security checks. Communication of procedures is a longstanding issue for immigration services; in 1997 and 2001, GAO reported, "[P]oor communication was a problem, especially between headquarters and field units. For example, field and policy manuals were out of date and there was not one place that program staff could go for direction."[25]

No SOP summarizes the current security check requirements for all forms. Revisions to the outdated Chapter 16 of the *Adjudicators Field Manual*, "Fingerprinting and Other Agency Background Checks," have been in draft for months. USCIS plans but has not begun to update the November 2002 SOP for IBIS name checks. In addition, although district office staff has had difficulty submitting and retrieving FBI name checks, they have no manual clarifying those procedures. In some cases, form-specific national SOPs consolidate security check guidance. Eight of the 12 forms discussed here

---

[24] In tandem with a critical report in 2000 from the DOJ OIG, USCIS (then part of the Immigration and Naturalization Service) reengineered the processing of the N-400 to limit errors. (*An Investigation of the Immigration and Naturalization Service's Citizenship USA Initiative,* July 31, 2000).

[25] *Immigration and Naturalization Service: Overview of Recurring Management Challenges,* GAO-02-168T, p. 5, October 17, 2001; *INS Management: Follow-up on Selected Problems,* GAO/GGD-97-132, July 22, 1997.

have SOPs. The four that do not–the I-129, I-192, I-730, and I-821–were the ones that showed missing or untimely security checks. Most other forms do not have specific national SOPs either.

Additional security check requirements are reflected in a patchwork of memoranda and manuals. For example, USCIS issued at least seven memoranda altering security check procedures in March and April 2005. Staff at seven of 11 processing sites we visited expressed frustration with the quantity or insufficient clarity of changes to security check procedures. At three sites, staff maintains local guidelines to consolidate and clarify security check requirements.

Second, for some but not most forms, USCIS implemented automated controls on check completion. Naturalization forms processed in CLAIMS 4 and asylum forms processed in the Refugee Asylum and Parole System (RAPS) have automated, rule-based support that requires security checks to be complete before the adjudicator can approve the case. The Department of State has had similar controls in place for visa approvals since 1996. When checks result in positive hits, adjudicators must override them, which prevents overlooking hits.

Our sample included two forms processed in RAPS (the I-589 and I-881) and all security checks processed through RAPS were complete. However, USCIS processes the majority of forms in CLAIMS 3, which does not have these automated controls. All the forms in our sample with missing or untimely checks were processed in CLAIMS 3. Furthermore, some forms filed at the district offices are not supported by any of these national automated systems. USCIS staff reported that adding automated controls for forms processed in CLAIMS 3 or manually will be difficult until USCIS has a new automated case management system, planned since 2001 but not expected until 2007. However, even before fielding a new case management system, USCIS may better leverage automated controls on check completion. For example, automated controls ensured that IBIS checks were complete for the I-90s in our sample that were processed in CLAIMS 3 under Systems Qualified Adjudication rules.

Third, USCIS lacks a complete record of checks performed. USCIS needs the records to conduct quality assurance and supervisory reviews and to enable staff to refer to previous, current checks rather than duplicate them. When USCIS began IBIS name checks, guidelines required paper documentation of all checks: "The record will be updated to reflect the results of every IBIS

query … When batch checks are conducted, confirmation that the check was performed must be placed in the file."[26]  The IBIS SOP supports full paper documentation.  However, senior officials disputed whether all security checks must be documented in paper files, when automated systems also contain records of checks.

In our estimation, neither method currently provides adequate control because both are incomplete; and paper records in particular are vulnerable to error.  Almost half of the security check errors discovered during our sampling (60 of 129, or 46.5 percent) involved paper documentation lapses.  Some adjudicators continue to document IBIS checks by stamping applications.  While quick, stamps in our sample were sometimes accompanied by illegible dates, results, and conductor initials, and stamps do not indicate which names were checked.  The more detailed Record of IBIS Query, which the IBIS SOP requires, does record which names staff check.  However, among over 300 forms in our sample where applicants listed more than one name, staff did not complete a Record of IBIS Query for 125.  The paper records do not indicate whether staff performed IBIS checks on the aliases as required.

Automated records do not fully capture alias information, either.  Furthermore, they do not reflect other important processing steps that are still performed manually: individual IBIS queries, adjudicator review of hits, and hit resolution.  As a result, USCIS' security check records are fragmentary.  Incomplete records hinder staff in monitoring check completion and result in processing inefficiencies.  Several managers and staff told us adjudicators routinely conduct new checks rather than rely on the file record.  Additionally, incomplete automated records compel staff to conduct quality assurance manually.[27]

Fourth, USCIS should reexamine its controls for reviewing check completion.  USCIS has set national standards for formal quality assurance and supervisory review, but these reviews cover a small proportion of completed applications.  As mentioned, national and Service Center Operations quality assurance samples up to a third of USCIS' completed applications each month.  National supervisory review of security checks occurs through the resolution memorandum for all IBIS name checks with confirmed hits, which are about two percent of IBIS checks.  Additionally, supervisors in asylum offices use a checklist to review all security checks.

---

[26] "Interagency Border Inspection System Records Check," July 2, 2002.
[27] USCIS does not have a process for auditing IBIS checks by reviewing the source records retained by CBP.

Beyond these reviews, processing offices provide a variety of supervisory and quality assurance checks. Four processing sites we visited, two of which were asylum offices, provided 100 percent supervisory review of security checks. Other offices review a percentage of applications completed, approved, or denied, sometimes based on form type or adjudicator tenure. Our concerns with this approach are twofold: 1) providing supervisory review based on form type can result in certain forms receiving no review; and 2) reviewing application denials is of lesser benefit to security because any mala fide benefit recipients are among the approvals. Quality assurance also varied among offices. Two processing sites we visited provided routine quality assurance for all forms; two, for all IBIS checks; and two were considering adding quality assurance for all IBIS checks. Other quality assurance staff with whom we met supplemented the national program with ad hoc reviews.

A number of forms are not subject to quality assurance. This is a missed opportunity for USCIS: staff reported that quality assurance reviews have helped to extinguish incorrect processing behaviors and provided a retraining opportunity. USCIS does not require refresher training on how to conduct security checks or procedural updates. An additional concern regarding quality assurance is that USCIS designated an acceptable quality level (for example, the one percent critical error rate) for only a few forms. USCIS should establish measures for the remaining forms or apply this one. It will be important for USCIS to continue to review security check performance and provide management with information to adjust management controls to ensure performance goals are met.

Incomplete security checks and weaknesses in USCIS management controls must be considered in context. Many USCIS applicants are bona fide. As GAO wrote in 1995, "While INS recognizes that even a relatively small number of aliens should not inappropriately receive benefits, it did not want to give the false impression that a criminal or terrorist receives a benefit every time a fingerprint check is not properly conducted."[28] We agree that this holds true for any type of USCIS security check. For the files in our sample with missing or untimely IBIS checks, USCIS ran new queries and reported no derogatory information on all people checked. Three offices we visited reported similar experiences with correcting erroneous IBIS and FBI name checks. But whether USCIS' incomplete security checks involve bona fide or

---

[28] *INS Fingerprinting of Aliens: Efforts to Ensure Authenticity of Aliens' Fingerprints,* GAO/GGD 95-40, p. 4, December 22, 1994.

mala fide applicants is a matter of chance. In 2002, incomplete screening led a USCIS adjudicator to approve naturalization for a member of a terrorist group.[29] Though there are few reports of USCIS approving benefits for the mala fide, incomplete checks present a security vulnerability that USCIS should address through targeted improvements to management controls on check completion.

### USCIS is implementing solutions to complete stalled cases

USCIS has an established structure for handling cases with security check hits and addressing national security, public safety, and fraud concerns. However, for a fraction of cases, slow, inconclusive, or legally inapplicable security check results can cause application processing to stall for months or even years. These delays can interfere with USCIS' concluding national security and public safety hits with timely denials or referrals to law enforcement. In addition, stalled cases decrease operational efficiency by reducing productivity and contributing to hundreds of lawsuits against USCIS. USCIS is pursuing several solutions to mitigate these effects and close stalled cases.

Staff described four primary ways that security checks could stall processing on a case:

- **Pending FBI name checks**. Unlike other USCIS checks that return results within a few days at most, the FBI name check takes more than a month to complete for six percent of submissions. For one percent, the FBI takes more than six months to compile the hit information and verify that the initial hit matches the identity of the applicant. In December 2002, USCIS (then INS) resubmitted 2.4 million applicant names for expanded checks,[30] almost double the number USCIS typically submits in a year's time. As of February 2005, USCIS reported 171,428 FBI name checks pending, including approximately 8,500 remaining from the December 2002 rerun. USCIS may pay the FBI double to "expedite" up to a few hundred FBI name checks per month. USCIS restricts these requests to certain cases, such as when the alien is about to become ineligible due to age, the applicant files writ of mandamus lawsuits to compel USCIS to complete adjudication,

---

[29] *Review of the Circumstances Surrounding the Naturalization of an Alien Known to be an Associate of a Terrorist Organization*, INS Office of Internal Audit, December 13, 2002.

[30] Ibid. In response to an incident that involved processing benefits for a member of a terrorist group, INS added searches of the FBI's reference file to searches of the main investigation file.

or other humanitarian factors.  The "expedite" requests are insufficient to clear the backlog of FBI name checks.

- **Open cases referred to ICE for investigation.**  When USCIS refers an open case to ICE for investigation, staff said long delays often occur before they receive clearance to complete the adjudication or another definitive response.  In 2004, FDNS reviewed the IBIS national security/terrorism-related hit referral process and found that ICE was capable of resolving only about a quarter of the USCIS referrals in a timely manner.  We observed rows of files USCIS staff shelved, pending a response from ICE.  8 C.F.R. § 103.2(b)(18) allows USCIS to place cases in formal abeyance and withhold adjudication when there is an ongoing investigation relating to the petitioner's eligibility and disclosure to the petitioner would jeopardize the investigation.

- **Inconclusive results from checks and referrals.**  Senior officials and staff said that security checks and supplementary information from FBI, ICE, or other record owners can sometimes be vague, inconclusive, or difficult to relate to the case adjudication.  At one district office, staff said they shelved cases with complete, positive FBI name check responses for months, pending guidance on how to adjudicate them.

- **Legally inapplicable security check results**.  In a 2003 audit, the DOJ OIG reported that INS could not deny the petition of an alien otherwise eligible for temporary worker benefits based on an IBIS hit.[31]  Unlike the adjudicative standards in the Immigration and Nationality Act for most benefits, the standards for adjudicating employment- and family-based petitions require USCIS to evaluate only the authenticity of the employment offer or family relationship, without regard to whether the person evokes security concerns.  These employment- and family-based petitions serve simply to document the relationship, but they enable approved aliens to apply for other benefits such as legal permanent residence and visas from the Department of State.  Nevertheless, USCIS would prefer not to approve any petition when security concerns have been identified.  USCIS sometimes withholds adjudication through an informal

---

[31] *Immigration and Naturalization Service's Premium Processing Program*, DOJ OIG Report No. 03-14, February 2003.

abeyance; 8 C.F.R. § 103.2(b)(18) does not apply unless the investigation relates to the pending application.

Previous options that USCIS had for completing these four types of cases in a timely manner were insufficient. Given their partially automated systems, staffing level, and number of customers other than USCIS, the FBI's National Name Check Program officials said they could not complete USCIS' routine cases more quickly. The American Immigration Lawyers Association said that lawyers have begun to recognize that filing mandamus lawsuits helps to expedite FBI name check results. The USCIS Office of Chief Counsel estimated there were 1,000 cases filed in the federal courts last year naming USCIS as a party, of which 80 to 90 percent relate to security checks.[32] This "solution" may assist applicants, but the volume of cases consumes USCIS time and resources that could be used elsewhere. Regardless, there are not enough "expedite" slots for all pending FBI name checks.

For the relationship-based petitions, USCIS options include withholding adjudication through an ongoing, informal abeyance; requesting that applicants withdraw the petitions; or approving the petitions in the expectation that applicants will be denied at another point in the process. However, delays from informal abeyance are also vulnerable to legal challenge. Furthermore, applicants can refuse to withdraw petitions, and the transfer of derogatory information to support later denial is not fail-safe. For some cases, USCIS relies on the Department of State to deny the alien a visa. USCIS forwards petitions stamped "admissibility concerns identified" to visa processing centers. Because information-sharing protocols prevent USCIS from revealing derogatory information it received from third parties, visa staff must attempt to recreate USCIS' hit. A Department of State manager said that they were not always able to do so.

Long-delayed cases increase USCIS' workload other ways, as well. IBIS and FBI fingerprint checks can expire, requiring new checks and repeated fingerprinting. In addition, adjudicators run queries on a regular basis for each case with a pending FBI name check, to learn whether FBI name checks cleared.

---

[32] This figure is exclusive of litigation relating to the commercial and administrative law division.

### Solutions USCIS is pursuing

USCIS has begun to address cases delayed with ICE and the FBI by assigning USCIS staff to work off the backlogs.  In order to keep ICE's backlog from growing, FDNS ceased referring IBIS national security hits to ICE in November 2004, instead resolving them in house.  In May 2005, FDNS assumed responsibility for the backlog of approximately 600 national security hit cases that had remained with ICE.  In March 2005, USCIS detailed five personnel to the FBI National Name Check Program for up to a year to assist with the pending FBI name checks.

Additionally, USCIS has been pursuing regulatory and statutory options to expand authority to withhold adjudication and to deny benefits due to national security concerns.  USCIS described the suggested statutory change as providing the legal basis "to deny any benefit to aliens described in any of the national security related provisions of inadmissibility or deportability in the Immigration and Nationality Act (INA), who are the subject of a pending investigation or case that is material to eligibility for a benefit, or for whom law enforcement checks have not been conducted and resolved."[33]  However, USCIS has been pursuing similar changes for several years, and staff has no indication that their approval is imminent.

Meanwhile, USCIS is developing two specialist staff units to help conclude cases with complex adjudication and security check issues.  In March 2005, USCIS created a unit called FOCUS within the Office of Field Operations to assist in the adjudication of selected cases with identified national security or public safety concerns.  Both field offices and FDNS may refer cases to FOCUS for adjudication guidance.  FOCUS's initial workload is 100 cases.  USCIS has also proposed developing a Background Check Analysis Unit within FDNS to resolve the more complex and sensitive hits, receive and review all national security notifications to observe trends, provide direction and oversight to the field, and coordinate issues with other USCIS components including the Office of Chief Counsel.  FDNS estimates the unit will resolve at least 500 complex and sensitive security checks per year.  The reprogramming request to fund seven personnel to staff the unit was in the preliminary approval process as of April 2005.

---

[33] USCIS draft amendment adding a new Section 362 of the Immigration and Nationality Act, "Denial of Immigration Benefits to Terrorists and Criminals."

# USCIS can administer security checks more efficiently

USCIS can strengthen the efficiency of its security check program. First, USCIS automation does not provide many of the efficiencies that existing IT solutions offer. USCIS needs improved automation to reduce duplicative, paper-based security check processes. USCIS has two systems in development that could streamline how USCIS runs, documents, and monitors checks. Second, more than a year after the creation of FDNS, many USCIS parties are still responsible for aspects of the security check program. While there are justifications for the diffused responsibility, clarifying accountability could better enable USCIS to address program weaknesses including the lack of an integrated, risk-based plan for which checks to conduct, lack of comprehensive program management data, and delays in disseminating uniform policies and standards.

## Automated systems provide inadequate support for processing security checks

USCIS does not have a centralized, automated case management system or security checks system. A large portion of the security check process is completed and documented by hand or with homegrown systems. Compared to the Department of State's, USCIS' systems have limited ability to reduce duplication and processing steps, control approvals, document checks for audit purposes, and create adequate program management information. As a result, the process is labor-intensive, vulnerable to human error, and inefficient.

Several previous OIG and GAO reports have noted that USCIS does not have information systems adequate to support efficient processing of benefits and security checks.[34] Cases are not managed or tracked centrally: staff processes applications in CLAIMS 3, CLAIMS 4, RAPS, the Integrated Case Management System, the Marriage Fraud Amendment System, homegrown systems such as the Buffalo Examination Tracking System, and in some cases, no automated system. Furthermore, even cases that have automated records have paper records as well, which staff must create, track, update, and retrieve manually. Although staff initiates security checks electronically, they remain

---

[34] *Audit Report: Fingerprint and Biographical Check Services Provided by the Federal Bureau of Investigation to the Immigration and Naturalization Service*, DOJ OIG, Report No. 99-13, March 1999; *Immigration Benefits: Several Factors Impede Timeliness of Application Processing*, GAO-01-488, May 4, 2001; *Immigration Benefit Fraud: Focused Approach is Needed to Address Problems*, GAO-02-66, January 31, 2002.

largely a paper process. Staff and contractors review paper applications to find and screen applicants' aliases. Checks are documented and reviewed manually with IBIS stamps, handwritten Records of IBIS Query, Interim IBIS printouts, printed FBI Rap sheets, printed FBI name check results, and handwritten hit resolution documents.

The existing paper and automated systems have limited ability to:

- Prevent duplication of work. USCIS' automated systems do not store complete security check information in order to permit staff to review it electronically regardless of location. While national case management systems such as CLAIMS 3 and RAPS store security check dates and results, more detailed information such as hit content and resolution is available only in paper files and, in some cases, local systems. Therefore, when staff does not have the paper record to review–for example, an immigration information officer assisting a walk-in applicant–staff re-runs and resolves IBIS checks even if they are current. USCIS also does not have an automated system to store fingerprints. When fingerprints age past 15 months, which USCIS' backlog and slow FBI name checks can cause, applicants must return to application support centers to submit their fingerprints again.

- Automatically update screening results. The screening databases USCIS uses do not provide "wrap-back" updates that push updated records to USCIS when information on applicants whom USCIS has already screened changes. Instead, USCIS staff re-runs all IBIS name checks more than 90 days old before adjudication to see if any of the records have changed. Although USCIS studied and selected the 90-day expiration period to reduce the possibility of missing significant record updates, the potential exists. Like the IBIS check, USCIS repeats the FBI fingerprint check for updates on a 15-month expiration schedule. USCIS has not set an expiration period for the FBI name check, but the FBI considers a name check to be current for 120 days. However, updating FBI name checks also consumes labor as staff checks repeatedly whether pending name checks have finalized. Asylum Branch's IDENT checks are refreshed when applicants return to the asylum offices. Asylum staff has begun to receive some wrap-back information through US-VISIT, though headquarters staff must manually redirect it to local offices.

- Assist in verifying applicants' identity with biometric identifiers.
  Although USCIS collects fingerprints and photographs from many of
  its applicants, in most cases these are used for card production and
  criminal history record checks, not for automated, biometric
  verification of the applicant's identity.  Visual inspection of biometric
  data to establish the applicant's identity is slower and less reliable than
  automated checks.  Only the fingerprints that are stored in IDENT-
  Asylum are used for automated identity verification.  However, this
  biometric check has limitations as well.  US-VISIT does not
  crosscheck IDENT-Asylum files with its visa and entry-exit records,
  and asylum staff conducts manual, name-based searches of this
  information until US-VISIT improves cross-check capability.

- Consolidate checks.  The May 2003 *Security Matrix Project
  Recommendations Report* advised USCIS to develop "multiple system
  search capacity," the ability to enter and review applicant information
  in a single system for checks conducted in several others.  USCIS staff
  must log in to separate systems to initiate and review most IBIS, FBI,
  IDENT, and administrative checks.  A March 2005 study indicated
  that derogatory information provided by FBI name checks was not
  consistently available via IBIS name checks, even though the IBIS
  check contains FBI information from the National Crime Information
  Center and Terrorist Screening Database.  Therefore, for many
  applications, USCIS continues to run two security name checks,
  biometric checks, and administrative checks.

- Generate national program management information.  The systems
  USCIS uses do not track the resources used to process security checks,
  and none except RAPS tracks the check results.  For example, national
  systems do not supply records of the number of IBIS checks
  conducted, the amount of time staff spends resolving hits, the number
  and types of IBIS hits received, and the adjudication results of cases
  with IBIS hits.  USCIS has developed estimates of some figures based
  on data provided by individual service centers, which have more
  extensive automated support than district offices.  Further information
  comes from ad hoc studies; other manually compiled reports; and the
  Performance Analysis System, the reliability of which DOJ OIG
  criticized.[35]

---

[35] *Accuracy of Adjudications and Naturalization Data in the Performance Analysis System of the U.S. Immigration and Naturalization Service*, DOJ OIG Report No. 99-03, February 1999.  In FY 2004, independent auditors reported internal

Improved automated systems that include these features would assist USCIS in eliminating duplication of work, increasing productivity, reducing opportunities for human error, and maintaining management controls. The Department of State developed systems that include some of these features. For example, an entry in the Department of State's Non-Immigrant Visa Processing System permits staff to initiate and review security check information in IDENT, the Consular Consolidated Database, Security Advisory Opinions, and the Consular Lookout and Support System. Consular officers can more quickly review the consolidated information, including historical records, without logging in and out to search different systems. The Non-Immigrant Visa Processing System also automatically checks applicant aliases, runs fingerprint and facial recognition biometric checks, and compares biographic data during checks to flag potential identity mismatches. Furthermore, the system incorporates management controls including rules that prevent approvals without security checks, complete historical records of security check information reviewed, and several means of reviewing case decisions.

Without these features, USCIS' security check processes are more labor intensive, vulnerable to human error, and difficult to monitor. For example, we estimated that refreshing IBIS checks to ensure they are current within 90 days at adjudication resulted in a minimum of 4.3 million additional IBIS checks in FY 2004. Conducting checks without automated controls on completion and renewal permits staff errors like those found during USCIS quality assurance and OIG sampling. And the lack of centralized, automated records for analysis causes USCIS to rely on less-definitive estimates and anecdotes for decisions. For example, USCIS has no record of how many relationship-based petitions staff was obliged to approve despite derogatory security check results. There is no estimate of the scale of the problem to help indicate whether the statutory change being pursued is the only viable solution.

USCIS has been planning to improve automated support for the security check process for several years. In December 2001, USCIS (then INS) issued an IT modernization plan[36] with goals to integrate the disparate case management systems; transition to a paperless system; and incorporate automated,

---

control weaknesses in USCIS' Performance Analysis System. (*U.S. Department of Homeland Security Performance and Accountability Report, Excerpts of Financial Information Part II, Seven Months Ended September 30, 2003*, KPMG LLP.)

[36] *Immigration Services IT Strategic Plan, 2002-2012*, December 2001.

biometric identification.  USCIS does not expect to field a consolidated, automated case management system until 2007.  However, other advances have been made.  In 2004 and 2005, the National Benefits Center and lockbox application receipt operations began to enter data and pre-process applications for all district offices, partially automating this work, which includes initial name checks and fingerprint scheduling.

Furthermore, USCIS conceived two new software systems to support the background check process.  The Background Check System (BCS), which USCIS began testing in spring 2005, will centralize check records, helping to reduce duplication of checks and supporting check reviews.  Also in spring 2005, USCIS contracted to begin building the BSS, which will retain fingerprints, photographs, and signatures for screening.  Once fielded, these systems should do much to reduce duplication and manual effort, and to improve USCIS' ability to monitor processing.  USCIS' May 2005 strategic plan discusses integrating these systems with its case management systems and pursuing wrap-back updates from the agencies that supply check information.

USCIS has suffered delays in implementing its plans to modernize and automate its background check systems.  Staff said that the BCS software were in development when Immigration Services split from the other offices of INS in March 2003.  Under the DHS realignment, Immigration Services lost direct IT support, instead receiving it from ICE under a shared service agreement.  USCIS recently reformed its IT infrastructure, integrating authority under the Chief Information Officer (CIO) in May 2005, and that office assisted in advancing BCS and BSS development.[37]  USCIS succeeded in obtaining access to a test environment for testing BCS in spring 2005, and a contract to develop BSS followed.  Continued progress will be necessary to eliminate obstacles to processing efficiency.

## USCIS should continue reorganization of security check management

In previous sections, we discussed several improvements USCIS should pursue, including a risk-based plan to enhance the scope of security checks, more comprehensive program management information, and stronger management controls.  FDNS has begun to provide some of this support for security checks.  However, it shares responsibility for these areas with adjudicative and policy

---

[37] For further discussion of USCIS IT modernization and infrastructure, see *U.S. Citizenship and Immigration Services Is Not Effectively Managing Information Technology to Meet Mission Requirements,* DHS OIG (forthcoming).

offices including Service Center Operations, Field Operations, and the Office of Quality Assurance and Production Management. It also shares responsibility with the Asylum Branch and the CIO, which are outside the domestic operations organization where FDNS sits. Coordinating some of these parties has delayed at least one significant SOP change. In order to ensure aggressive progress in security check management, USCIS needs to establish accountability and timelines for developing security check plans, policies, and program information.

Announcing the official formation of FDNS in May 2004, the USCIS director defined its mission to:

- Oversee and enhance policies and procedures pertaining to the performance of law enforcement (background) checks on applicants and petitioners
- Identify and evaluate vulnerabilities in the various policies, practices, and procedures which threaten the integrity of the legal immigration process
- Recommend solutions and internal controls to address these vulnerabilities.[38]

Since that time, FDNS reengineered procedures for resolving security check hits involving national security and developed new policies to support law enforcement and intelligence agencies interacting with benefit applicants. In February 2005, FDNS initiated its Benefits Fraud Assessment to statistically assess for the first time the percentage and type of fraud in six higher risk applications. The information from this study should enable FDNS to evaluate vulnerabilities, as will the information developed with FDNS's new automated Fraud Tracking System and planned Background Check Analysis Unit.

Several responsibilities related to policy, procedures, and controls for security checks are assigned outside FDNS. FDNS officials told us that the responsibility for planning the types of security checks to conduct belongs with the adjudicative offices such as the Asylum Branch, Service Center Operations, and Field Operations. Supporting this statement, the Asylum Branch and Service Center Operations initiated recent changes regarding how USCIS screens applicant aliases.

---

[38] "Introducing the Office of Fraud Detection and National Security (FDNS)", May 2004.

For writing the policy defining user access to IBIS, or which type of records users at different security clearance levels can view, the Office of the CIO has responsibility.  For the management control of quality assurance procedures and testing, the Office of Quality Assurance and Production Management, Service Center Operations, and selected field offices have been driving changes.  Much of USCIS' quality assurance assesses performance other than security checks, but field offices are discussing plans to develop a quality assurance test solely for security checks.  Offices other than FDNS also manage another control, security checks training.  We observed several opportunities for making training more complete and uniform.  Most field offices we visited lack recurrent training on changing security check policies and procedures, and staff requested more security checks training, such as on IBIS features.

In sum, security check administration is still somewhat decentralized within USCIS.  While this is management's prerogative, we note that USCIS formed FDNS partially in response to a 2003 study that recommended USCIS centralize management of security checks.  The centralization was intended to improve the efficiency and effectiveness of the security check process and eliminate "variability of background check requirements … inconsistent administration of background check information … [and] poor use of resources."[39]

Although USCIS continues to refine its security check process, we did not observe efforts to unify the process under a plan with performance goals and measures, clearly defined accountability, and timelines for implementing changes.  However, these steps are necessary to balance available resources, decentralized office responsibilities, and desired program outcomes.  The Office of Management and Budget directs: "[R]esults-oriented managers must ask themselves if the programs they administer are achieving the desired result at an acceptable cost.  If the answer is 'no' or 'we don't know,' they must do something about it, such as clearly define the desired outcomes, determine the causes of unsatisfactory performance, construct plans to remedy any problems, develop aggressive timeframes for taking action, and ensure that actions are implemented."[40]

Without clear plans, accountability, and timelines, USCIS will have difficulty coordinating its offices to implement needed improvements on an aggressive

---

[39] *BCIS Background Checks: Identifying the Need for a centralized Background Check Unit (BCU),* Booz Allen Hamilton, May 14, 2003.
[40] *The Federal Government is Results-Oriented: A Report to Federal Employees*, Office of Management and Budget, p. 1, August 2004.

schedule. For example, when our review began in October 2004, FDNS planned to revise the outdated 2002 SOP for IBIS. By the conclusion of our fieldwork in March 2005, FDNS and Service Center Operations had begun discussions on IBIS roles and responsibilities and potential SOP changes, to be followed by discussions with Field Operations and other IBIS users on an indefinite timeline. It is unclear when the revision will be complete, and as we noted on page 21, field offices have begun compiling local guidelines in the absence of a current IBIS SOP. The risk of this alternative is that local offices will develop guidelines that do not fully comply with the official SOP, which was the case at one office we visited.

# Recommendations

We recommend that U.S. Citizenship and Immigration Services:

**Recommendation 1:** Expand the use of biometric identification in security checks, as consistent with risk assessment.

**Recommendation 2:** Establish a comprehensive, risk-based plan for the selection and completion of security checks.

**Recommendation 3:** Set measurable objectives for the conduct and completion of all security checks and reorganize management controls to ensure objectives are met.

**Recommendation 4:** Implement the Background Check Analysis Unit in the Office of Fraud Detection and National Security.

**Recommendation 5:** Implement an automated system that stores applicants' biometric information and supports its use in security checks.

**Recommendation 6:** Implement an automated system that supports running, documenting, reviewing, and monitoring security checks.

**Recommendation 7:** Define accountability and timelines for implementing changes to the security check process that include the development of the plan for completion of security checks, check completion objectives, and reorganized management controls.

# Management Comments and OIG Evaluation

We evaluated USCIS' written comments and made changes to the report where deemed appropriate.  Below is a summary of USCIS' written responses to our recommendations and our analysis of the response.  A copy of USCIS' response in its entirety can be found in Appendix B.

USCIS agreed that its security check process requires improvements including consolidated management, clarified procedures, and increased monitoring. USCIS added that better automated tools, which are in development, are fundamental to process improvements. In addition, USCIS stated that it will continue to pursue access to automatic updates for changing security check information, i.e. wrap-back. We agree the wrap-back feature could play a vital role in improving both the security and efficiency of USCIS checks.

**Recommendation 1:** Expand the use of biometric identification in security checks, as consistent with risk assessment.

**USCIS Response:** USCIS acknowledged that only applications related to asylum currently use biometrics to validate identity. USCIS intends to work with DHS to establish a biometric and biographic data collection standard that will be common to USCIS, the Department of State, CBP, and ICE. Separately, USCIS is in the preliminary stages of plans to collect biometrics from customers when they first apply for a benefit and to use the biometrics to verify identity during subsequent processes. USCIS anticipates using this model for the Temporary Worker Program.

**OIG Evaluation:** We concur with USCIS' action and regard the recommendation as resolved and open. In its action plan, USCIS should explain which benefits will be included as biometric collection is expanded and note the results of its preliminary planning. Coordination with DHS to ensure the compatibility and interconnectivity of USCIS, CBP, ICE, and Department of State biometric identity systems is a critical part of managing the entry and exit of immigrants and non-immigrants to the United States.

**Recommendation 2:** Establish a comprehensive, risk-based plan for the selection and completion of security checks.

**USCIS Response:** FDNS will prepare a plan to outline how, when, and for what benefits expansion of biometric checks should occur. They will base this

analysis on risk assessments and assign responsibilities, timelines, and milestones for the implementation.

**OIG Evaluation:** We concur with USCIS' action and regard the recommendation as resolved and open. In its action plan, USCIS should include documentation of the plan's progress.

**<u>Recommendation 3:</u>** Set measurable objectives for the conduct and completion of all security checks and reorganize management controls to ensure objectives are met.

**USCIS Response:** FDNS, in coordination with the Production Management Division, will work to establish acceptable quality levels. These two offices will use information in the Background Check System to measure compliance with the quality levels. USCIS commented that management controls embedded in automated systems are the most effective for ensuring security check completion. Future USCIS systems will include these controls. In addition, FDNS will review and consolidate all USCIS guidance on security checks. USCIS will also explore ways to improve program management information by tracking adjudication decisions in relation to security check results.

**OIG Evaluation:** USCIS' proposed actions, including establishing acceptable quality levels for all forms and improving management controls such as policy documentation, are responsive to the recommendation. The recommendation is resolved and open.

**<u>Recommendation 4:</u>** Implement the Background Check Analysis Unit in the Office of Fraud Detection and National Security.

**USCIS Response:** USCIS noted that FDNS has resolved all national-security-related IBIS hits since March 2005. FDNS's Background Check Analysis Unit reviews, tracks, analyzes, and resolves all name-vetted hits related to rational security.

**OIG Evaluation:** This recommendation is resolved and open. In its action plan, USCIS should discuss the organizational and staffing changes made in FDNS to support the additional mission of analyzing and resolving national security hits.

**Recommendation 5:** Implement an automated system that stores applicants' biometric information and supports its use in security checks.

**Recommendation 6:** Implement an automated system that supports running, documenting, reviewing, and monitoring security checks.

**USCIS Response:** USCIS will deploy the Biometric Storage System in the fourth quarter of FY 2006 and the Background Check System in the third quarter of FY 2006.

**OIG Evaluation:** USCIS' proposed actions are responsive to the recommendations, which are resolved and open.

**Recommendation 7:** Define accountability and timelines for implementing changes to the security check process that include the development of the plan for completion of security checks, check completion objectives, and reorganized management controls.

**USCIS Response:** As of September 19, 2005, USCIS designated FDNS as the lead on all security check-related activities. As discussed in recommendations 2, FDNS will develop the plan for security check completion.

**OIG Evaluation:** This recommendation is resolved and open. In its action plan, USCIS should note the timeline for completion of changes to the security check process discussed in its response to this report.

Appendix A
Purpose, Scope and Methodology

---

We evaluated the adequacy and efficiency of the security checks that USCIS conducts to help identify unqualified alien beneficiaries, particularly terrorists and criminal aliens, and to deny their applications for immigration benefits. We examined the security check processes and procedures USCIS uses to detect fraud and identify mala fide applicants. We assessed the scope and depth of the security checks that USCIS performs to identify whether there are gaps in coverage and opportunities for increasing coverage. We reviewed USCIS' implementation of the security checks to learn whether checks are completed, properly conducted, and concluded with timely denials and law enforcement/fraud referrals when appropriate. Finally, we examined the efficiency of USCIS' implementation of the security checks, including frequency of duplicate checks and resources required for processing.

We analyzed laws and regulations related to immigration benefits and security checks; USCIS documentation, including guidance, directives, SOPs, manuals, policy memoranda, training materials, quality assurance reports, and Internet websites; various reports from the GAO and DOJ and DHS OIG on immigration benefits processing, fraud and security checks, and the management of immigration programs; and other related reports and articles.

During our review we conducted over 125 interviews and teleconferences. The majority of the interviews took place during our site visits to three USCIS service centers, four district offices, two asylum offices, two application support centers, and two file storage facilities. We spoke with senior officials at USCIS headquarters and at the Department of State, FBI, the Directorate of Border and Transportation Security, ICE, EOIR, and US-VISIT.

As part of our data analysis, we sampled over 600 immigration and asylum files for evidence of security check completion. Focusing on applications USCIS approved in FY 2004, we selected a random sample of eight different form types for which USCIS does not provide monthly, national quality assurance checks. These included two asylum-related forms that receive 100 percent supervisory review of security check completion. Based on inspector judgment, we sampled approximately 300 forms at each of two sites: the National Records Center (five form types) and the Harrisonburg storage facility (three form types).

Our fieldwork was conducted from October 2004 to March 2005. The review was conducted under the authority of the *Inspector General Act of 1978*, as amended, and according to the *Quality Standards for Inspections* issued by the President's Council on Integrity and Efficiency.

Appendix B
Management Response to Draft Report

---

OCT-06-2005  10:45        INS / MGT RES STAFF                        202 514 8667    P.02/07



U.S. Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, D.C. 20529

**U.S. Citizenship
and Immigration
Services**

**To:**    Robert L. Ashbaugh
        Assistant Inspector General
        Inspections and Special Reviews

**From:**  Robert C. Divine    *RCD*
        Acting Deputy Director

**Date:**    OCT  5  2005

**Re:**    Comments on OIG Draft Report:  A Review of U.S. Citizenship and Immigration Services'
        Alien Security Checks

We appreciate the opportunity to review and comment on the subject report.  As the report noted, we
have made many changes over the past few years to improve the adequacy of security checks, detect
applicants who pose risks to national security and public safety and ensure that benefits are granted
only to eligible applicants.  Security checks support the Department of Homeland Security's goal of
ensuring the security and integrity of the immigration system.  However, as discussed throughout the
report, we need to improve how we conduct this process, in order to increase efficiencies and
effectiveness.  Your report has highlighted a number of areas where we need to improve to include
consolidating the management of this function into one office, ensuring that guidance to the field is
clear, updated and available, and monitoring compliance with such guidance.  Fundamental to
changing the process is the need for better automated tools which are currently completing
development and which should provide the staff with needed and timely information.  USCIS plans to
continue to pursue the issue of obtaining automatic updates from other agencies if there are changes
in a person's criminal history and national security considerations.  Only with this can the
Department, Congress, and the public be assured that we have information available to fully address
the Department's goals.

**Recommendation 1.  Expand the use of biometric identification in security checks, as consistent
with risk assessment.**

**Agree.**  As stated in the report only applications related to asylum use biometrics to validate identity.
However, our plans for transforming the way we do business will emphasize the requirement for
early biometric collection from which to confirm identity.  In doing this, we will work with the
Department to establish a standard to collect core biometrics and biographic data on our customers at
their first contacts with the Department of State, U.S. Customs and Border Protection, U.S.
Immigration and Customs Enforcement, or us.  Until this can be done, we will collect the information

Appendix B
Management Response to Draft Report

---

OCT-06-2005  10:45        INS / MGT RES STAFF                202 514 8667   P.03/07

Robert L. Ashbaugh
Comments on OIG Draft Report:  A Review of U.S. Citizenship and Immigration Services' Alien
Security Checks
Page 2

for our customers when they first apply for a benefit, connect the customer's biometric to a unique
account number, and use the biometric to verify customer identity for subsequent steps and services.
We are in the preliminary stages of planning, but anticipate this concept will be used as the business
model for the Temporary Worker Program.

**Recommendation 2.  Establish a comprehensive, risk-based plan for the selection and completion
of security checks.**

**Agree:** We have begun expanding the use of biometrics for conducting security checks to other
applications.  In January 2005, we began requiring Temporary Protected Status applicants to undergo
a new fingerprint check regardless of prior status and in May 2005, the same requirement was applied
to applicants seeking a replacement Alien Registration Card.  Effective September 19, 2005, the Office
of Fraud Detection and National Security, has been designated the lead on all security check-related
activities within USCIS.  This office will prepare a comprehensive plan that will outline how, when,
and for what benefits expansion of the use of biometric checks should occur based on risk assessments
that are already underway.  This plan will assign responsibilities, timelines and milestones for
implementation.

**Recommendation 3:  Set measurable objectives for the conduct and completion of all security
checks and reorganize management controls to ensure objectives are met.**

**Agree.**   As discussed in the report, the most effective controls for ensuring that security checks are
accomplished are embedded into an automated system, as is done with CLAIMS 4 and RAPS.  As we
move forward with our information technology modernization initiatives, this function will be a
requirement within the automated process.  Until this is accomplished, the Background Check System
should allow management to monitor the initiation and completion of security checks.  The Office of
Fraud Detection and National Security will work with the Production Management Division to
establish acceptable quality levels for existing processes and to continually measure compliance against
such levels using information from the Biometric Check System.

With respect to ensuring consistent guidance is available, as part of the plan discussed above, the
Office of Fraud Detection and National Security will take the lead in reviewing and consolidating all
guidance within USCIS that addresses security checks.  Finally, the report identified weaknesses in the
program management information, or lack thereof, over this process.  We agree that we cannot
effectively track adjudication decision that resulted from information derived through the security
check process.  We will start exploring ways to accomplish this function.

**Recommendation 4:  Implement the Background Check Analysis Unit in the Office of Fraud
Detection and National Security.**

**Agree.** Since March 2005, USCIS has required all IBIS hits related to National Security be reported to
the Office of Fraud Detection and National Security for resolution and release for adjudicative action.
The Background Check Analysis Unit was recently created to review, track, and analyze information
submitted under a revised National Security Notification process. In this process, all name-vetted hits

Appendix B
Management Response to Draft Report

---

Robert L. Ashbaugh
Comments on OIG Draft Report:  A Review of U.S. Citizenship and Immigration Services' Alien
Security Checks
Page 3

related to national security are forwarded to the Background Check Analysis Unit for review and
resolution.

**Recommendation 5:  Implement an automated system that stores applicants' biometric
information and supports its use in security checks.**

**Agree.**  As mentioned in the report, the Biometric Storage System will retain fingerprints, photographs
and signatures for screening.  This system will be deployed in the fourth quarter, FY 2006.

**Recommendation 6:  Implement an automated system that supports running, documenting,
reviewing, and monitoring security checks.**

**Agree.**  The Background Check System will centralize records checks, reducing duplication of checks
and supporting check reviews.  The Background Check System will be deployed in the third quarter,
FY 2006.

**Recommendation 7:  Define accountability and timeliness for implementing changes to the
security check process that include the development of the plan for completion of security checks,
check completion objectives, and reorganized management controls.**

**Agree.**  As discussed in the comments provided for recommendation 2, the Office of Fraud Detection
and National Security will develop such a plan.

We want to express our appreciation to Wynne Krause and her team for the work they did in this
highly critical and complex area.  If you have any questions please contact Kathleen Stanley, USCIS
Audit Liaison, at 202-272-1982.

Appendix C
Security Checks for USCIS Immigration Forms

---

Figure 4:   Security Checks for USCIS Immigration Forms

| FORM TITLE | FY 2004 Application Receipts[41] | FY 2004 Application Completions[42] | IBIS Name Check | FBI Finger- print Check | FBI Name Check | IDENT Asylum |
|---|---|---|---|---|---|---|
| **I-765** *Application for Employment Authorization* | 1,555,176 | 1,919,980 | yes | | | |
| **I-90** *Application to Replace Permanent Resident Card* | 624,583 | 1,111,469 | yes | yes | | |
| **I-130** *Petition for Alien Relative* | 712,320 | 831,042 | yes | | | |
| **I-485** *Application to Register Permanent Residence or to Adjust Status* | 605,505 | 742,333 | yes | yes | yes | |
| **N-400** *Application for Naturalization* | 662,788 | 639,377 | yes | yes | yes | |
| **I-131** *Application for Travel Document* | 437,441 | 557,193 | yes | | | |
| **I-129** *Petition for a Nonimmigrant Worker* | 418,125 | 433,744 | yes[43] | | | |
| **I-539** *Application to Extend/Change Nonimmigrant Status (Supp A also)* | 251,735 | 280,687 | yes | | | |
| **I-751** *Petition to Remove the Conditions on Residence* | 175,324 | 137,875 | yes | | | |
| **I-821** *Application for Temporary Protected Status* | 13,826 | 126,493 | yes | yes | | |
| **I-589** *Application for Asylum and Withholding of Removal* | 32,859[44] | 110,646 | yes | yes | yes | yes |
| **I-140** *Immigrant Petition for Alien Worker* | 80,348 | 85,844 | yes | | | |
| **N-600** *Application for Certification of Citizenship* | 57,803 | 66,513 | yes | | | |
| **I-824** *Application for Action on an Approved Application or Petition* | 29,140 | 37,253 | yes | | | |
| **I-881** *Application for Suspension of Deportation or Special Rule Cancellation of Removal (NACARA)* | 12,368[45] | 35,441 | yes | yes | yes | yes |

---

[41] USCIS Performance Analysis System data.
[42] USCIS Performance Analysis System data.
[43] Unnamed applicants on blanket petitions do not receive IBIS checks.
[44] RAPS data.
[45] RAPS data.

Appendix C
Security Checks for USCIS Immigration Forms

| FORM TITLE | FY 2004 Application Receipts[41] | FY 2004 Application Completions[42] | IBIS Name Check | FBI Finger-print Check | FBI Name Check | IDENT Asylum |
|---|---|---|---|---|---|---|
| **I-730** Refugee/Asylee Relative Petition | 26,715 | 33,377 | yes | | | |
| **N-565** Application for Replacement Naturalization/ Citizenship Document | 29,405 | 30,740 | yes | | | |
| **I-600** Petition to Classify Orphan as an Immediate Relative | 28,066 | 29,913 | yes | yes | | |
| **I-102** Application for Replacement/ Initial Nonimmigrant Arrival/ Departure Document | 20,231 | 23,343 | yes | | | |
| **I-360** Petition for Amerasian, Widow(er), or Special Immigrant | 12,600 | 11,403 | yes | | | |
| **N-336** Request for Hearing on a Decision in Naturalization Proceedings under section 336 of the Act | 9,659 | 10,100 | yes | | | |
| **I-817** Application for Family Unity Benefits | 6,697 | 9,584 | yes | yes | | |
| **I-698** Application to Adjust Status From Temporary to Permanent Resident (IRCA applicants) | 226 | 944 | yes | | | |
| **N-300** Application to File Declaration of Intention | 205 | 753 | yes | | | |
| **N-470** Application to Preserve Residence for Naturalization Purposes | 579 | 537 | yes | | | |
| **I-914** Application for T Nonimmigrant Status (supporting form -B, family form -A) | 566 | 507 | yes | yes | | |
| **I-690** Application for Waiver of Grounds of Excludability under sections 245A or 210 of the Immigration and Nationality Act | 393 | 316 | yes | | | |
| **I-829** Petition by Entrepreneur to Remove Conditions | 123 | 310 | yes | | | |
| **I-526** Immigrant Petition By Alien Entrepreneur | 247 | 290 | yes | | | |
| **I-694** Notice of Appeal of Decision | 155 | 248 | yes | | | |
| **I-914A** Application for T Nonimmigrant Status (family form -A) | 86 | 117 | yes | yes | | |
| **N-644** Application for Posthumous Citizenship | 9 | 3 | yes | | | |

Appendix C
Security Checks for USCIS Immigration Forms

| FORM<br>*TITLE* | FY 2004<br>Application<br>Receipts[41] | FY 2004<br>Application<br>Completions[42] | IBIS<br>Name<br>Check | FBI<br>Finger-<br>print<br>Check | FBI<br>Name<br>Check | IDENT<br>Asylum |
|---|---|---|---|---|---|---|
| **I-192**<br>*Application for Advance Permission to Enter as Nonimmigrant* | data not available | data not available | yes | yes | yes | |
| **I-212**<br>*Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal* | data not available | data not available | yes | | | |
| **I-600A**<br>*Application for Advance Processing of Orphan Petition* | data not available | data not available | yes | yes | | |
| **I-601**<br>*Application for Waiver of Grounds of Excludability* | data not available | data not available | yes | yes | yes | |
| **I-602**<br>*Application By Refugee For Waiver of Grounds of Excludability* | data not available | data not available | yes | | | |
| **I-612**<br>*Application for Waiver of the Foreign Residence Requirement* | data not available | data not available | yes | | | |
| **I-94**<br>*Arrival-Departure Record* | data not available | data not available | yes | | | |

In addition to security checks performed on people, USCIS may conduct security checks on businesses (for example, those submitting an I-129, *Petition for Nonimmigrant Worker*) and schools (for example, those submitting an I-17, *School Approval*).

Appendix D
Major Contributors to Report

---

### **Office of Inspections**

Douglas Ellice, Chief Inspector
Randall Bibby, Chief Inspector
David M. Hiles, Chief Inspector
Wynne Krause, Inspector
Kirsten Murray, Inspector
Melissa Keaster, Inspector

Appendix E
Report Distribution

---

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
General Counsel
Executive Secretariat
Under Secretary, Border and Transportation Security
Director, Bureau of Citizenship and Immigration Services
Assistant Secretary, Public Affairs
Assistant Secretary, Legislative Affairs
Assistant Secretary of Policy
Deputy Chief Security Officer
OIG Audit Liaison
CIS Audit Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Program Examiner

**Congress**

Congressional Oversight and Appropriations Committees

**Additional Information and Copies**

To obtain additional copies of this report, call the Office of Inspector General (OIG) at (202) 254-4100, fax your request to (202) 254-4285, or visit the OIG web site at www.dhs.gov/oig.

**OIG Hotline**

To report alleged fraud, waste, abuse or mismanagement, or any other kind of criminal or noncriminal misconduct relative to department programs or operations, call the OIG Hotline at 1-800-323-8603; or write to Department of Homeland Security, Washington, DC 20528, Attn: Office of Inspector General, Investigations Division – Hotline.  The OIG seeks to protect the identity of each writer and caller.

# Exhibit 15

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VICTOR MOCANU                          CIVIL ACTION
                                       No.  07-0445
          V.
ROBERT S. MUELLER, ET AL.

GUISEPPE CUSUMANO                      CIVIL ACTION
                                       No.  07-0971
          V.
MICHAEL B. MUKASEY, ET AL.

MOHAMMAD BARIKBIN                      CIVIL ACTION
                                       No. 07-3223
          V.
UNITED STATES, ET AL.

JEAN ELISSAINT                         CIVIL ACTION
                                       No.  07-4747
          V.
UNITED STATES, et al.

ANDREW O. NEWTON, M.D.                 CIVIL ACTION
                                       No. 07-2859
          V.
DONALD MONICA, et al.

TONGZIAO ZHANG                         CIVIL ACTION
                                       No. 07-2718
          V.
MICHAEL CHERTOFF, et al.

SAID HUSSAIN                           CIVIL ACTION
                                       No. 08-195
          V.
MICHAEL B. MUKASEY, et al.

1

<u>PRAECIPE</u>

TO THE CLERK OF THE COURT:

Kindly file the enclosed Certification of Supplement to the Administrative Record (AR

CIS) and attached Memorandum regarding **Revised National Security Adjudication and**

**Reporting Requirements** issued by USCIS as of February 4, 2008 in the above-captioned cases.

The above-captioned actions were joined by the Honorable Michael Baylson, Judge U.S. District

Court, for consolidated hearing with the other cases captioned on the Administrative Records

previously supplied by FBI and CIS. The purpose of this supplement to the CIS Administrative

Record (AR CIS) is to provide the Court and all counsel of record with a certified copy of the

Revised National Security Adjudication and Reporting Requirements issued by USCIS on

February 4, 2008 which has been sent to all USCIS offices and the FBI (see e-mail Smith to

Cannon at attached AR CIS 0103-0104.

Respectfully submitted,

PATRICK L. MEEHAN
United States Attorney

Virginia A. Gibson
Chief, Civil Division

Date: February 6, 2008

2

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VICTOR MOCANU                                CIVIL ACTION
     V.                                    No. 07-0445

ROBERT S. MUELLER, ET AL.

_____

GUISEPPE CUSUMANO                            CIVIL ACTION
     V.                                    No. 07-0971

MICHAEL B. MUKASEY, ET AL.

_____

MOHAMMAD BARIKBIN                            CIVIL ACTION
     V.                                    No. 07-3223

UNITED STATES, ET AL.

_____

JEAN ELISSAINT                               CIVIL ACTION
     V.                                    No. 07-4747

UNITED STATES, et al.

_____

HASSAIN                                      CIVIL ACTION
     V.                                    No. 08-195

MUKASEY, et al.

_____

ANDREW O. NEWTON, M.D.
     V.                                    CIVIL ACTION
                                             No. 07-2859
DONALD MONICA, et al.

_____

TONGZIAO ZHANG                        CIVIL ACTION
                                      No. 07-2718
      V.

MICHAEL CHERTOFF, et al.

_____

SAID HUSSAIN                          CIVIL ACTION
                                      No. 08-195

      v.

MICHAEL B. MUKASEY, et al.

## CERTIFICATION OF SUPPLEMENT TO THE ADMINISTRATIVE RECORD

Gregory Smith, pursuant to 28 U.S.C. § 1746, declares the following:

1. I am currently employed as the Acting Associate Director of the National Security and Records Verification Directorate of U.S. Citizenship and Immigration Services (USCIS), an agency within the U.S. Department of Homeland Security (DHS). My duty station is presently Washington, D.C.

2. I have been employed as the Associate Director since May 28, 2007. I have been employed by USCIS since March 2003, when the agency was created. My current duties include the management of the National Security and Records Verification Directorate, which includes individuals who work to resolve national security background check issues in the context of adjudicating applications and petitions for immigration benefits.

3. Due to the nature of my official duties, I am familiar with the procedures for investigation and examination of applicants for naturalization and adjustment of status and the communications between USCIS and the Federal Bureau of Investigation, which conducts name checks on applicants.

AR CIS 0098

4. I have reviewed information about the name check process, USCIS policy on name checks, and other USCIS system of records, and I designated the Supplement to the Administrative Record in this case. This information was created in the regular course of USCIS business.

AR CIS 0099

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.

Executed this          day of February 2008.

GREGORY SMITH
Acting Associate Director
National Security and Record Verification
Directorate
United States Citizenship and Immigration
Services
Washington, D.C.

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Domestic Operations of Directorate*
Washington, DC 20529



**U.S. Citizenship
and Immigration
Services**

**FEB 4 - 2008**

HQ 70/23 & 70/28.1

## Interoffice Memorandum

**TO:**        Field Leadership

**FROM:**    Michael Aytes
            Associate Director, Domestic Operations

**SUBJECT:**  Revised National Security Adjudication and Reporting Requirements

**Background**

U.S. Citizenship and Immigration Services (USCIS) conducts background checks on all applicants, petitioners, and beneficiaries seeking immigration benefits. This is done both to enhance national security and to ensure the integrity of the immigration process. USCIS has previously mandated that FBI name checks be completed and resolved before any positive adjudication can proceed on certain form types. This memorandum modifies existing guidance for applications where statutory immigration provisions allow for the detention and removal of an alien who is the subject of actionable information that is received from the FBI or other law enforcement agencies after approval of the application.

USCIS is issuing revised guidance in response to recommendations of the DHS Office of Inspector General (OIG-06-06) regarding the need to align the agency's background and security check policies with those of U.S. Immigration and Customs Enforcement (ICE). The *Background and Security Investigations in Proceedings Before Immigration Judges and the Board of Immigration Appeals* regulations prevent immigration judges and the Board of Immigration Appeals (BIA) from granting benefits to aliens before DHS confirms that all background and security checks have been completed. *See* 8 C.F.R. § 1003.47(g); 8 C.F.R. § 1003.1(d)(6)(i). In the context of removal proceedings, ICE has determined that FBI fingerprint checks and Interagency Border Inspection Services (IBIS) checks are the required security checks for purposes of the applicable regulations. In the unlikely event that FBI name checks reveal actionable information after the immigration judge grants an alien permanent resident status, DHS may detain and initiate removal proceedings against the permanent resident. *See* 8 U.S.C. § 1227; *see also* 8 U.S.C. § 1256 (allowing DHS to rescind an alien's adjustment of status).

www.uscis.gov

AR CIS 0101

**Revised National Security Adjudication and Reporting Requirements**
Page 2

**Revised Guidance**

A definitive FBI fingerprint check and the IBIS check must be obtained and resolved before an Application for Adjustment of Status (I-485), Application for Waiver of Ground of Inadmissibility (I-601), Application for Status as a Temporary Resident Under Section 245A of the Immigration and Nationality Act (I-687), or Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of Public Law 99-603) (I-698) is approved. USCIS will continue to initiate FBI name checks when those applications are received. Where the application is otherwise approvable and the FBI name check request has been pending for more than 180 days, the adjudicator shall approve the I-485, I-601, I-687, or I-698 and proceed with card issuance. The FBI has committed to providing FBI name check results within this timeframe.

There is no change in the requirement that FBI fingerprint check, IBIS check and FBI name check results be obtained and resolved prior to the adjudication of an Application for Naturalization (N-400).

Pending further guidance regarding post-audit reporting and tracking requirements and modifications to associated quality assurance procedures, applications approved pursuant to this memorandum shall be held at the adjudicating office. If derogatory or adverse information is received from the FBI after the application is approved, USCIS will determine if rescission or removal proceedings are appropriate and warranted.

Subject to the reporting requirements set forth in the February 16, 2007, memorandum titled "FBI Name Checks Policy and Process Clarification for Domestic Operations," an application or petition may be denied, dismissed, administratively closed, withdrawn, or referred to the Immigration Court at any time.

Questions regarding this memorandum should be directed through appropriate supervisory and operational channels. Local offices should work through their chain of command.

Distribution List:
Regional Directors
Service Center Directors
District Directors (except foreign)
Field Officer Directors (except foreign)
National Benefits Center Director

**From:** Smith, Gregory B
**Sent:** Tuesday, February 05, 2008 11:40 AM
**To:** Cannon, Michael
**Subject:** Revised USCIS Name Check Guidance

Michael,

Thank you for meeting last week to discuss our mutual efforts to address the FBI name check backlog.

I am attaching revised guidance that USCIS will distribute to the field today. Under the revised guidance, a definitive FBI fingerprint check and the IBIS check must be obtained and resolved before an adjustment of status application is approved. USCIS will continue to initiate FBI name checks when those applications are received. Where the application is otherwise approvable and the FBI name check request has been pending for more than 180 days, the adjudicator shall approve the adjustment of status application.

The overwhelming majority of FBI name checks are completed within six months, and it is the goal to complete all FBI name checks within that time frame. While USCIS would prefer to have the FBI name check results before approving the application (and *will* have the results as the FBI meets its processing goals), the alien is already in the United States and DHS is able to detain and remove the alien irrespective of whether the adjustment application has been approved or remains pending.

The revised guidance does not make any changes to naturalization applications. USCIS will continue to require that FBI fingerprint check, IBIS check and FBI name check results be obtained and resolved prior to the adjudication of an application for naturalization. It is exceedingly difficult to denaturalize a citizen, and it is imperative that we protect the integrity of the naturalization process.

However, USCIS will prioritize allocation of additional appropriations (i.e. a significant percentage of the $20 million in the DHS appropriations bill) to addressing FBI name checks that delay adjudication of naturalization applications. Existing resources should not be diverted from pending adjustment of status name checks, but new resources should be directed to resolving those checks that hold up the oldest naturalization applications. All available options should be explored, including the use of additional contractors, shift work, rehired annuitants, and any other tools designed to decrease case processing times and increase productivity without sacrificing quality controls.

USCIS has previously requested that the FBI provide a detailed and reliable plan for linking additional resources to measurable improvements in FBI name check process. USCIS looks forward to working with you to develop that plan. USCIS has committed to addressing the backlog of pending naturalization applications, and dedicating additional resources to tackle the FBI name check issue is critical to the agency's success.

Regards,

Greg

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I served a true and correct copy of the Praecipe to file the

Certification of Supplement to the Administrative Record (AR CIS 0097-0102) and attached

Memorandum regarding **Revised National Security Adjudication and Reporting**

**Requirements** issued by USCIS as of February 4, 2008 first class mail, postage prepaid, on the

following:

**Laraine A. Ryan, Esq.**
1601 MILLTOWN RD., STE 8
POBOX 5733
WILMINGTON, DE 19808
(Said Hussain)

**Daniel Sansoni, Esquire**
8040 Roosevelt Boulevard
Suite 218
Philadelphia, PA  19152
(Jean Eliassaint)

**Jon Landau, Esquire**
Baumann, De Seve & Landau
510 Walnut Street
Suite 1340
Penn Mutual Building
Philadelphia PA 19106
(Mohammed Barikbin)

**Daniel George Anna, Esquire**
533 A Darlington Road
Media, PA  19063
(Andrew O. Newton, MD)

**Tongxiao Zhang**, Pro Se
26 Adamson Court
Phoenixville, PA  19460

**Ephraim Tahir Mella, Esquire**
Law Offices of Ephraim Tahir Mella
1814 Callowhill Street, 1st Floor
Philadelphia, PA 19130
(Guiseppe Cusumano)

**David Kaplan , Esquire**
Orlow & Orlow, P.C.
620 Chestnut Street
Suite 656
Philadelphia, PA 19106
(Victor Mocanu)

# Exhibit 16



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Domestic Operations of Directorate*
Washington, DC 20529

**U.S. Citizenship
and Immigration
Services**

FEB 4 - 2008

HQ 70/23 & 70/28.1

# Interoffice Memorandum

**TO:**        Field Leadership

**FROM:**    Michael Aytes
Associate Director, Domestic Operations

**SUBJECT:**   Revised National Security Adjudication and Reporting Requirements

**Background**

U.S. Citizenship and Immigration Services (USCIS) conducts background checks on all applicants, petitioners, and beneficiaries seeking immigration benefits. This is done both to enhance national security and to ensure the integrity of the immigration process. USCIS has previously mandated that FBI name checks be completed and resolved before any positive adjudication can proceed on certain form types. This memorandum modifies existing guidance for applications where statutory immigration provisions allow for the detention and removal of an alien who is the subject of actionable information that is received from the FBI or other law enforcement agencies after approval of the application.

USCIS is issuing revised guidance in response to recommendations of the DHS Office of Inspector General (OIG-06-06) regarding the need to align the agency's background and security check policies with those of U.S. Immigration and Customs Enforcement (ICE). The *Background and Security Investigations in Proceedings Before Immigration Judges and the Board of Immigration Appeals* regulations prevent immigration judges and the Board of Immigration Appeals (BIA) from granting benefits to aliens before DHS confirms that all background and security checks have been completed. *See* 8 C.F.R. § 1003.47(g); 8 C.F.R. § 1003.1(d)(6)(i). In the context of removal proceedings, ICE has determined that FBI fingerprint checks and Interagency Border Inspection Services (IBIS) checks are the required security checks for purposes of the applicable regulations. In the unlikely event that FBI name checks reveal actionable information after the immigration judge grants an alien permanent resident status, DHS may detain and initiate removal proceedings against the permanent resident. *See* 8 U.S.C. § 1227; *see also* 8 U.S.C. § 1256 (allowing DHS to rescind an alien's adjustment of status).

**Revised National Security Adjudication and Reporting Requirements**
Page 2

**Revised Guidance**

A definitive FBI fingerprint check and the IBIS check must be obtained and resolved before an Application for Adjustment of Status (I-485), Application for Waiver of Ground of Inadmissibility (I-601), Application for Status as a Temporary Resident Under Section 245A of the Immigration and Nationality Act (I-687), or Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of Public Law 99-603) (I-698) is approved. USCIS will continue to initiate FBI name checks when those applications are received. Where the application is otherwise approvable and the FBI name check request has been pending for more than 180 days, the adjudicator shall approve the I-485, I-601, I-687, or I-698 and proceed with card issuance. The FBI has committed to providing FBI name check results within this timeframe.

There is no change in the requirement that FBI fingerprint check, IBIS check and FBI name check results be obtained and resolved prior to the adjudication of an Application for Naturalization (N-400).

Pending further guidance regarding post-audit reporting and tracking requirements and modifications to associated quality assurance procedures, applications approved pursuant to this memorandum shall be held at the adjudicating office. If derogatory or adverse information is received from the FBI after the application is approved, USCIS will determine if rescission or removal proceedings are appropriate and warranted.

Subject to the reporting requirements set forth in the February 16, 2007, memorandum titled "FBI Name Checks Policy and Process Clarification for Domestic Operations," an application or petition may be denied, dismissed, administratively closed, withdrawn, or referred to the Immigration Court at any time.

Questions regarding this memorandum should be directed through appropriate supervisory and operational channels. Local offices should work through their chain of command.

Distribution List:
Regional Directors
Service Center Directors
District Directors (except foreign)
Field Officer Directors (except foreign)
National Benefits Center Director